UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | * | |
| DAIRY FARMERS OF AMERICA, INC., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 22-cv-10422-ADB |
| | * | |
| BERNON LAND TRUST, LLC, | * | |
| | * | |
| Defendant. | * | |
| | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Plaintiff Dairy Farmers of America, Inc. ("DFA") filed this action against Defendant

Bernon Land Trust, LLC ("Trust") alleging two breach of contract claims. [ECF No. 9

("Amended Complaint" or "Am. Compl.")].  DFA's first claim relates to the Trust's failure to

sell and convey to DFA a parcel of land and its premises in Franklin, Massachusetts ("Franklin

Premises"), in breach of an option to purchase that was allegedly assigned to DFA through a

bankruptcy proceeding.  [Id.].  The second claim relates to the Trust's demand for allegedly

excessive rents under a lease agreement for the same premises.  [Id.].  The Trust, in turn, filed

two declaratory judgment counterclaims.  [ECF No. 11].  Currently pending before the Court are

DFA's motion for summary judgment, [ECF No. 31], and the Trust's cross motion for partial

summary judgment, [ECF No. 50].  For the following reasons, both motions are DENIED.

## I.      BACKGROUND

### A.      Factual Summary

Except as otherwise noted, the following facts are not in dispute.[1]

#### 1.      Garelick Brothers Farm and the Bernon Land Trust

In the 1930s, Israel and Max Garelick purchased a farm, that would become the Franklin Premises, at 1199 West Central Street in Franklin, Massachusetts, and founded Garelick Brothers Farm, which was eventually re-organized into Garelick Farms, Inc. ("Garelick") in 1973.  [Trust CSOF ¶¶ 1, 8].  In the 1940s, "Garelick Brothers Farms was run by Israel Garelick, his son Daniel, and his son-in-law Paul Bernon [husband to Israel's daughter, Elinor]. . . . Israel owned all of the preferred stock in Garelick Brothers Farms, and Daniel Garelick and Paul Bernon equally owned the common stock."  [Id. ¶¶ 2, 4].  In quick succession Daniel, Paul Bernon, and Israel died: Daniel in 1968, Paul Bernon in 1969, and Israel in 1970.  [Id. ¶¶ 3–6].

Upon Daniel's death, "all of his interests in Garelick Brothers Farms common stock passed to Paul Bernon."  [Trust CSOF ¶ 3].  "When Paul Bernon died, Elinor inherited approximately 50% of the common stock, with the rest of the common stock split among her and Paul's children—Peter Bernon, Ronnie Bernon Gallina, Alan Bernon, and Jonathan Bernon."  [Id. ¶ 5].  Shortly before Israel's death, Elinor also purchased the preferred stock in Garelick

_____

[1] The Court draws the facts from the Combined Rule 56.1 Statement, [ECF No. 73], filed by the Trust, which combines DFA's Revised Rule 56.1 Statement of Material Facts in Support of Its Motion for Summary Judgment ("DFA SOF"), [ECF No. 41]; the Trust's Responses to the DFA SOF and Rule 56.1 Counterstatement of Material Facts ("Trust CSOF"), [ECF No. 52]; DFA's Responses to the Trust CSOF and DFA's Supplemental Statement of Material Facts in Support of its Motion for Summary Judgment and in Opposition to BLT's Cross Motion for Partial Summary Judgment ("DFA Supp. SOF"), [ECF No. 64]; and the Trust's Responses to the DFA Supp. SOF., [ECF No. 73]; and the documents referenced therein.  These filings contain all of the parties' positions on the material facts.  References to paragraph numbers include both the statement and response.  Limited parts of those public filings have been redacted, but unredacted filings have been provided to the Court under seal.

Brothers Farms from him.  [Id. ¶ 6].  Also after Paul Bernon's death, in 1970, Garelick Brother

Farms conveyed its land, which included the Franklin Premises, to the executors of Paul

Bernon's will.  [Id. ¶ 9].  On January 4, 1977, the executors of Paul Bernon's will established the

first Bernon Land Trust (collectively with its successor entities, the Trust).  [Id. ¶ 10].  The

"Trust Estate" included the Franklin Premises.  [Id. ¶ 12].  As of 1985, the beneficiaries of the

Trust were Elinor, and her and Paul Bernon's children, Peter, Alan, Jonathan, and Ronnie.  [Id.

¶¶ 13–14].

        2.    The Lease

On December 30, 1986, the Trust, as landlord, and Garelick, as tenant, entered into a

commercial lease agreement ("Lease") for the Franklin Premises, which was defined as the

"approximately 195 acres of land, including the buildings and improvements thereon, in

Franklin, Massachusetts . . . at 1199 West Central Street in Franklin, Massachusetts."  [Trust

CSOF ¶ 28].  The Lease provided for an initial lease term of five years, running from March 1,

1987 to February 29, 1992; gives the tenant an option to renew the Lease for "nineteen (19)

additional successive terms of five (5) years"; and provides that "[u]nless Tenant notifies

Landlord in writing not less than six (6) months prior to the end of the then current term that

Tenant elects not to renew this Lease, Tenant shall be deemed to have elected to renew for an

additional term of five (5) years."  [DFA SOF ¶¶ 3–4; ECF No. 9-1].

As to rent, the Lease states that "[t]he fixed annual rental for each five (5) year option

period shall be equal to the lesser of (a) one hundred fifteen percent (115%) of the fixed annual

rental payable during the preceding five (5) year period, multiplied by the change in the Cost of

Living, measured by the Consumer Price Index (the 'Index')."  [ECF No. 9-1 § 3.02].[2]

The Lease also includes an "Option to Purchase" the Franklin Premises, for $20,000 per acre, "[c]ontemporaneously with or within six (6) months following the sale or transfer of a majority of the stock or the assets of Tenant [Garelick] to owners unrelated by blood or marriage to Peter M. Bernon, Alan J. Bernon, or Jonathan R. Bernon."  [ECF No. 9-1, art. 27].

3.   The Purchase Option

On July 30, 1997, Robert Berkelhammer, in his capacity as Trustee of the Trust, and Garelick entered into an "Option to Purchase" the Franklin Premises (the "Purchase Option"). See [ECF No. 9-2; see also [DFA SOF ¶ 5].  Alan Bernon, also a beneficiary of the Trust, [id. ¶ 2], signed the Purchase Option on Garelick's behalf, as President of Garelick, [id. ¶ 8].  The Purchase Option grants "to Garelick an exclusive and irrevocable option to purchase" the Franklin Premises for "ten (10) times the then current annual rental amount in effect under the Lease at the time the Option is exercised."  [ECF No. 9-2 ¶¶ 1, 4].  The Purchase Option "is exercisable by written notice . . . given to the Trust at least 6 months and no more than 12 months prior to the expiration of the Lease, as extended pursuant to the Lease Extension or as thereafter extended in accordance with the Lease . . . ."  [Id. ¶ 3].  There is no other time limit placed on the exercise of the Purchase Option.

Although the Purchase Option references the Lease in the above quoted provisions and elsewhere, e.g., [ECF No. 9-2 ¶ 2 ("Garelick agrees to extend the Lease for not less than two (2) additional 5-year option periods . . . )], its terms do not expressly amend the Option to Purchase contained in the Lease.  See generally [id.].  The Purchase Option also provides that it "is to take

---

[2] As further discussed infra, this provision appears to contain a drafting error, since the use of the term "lesser of (a)" suggests an option (b) for calculating rent, but there is no option (b) described in the Lease.

effect as a sealed instrument, sets forth the entire agreement between the parties, is binding upon and inures to the benefit of the parties hereto, and their respective permitted successors and assigns, and may be canceled, modified or amended only by a written instrument executed by both the Trust and Garelick."  [Id. ¶ 12].

Finally, the Purchase Option includes a provision entitled "No Assignment," which specifies that "Garelick may not assign its rights under this Option to Purchase except that Garelick may assign this Option to Purchase to a related entity or affiliate of Garelick."  [ECF No. 9-2 ¶ 13].

### 4.    The 1997 Suiza Stock Purchase Agreement

Pursuant to a Stock Purchase Agreement, executed June 20, 1997, Suiza Food Corporation ("Suiza") agreed to purchase "all issued and outstanding stock" of Garelick, three other "Fluids Companies," and seventeen "Plastics Companies" ("1997 Suiza SPA").  [DFA SOF ¶¶ 10–11; ECF No. 56-1].  The 1997 Suiza SPA identifies Suiza as the "Buyer" and Garelick, the three other fluids companies, the seventeen plastics companies, and "the parties whose names are set forth on Exhibit A," which includes Peter M. Bernon, Alan J. Bernon, and trusts established for the benefit of the children of Alan and Peter Bernon, as the "Sellers." [Trust CSOF ¶¶ 45–47; ECF No. 56-3].  The sale closed on July 31, 1997, the day after the Purchase Option was executed.  [DFA SOF ¶¶ 5, 10].

The 1997 Suiza SPA stipulates that "Garelick and The Bernon Land Trust shall have entered into a real estate purchase option agreement containing the terms set forth on Schedule 6.02(1) of the Disclosure Schedule and Fairdale [one of the fluids companies] shall have acquired the real estate it currently occupies."  [ECF No. 56-1 § 6.02(1)].  Schedule 6.02(1) of the Disclosure Schedule, titled "Lease and Option Agreement Term Sheet" indicated that

"Robert Berkelhammer, in his capacity as Trustee of the Bernon Land Trust" was the "Seller"
and "Garelick Farms, Inc." the "Buyer," and that "Buyer may not assign its rights under the
Option Agreement."  [ECF No. 56-2].

5.    Subsequent Corporate Transaction History

The parties dispute the transaction history that followed, and its consequences for the
assignment of the Purchase Option.  DFA asserts:

> In December of 1998, Suiza merged [Garelick] into another related entity, one of
> its subsidiaries known as **Suiza GTL, LLC**, a joint venture.  A year later, all
> membership interests in Suiza GTL, LLC, which were held by various Suiza
> entities as well as [DFA] and two [DFA]-related entities, were placed into a new
> joint venture named **Suiza Fluid Dairy Group, L.P.**  The various entities that had
> held membership interests in Suiza GTL, LLC, received membership interests in
> Suiza Fluid Dairy Group, L.P., Suiza GTL, LLC's new parent organization, as part
> of this deal.
>
> In February of 2000, Suiza Fluid Dairy Group, L.P. changed its name to **Suiza
> Dairy Group, L.P.**  In December of 2001, Suiza GTL, LLC's ultimate parent
> organization, Suiza, merged with, and took the name of, **Dean Foods Company**.
> As part of this merger, all outstanding membership interests in Suiza Dairy Group,
> L.P. not held by Suiza Foods Corporation (now Dean Foods Company), were
> reacquired, such that **Suiza, Dairy Group, L.P. and its subsidiary, Suiza GTL,
> LLC, were fully owned by the new Dean Foods Company**.
>
> On the same day, Suiza GTL, LLC changed its name to **Dean Northeast, LLC**
> (d/b/a Garelick Farms).  Coming full circle in April of 2006, Dean Northeast, LLC
> (d/b/a Garelick Farms) was renamed **Garelick Farms, LLC**.
>
>  …
>
> Thirteen years later, on November 12, 2019, Dean Foods Company and
> substantially all of its wholly-owned subsidiaries, including Garelick Farms, LLC,
> filed for Chapter 11 bankruptcy in the Southern District of Texas.  During these
> bankruptcy proceedings, **[DFA] purchased substantially all of the assets of
> Garelick Farms, LLC**, along with a number of other Dean Foods Company
> entities, with the approval of the bankruptcy court.

[ECF No. 39 at 8–9 (internal citations omitted)].  The Trust objected to the transfer of both the
Lease and Purchase Option from Garelick Farms, LLC to DFA.  [DFA SOF ¶ 38; Trust CSOF
¶ 135].  The bankruptcy court held a hearing on the Trust's objections.  [DFA SOF ¶ 39; Trust

6

CSOF ¶ 136].  At the hearing, the court approved the assumption and assignment of both the

Lease and Purchase Option to DFA, under the bankruptcy code.  [DFA SOF ¶ 39; Trust CSOF

¶ 136].  The court further stated that "[n]otwithstanding entry of this Order, all rights of DFA and

[the Trust] under the Lease and Option, including with respect to the enforceability or validity

thereof under non-bankruptcy law, are preserved."  [DFA SOF ¶ 42; Trust CSOF ¶ 136].

     DFA further asserts that "through [this] series of corporate re-organizations . . . the

Purchase Option was originally re-assigned from [Garelick] to [Suiza,] . . . and then to various

related Suiza-operated entities, which were subsequently renamed to Dean Foods after Dean

Foods acquired Suiza," all before "the Purchase Option came to be transferred via court order to

[DFA] from Dean Foods as a result of the Southern Foods Group, LLC (d/b/a Dean Foods)

Bankruptcy."  [ECF No. 39 at 11; id. ("As held by the Bankruptcy Court, if the Purchase Option

was valid when Dean Foods Company owned it prior to the bankruptcy, then the Purchase

Option is valid when Dairy Farmers owns it, or vice versa.")].

     The Trust responds that "DFA has failed to produce critical documents establishing that

Garelick's interest in the [Purchase] Option passed through Suiza to Dean Foods, including the

Suiza GTL merger agreement and executed (or even draft) versions of multiple assignments

purporting to transfer Suiza's and DFA's interests and assets in Suiza GTL following the 1998

merger."  [ECF No. 51-1 at 24 (citing Trust CSOF ¶¶ 73, 86–87, 89–90, 94–95, 98, 108, 117)].

In reply, DFA presents a slightly different position, that is, that "Suiza, as the parent company of

various Suiza-related entities, continued to own the Purchase Option" and the Purchase Option

did [not] change hands from Garelick to a Suiza subsidiary."  [ECF No. 62 at 11].

        6.    <u>DFA's Attempt to Exercise the Purchase Option</u>

     On August 25, 2021, DFA sent a "Notice of Exercise of Option" to the Trust indicating

that it was seeking to exercise the Purchase Option.  [DFA SOF ¶ 47].  The Notice named a closing date of March 15, 2022 ("Closing Date") at a specific time and place.  [Id.].  On September 1, 2021, the Trust responded to the Notice of Exercise of Option stating that the Purchase Option was void and could not be exercised by DFA.  [Id. ¶ 50].  DFA rejected the Trust's arguments on September 27, 2021 and then made several further attempts to communicate with the Trust, prior to the specified Closing Date.  [Id. ¶¶ 51–52].  On March 15, 2022, the Trust failed to appear at the Closing.  [Id. ¶ 55].

### 7.    2022 Rent Increase

The Monthly rent for the Lease Term 1987–1992 was stipulated in the Lease to be $40,000.  [DFA SOF ¶ 60].  Since then, the Lease has continued to renew every five years, [DFA SOF ¶¶ 58–76], and for all but one of the subsequent lease terms (1997–2002), the rent was calculated by multiplying the rent charged in the previous term by 115% or the change in the Cost of Living.  [Id. ¶¶ 58–76].  The rent charged for the Lease Term 1997–2002 was "slightly less than a 115% increase in the previous term's rent (46,000.00 x 1.15 = 52,900)."  [Id. ¶ 63].  "The Trust is not aware of how rent was calculated for this term."  [Id. ¶ 64].

The bankruptcy court assigned DFA the Lease during the 2017–2022 term, which ran through February 28, 2022.  [Trust CSOF ¶ 158].  On March 2, 2022, "the Trust received payment by [DFA] of $80,093.24 – the monthly rental amount for the seventh term that expired February 28, 2022, calculated by multiplying the sixth term's rent by the change in the Cost of Living (75,481.21 x (705.517/663.891) = 80,093.24)."  [DFA SOF ¶ 77].  On March 14, 2022, the Trust sent DFA a Notice of Default indicating that DFA was "in default under the Lease for underpayment of rent . . . [because] rent for the eighth term for the years 2022 to 2027 was $107,444.96 per month."  [Id. ¶ 77].  The Trust stated that this value reflects the "[p]rior rent

multiplied by the 'change in the Cost of Living,' multiplied by 115%, as provided under the Lease." [Id.].

The following day, DFA "responded . . . that it disagreed with the Trust's calculation of the new rental amount, but would pay 115% of the prior rent, or $92,107.21, to cure any alleged default." [DFA SOF ¶ 84]. On March 23, 2022, the Trust replied that "it would not accept [DFA's] rental calculation, and that [DFA] remained in default . . . ." [Id. ¶ 85]. On March 23, 2022, DFA responded to the Trust, "stating that it agreed to pay, under protest, the full $107,444.96 requested by the Trust" and paid the full amount. [Id. ¶¶ 87–88].

**B.    Procedural Background**

DFA filed its original complaint on March 21, 2022, [ECF No. 1], and the Amended Complaint on May 6, 2022, [ECF No. 9]. As noted above, the Amended Complaint raises two breach-of-contract claims, alleging in Count One that the Trust breached its obligation to sell and convey the Franklin Premises to DFA, pursuant to the Purchase Option, and seeking specific performance; and in Count II that the Trust demanded rent for the Lease Term 2022–2027 in excess of the terms of the Lease. [Id. ¶¶ 42–53]. The Trust answered the Amended Complaint and raised two counterclaims seeking declaratory judgments that the Purchase Option is void and not exercisable by DFA (Counterclaim I), and that DFA is a holdover tenant, the terms of the lease do not "provide for rent in the event of a holdover tenancy," and "the proper amount of holdover rent is $1,289,339.54 annually, or $107,444.96 monthly, as an estimate of market rent" (Counterclaim II). [ECF No. 11 at Counterclaim Compl. ¶¶ 72–86].

On January 25, 2023, DFA moved for summary judgment on both of its claims. [ECF No. 31]. On March 13, 2023, the Trust opposed DFA's motion and filed a cross motion for partial summary judgment in its favor, granting its Counterclaim I and dismissing DFA's Count

I.  [ECF No. 50].  On April 3, 2023, DFA filed an opposition to the Trust's motion for partial summary judgment and a reply in further support of its motion for summary judgment.  [ECF No. 62].  Finally, on April 18, 2023, the Trust filed a reply in further support of its motion for partial summary judgment.  [ECF No. 72].

## II.    LEGAL STANDARD

Summary judgment is appropriate where the movant demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A fact is material if its resolution might affect the outcome of the case under the controlling law."  Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003).  "A genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way."  Id.  When reviewing the record, the court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor."  Id.  The First Circuit has noted that this standard "is favorable to the nonmoving party, but it does not give him a free pass to trial."  Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011).  "The factual conflicts upon which he relies must be both genuine and material," Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012), and the court may discount "conclusory allegations, improbable inferences, and unsupported speculation," Cochran, 328 F.3d at 6 (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

"To succeed in showing that there is no genuine dispute of material fact," the moving party must point to "specific evidence in the record that would be admissible at trial." Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015).  "That is, it must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using

'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" Id. at 4–5 (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986).  Once the movant takes the position that the record fails to make out any trial-worthy question of material fact, "it is the burden of the nonmoving party to proffer facts sufficient to rebut the movant's assertions." Nansamba v. N. Shore Med. Ctr., Inc., 727 F.3d 33, 40 (1st Cir. 2013).

**III.    DISCUSSION**

**A.    The Parties' Cross Motions on the Purchase Option Claim and Counterclaim (Count I and Counterclaim I)**

DFA argues that it is entitled to summary judgment on Count I and dismissal of Counterclaim II, because the Purchase Option is enforceable and was validly assigned to DFA, and that by failing to convey the Franklin Premises to DFA, the Trust has breached the Purchase Option.  The Trust argues, in turn, that it is entitled to summary judgment denying Count I and granting Counterclaim I, because the Purchase Option could not be and was never assigned to DFA and, regardless, the Purchase Option is void and unenforceable as it violates the Rule Against Perpetuities and constitutes an unreasonable restraint on trade.  Finally, the Trust argues that there are equitable considerations that make summary judgment granting specific performance inappropriate.

1.    Assignability of the Purchase Option

The parties' threshold dispute as to whether DFA can exercise the Purchase Option relates to its assignability.  As noted above, Paragraph 13 of the Purchase Option provides:

> No Assignment. Garelick may not assign its rights under this Option to Purchase except that Garelick may assign this Option to Purchase to **a related entity or affiliate of Garelick**.

[ECF No. 9-2 ¶ 13 (emphasis added)]. DFA argues that the plain language of Paragraph 13, and the Purchase Option more generally, unambiguously allows for the transfer of Garelick's rights to Suiza, the entity that acquired all of Garelick's outstanding stock the day after the Purchase Option was executed, as well as to the various Suiza entities,[3] Dean Foods, and, ultimately, to DFA, via Dean Foods' bankruptcy proceedings, as each is a "related entity or affiliate." [ECF No. 39 at 11–17]. The Trust, in turn, asserts that the language makes clear that the option is generally unassignable, and the exception for assignment to a "related entity or affiliate of Garelick" does not apply to an entity like Suiza or any entity that was not "related" to Garelick at the time the Purchase Option was executed. [ECF No. 51-1 at 18–23]. Instead, according to the Trust, Paragraph 13 was only intended to allow assignment to "the three fluids and seventeen plastics companies" that were related to Garelick and also sold to Suiza in the 1997 Suiza SPA. [Id. at 20–21]. Further, both DFA and the Trust argue that the extrinsic evidence supports their position. [ECF No. 39 at 11–17; ECF No. 51-1 at 18–23].

Under Massachusetts law, interpretation of a contract, including the determination of ambiguity, is a question of law. See Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1122 (1st Cir. 1995); Balles v. Babcock Power Inc., N.E.3d 905, 911 (Mass. 2017). "To answer the ambiguity question, the court must first examine the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties." Bank v. Thermo Elemental Inc., 888 N.E.2d 897, 907 (Mass. 2008) (citation omitted). "In doing so, we are mindful that '[p]articular words should be considered, not as if isolated from the

---

[3] As noted above, in reply, DFA asserts that Suiza or Suiza GTL continued to own the Purchase Agreement and it did not in fact pass to other Suiza entities. [ECF No. 62 at 12].

context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. . . . [A] sensible meaning of words should be sought.'" Cave v. Cave, No. 22-P-84, 2022 WL 17243723, at *2 (Mass. App. Ct. Nov. 28, 2022) (alterations in original) (quoting Acushnet Co. v. Beam, Inc., 93 N.E.3d 1186, 1193 (Mass. App. Ct. 2018)); see also Starr v. Fordham, 648 N.E.2d 1261, 1270 (Mass. 1995) ("[A] contract should be construed to give it effect as a rational business instrument and in a manner which will carry out the intent of the parties." (quoting Shane v. Winter Hill Fed. Sav. & Loan Ass'n, 492 N.E.2d 92, 94 (Mass. 1986))). "'Should the court find the contract language unambiguous, we interpret it according to its plain terms.' If those plain terms unambiguously favor either side, summary judgment is appropriate." Bank v. Int'l Bus. Machs. Corp., 145 F.3d 420, 424 (1st Cir. 1998) (quoting Den Norske Bank AS v. First Nat. Bank of Bos., 75 F.3d 49, 52 (1st Cir. 1996)). Where, however, a contract's terms are ambiguous, interpretation of the term is an issue for the factfinder and summary judgment is only appropriate if "the extrinsic evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide to the contrary." Id. (quoting Den Norske Bank AS, 75 F.3d at 52).

Contract language is "considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable difference[s] of opinion as to the meaning of the words employed and obligations undertaken." Rey v. Lafferty, 990 F.2d 1379, 1384 (1st Cir. 1993) (quoting Fashion House, Inc. v. K mart Corp., 892 F.2d 1076, 1083 (1st Cir. 1989)).[4] The term "related entity or affiliate of Garelick" is not defined in the Purchase Option,

---

[4] The Trust argues that, as an option contract, the Purchase Option should be strictly construed. See [ECF No. 51-1 at 19 ("Because options 'confer[] a unilateral right to compel performance exclusively for the benefit of the holder,' under Massachusetts law, they are 'to be strictly construed.'" (quoting Lewis v. Chase, 505 N.E.2d 211, 213 (Mass. App. Ct. 1987))]. The Court finds that "the principle of strict construction applied to an option's exercise is somewhat beside

and thus the Court looks to its "plain meaning."  See Golchin v. Liberty Mut. Ins. Co., 993

N.E.2d 684, 688 (Mass. 2013).  As the Trust asserts, see [ECF No. 51-1 at 25], "related" means

"[c]onnected in some way; having relationship to or with something else," Black's Law

Dictionary (11th ed. 2019).  "Entity" means "[a]n organization (such as a business or a

governmental unit) that has a legal identity apart from its members or owners."  Black's Law

Dictionary (11th ed. 2019); see Entity, Merriam-Webster Dictionary (last visited Sept. 29, 2023),

https://www.merriam-webster.com/dictionary/entity.  Finally, "affiliate" means "[a] corporation

that is related to another corporation by shareholdings or other means of control; a subsidiary,

parent, or sibling corporation."  Black's Law Dictionary (11th ed. 2019).[5]  As the owner of all

issued and outstanding Garelick stock, Suiza was "connected in some way" to Garelick and

"related to [Garelick] by shareholdings or other means of control."  If Suiza's purchase of

---

the point in the present case," given that there is no suggestion that DFA sought to exercise the
option in a "procedurally [im]proper fashion."  McDonald's Corp. v. Lebow Realty Tr., 710 F.
Supp. 385, 386 (D. Mass. 1989), aff'd, 888 F.2d 912 (1st Cir. 1989).

> [I]t is the procedure for exercising an option that is strictly required. . . . [T]he
> language of option provisions themselves is [not] somehow to be singled out under
> Massachusetts law for a crabbed or unduly narrow construction.  Instead, a fair
> reading of the language of the option provision itself determines its role in the
> execution of the contract and the manner in which it is to be exercised.

Id. at 386 n.1 (citing Roberts–Neustadter Furs, Inc. v. Simon, 457 N.E.2d 668, 670–73 (Mass.
App. Ct. 1983), rev. den. 459 N.E.2d 826 (Mass. 1984)); see also Westinghouse Broad. Co. v.
New Eng. Patriots Football Club, Inc., 406 N.E.2d 399, 401 (Mass. App. Ct. 1980) (emphasis
added) ("Generally, **conditions for the exercise** of an option require a more strict degree of
adherence than may be the case in provisions of a bilateral contract.").

[5] See also Affiliate, Merriam-Webster Dictionary (last visited Sept. 29, 2023),
https://www.merriam-webster.com/dictionary/affiliate (defining affiliate as "an affiliated person
or organization," and "affiliated" in turn as "closely associated with another typically in a
dependent or subordinate position."); Bacardi Int'l Ltd. v. V. Suarez & Co., 719 F.3d 1, 11 (1st
Cir. 2013) (defining affiliate as "[a] corporation related to another corporation by shareholdings
or other means of control; a subsidiary, parent, or sibling corporation." (quoting Black's Law
Dictionary 67 (9th ed. 2009))).

Garelick had closed before the Purchase Option was executed, Suiza would have been a "related entity or affiliate of Garelick." The Trust does not appear to dispute this conclusion. Rather, the Trust argues that the contract language evinces the parties' intent to limit assignment and thus to create only a narrow exception to the then-current "related entit[ies] or affiliate[s] of Garelick," which were "the three fluids and seventeen plastics companies" that were also sold to Suiza. [ECF No. 51-1 at 18–23]. The Court finds that based on the definitions discussed above, "related entity or affiliate," considered on its own, would not seem to have a temporal limitation. That said, DFA does not appear to refute that Garelick already had related entities or affiliates (i.e., the other fluids and plastic companies) at the time of the sale, and the parties could have, but did not, specify that this term encompassed future entities. See, e.g., Associated Chiropractic Serv., Inc. v. Travelers Ins. Co., Nos. 9493, 9497, 9498, 1998 WL 544315, at *1, (Mass. Dist. Ct. Aug. 21, 1998) (describing an agreement that defined a "[Company] Affiliate" to include, among others, "all **present or future** affiliates, successors and assigns. . . ; . . . all entities in which any of the foregoing **have or may come to have** any direct or indirect ownership or financial interest; and . . . all entities in which any of the foregoing **have or may come to have** any operational, supervisory, control or guidance role" (emphasis added)).

Further, the Court does not consider this provision in isolation. Petricca Dev. Ltd. P'ship v. Pioneer Dev. Co., 40 F. Supp. 2d 49, 53 (D. Mass. 1999) ("When searching for plain meaning, the Court will consider 'every phrase and clause . . . [in light of] all the other phraseology contained in the instrument.'" (quoting J.A. Sullivan Corp. v. Commonwealth, 494 N.E.2d 374, 378 (Mass. 1986))), aff'd, 214 F.3d 216 (1st Cir. 2000). As the Trust points out, Paragraph 1 provides that the option is "exclusive" to "Garelick," [ECF No. 9-2 ¶ 1], which is a widely used synonym of "personal," see [ECF No. 51-1 at 20 (citing Exclusive, Merriam-Webster Thesaurus,

(last visited Sept. 29, 2023), https://www.merriamwebster.com/thesaurus/exclusive)].  The Trust argues that this cuts against a broad interpretation of assignability because personal rights generally are not assignable.[6]  The Court find that this is a possible interpretation of that term, but that "exclusive" can also be understood to mean that the grantor (here, the Trust) cannot grant an option to anyone other than the grantee (here, Garelick), but with no restraints on what the grantee can do with the option in terms of future assignment.  See, e.g., Am. Tel. & Tel. Co. of Mass. v. McDonald, 173 N.E. 502, 502 (Mass. 1930) (holding that the New England Telephone and Telegraph Company [the grantee] could assign its "exclusive right" to erect and operate telephone poles over a specific property, because "the right is 'exclusive' of the grantor, not 'exclusive' in the grantee"); see also Shayeb v. Holland, 73 N.E.2d 731, 733 (Mass. 1947) ("The option [in a lease] was for the exclusive benefit of the lessee [the grantee]. . . . It ran with the land and inured to the benefit of the plaintiff as assignee of the lessee.").  Because the parties may well have intended this meaning of "exclusive," the use of the word  does not necessarily counsel against assignment to an entity, like Suiza.

The Trust also points out that, throughout, the Purchase Option refers to "Garelick" specifically, rather than using a more general descriptor, like "Tenant" or "Buyer" or "Suiza."  See [ECF No. 51-1 at 20].  Additionally, the rest of the language in Paragraph 13, including its

---

[6] See, e.g., Lipton Pro. Soccer, Inc. v. Bay State Harness Horse Racing & Breeding Ass'n, Inc., 395 N.E.2d 470, 473 (Mass. App. Ct. 1979) (evaluating "whether the restrictive covenant in . . . [a] Lease was personal to Bay State or whether it [wa]s appurtenant to the racetrack land and enforceable by Foxboro as Bay State's successor in title" and finding that the "covenant . . . [wa]s appurtenant to, and r[an] with, Bay State's racetrack land and is enforceable by Bay State's successors or assigns."); § 74:18. Assignment of option contracts, 29 Williston on Contracts § 74:18 (4th ed.) ("Options are, in general, freely assignable, except when the terms of a contract indicate that the seller is relying upon the credit of the optionee or other forms of personal performance.  However, rights of first refusal are presumed to be personal and are not ordinarily construed as transferable or assignable.").

title, "No Assignment," suggests an intent to limit assignability.  [ECF No. 9-2 ¶ 13].  Further,

Paragraph 12 states that the Purchase Option is "binding upon and inures to the benefit of the

parties hereto, and their respective **permitted** successors and assigns."  [Id. ¶ 12].  This too

suggests the parties contemplated limiting those that could benefit from the Purchase Option.

Though a close call, the Court finds that the Trust's interpretation of the Purchase Option, as

unassignable to future related entities or affiliates like Suiza, is a plausible, reasonable reading,

and that there is thus ambiguity.

Because there is ambiguity, the Court must look to the extrinsic evidence to divine the

parties' intent as to its meaning.  See Bank, 145 F.3d at 424.  "In descending order of

importance, extrinsic evidence may include: (1) the parties' negotiations on the particular

[agreement]; (2) their course of performance; (3) their prior course of dealing; and (4) trade

usage in the relevant . . . industry."  Den Norske Bank AS, 75 F.3d at 52–53 (citations omitted)

(applying Massachusetts law); see also Haggins v. Verizon New Eng., Inc., 736 F. Supp. 2d 326,

331 (D. Mass 2010) ("For evidence of the parties' intentions, [Massachusetts] courts look to

the 'language and circumstances' of the contract at the time of its negotiation, drafting and

execution." (quoting Anderson v. Fox Hill Vill. Homeowners Corp., 676 N.E.2d 821, 822 (Mass.

1997))).  DFA points to several pieces of evidence, including ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

[ECF No. 62-1 at 7–8; DFA Supp. SOF ¶¶ 90–92]; deposition testimony from the Trust's

30(b)(6) witness stating that "presumably" Suiza wanted the option, [ECF No. 62-1 at 7–8; DFA

Supp. SOF ¶¶ 93–98]; and various documents from 2007 onward that it says shows that the Trust

understood that various entities, such as Dean Foods, possessed the rights conferred in the

Purchase Option, [ECF No. 39 at 13–14].  On the other hand, the Trust points to a present-day

declaration from Alan Bernon, [DFA Supp. SOF ¶¶ 90–92; ECF No. 54], stating that "Suiza

originally requested that it be the holder of the Option," but that he "negotiated . . . so that

Garelick Farms, Inc. would be the entity exercising the Option in the future," [ECF No. 54 ¶ 17].

In his declaration, Alan Bernon further states that he

> negotiated for the Option to include a clause prohibiting assignment by Garelick
> Farms, Inc. except to a "related entity or affiliate" of Garelick Farms, Inc. The
> related entities and affiliates of Garelick Farms, Inc. in existence on July 30, 1997,
> at the time the Option was executed, were the three fluids and seventeen plastics
> companies that Peter and [Alan Bernon] sold to Suiza.

[Id. ¶ 18].  The Trust also asserts that, as to DFA's cited deposition testimony, its 30(b)(6)

witness was not involved in negotiating or drafting the Purchase Option and indicated at several

points in his deposition that he was "speculating" as to Suiza's intent related to the Purchase

Option.  See [DFA Supp. SOF ¶ 97].  Further, as noted above, the 1997 Suiza SPA required that

Garelick and the Trust would enter into "a real estate purchase option agreement containing the

terms set forth on Schedule 6.02(1) of the Disclosure Schedule," [ECF No. 56-1 § 6.02(1)],

which in turn stipulated that "Buyer," defined as Garelick Farms, Inc., "may not assign its rights

under the Option Agreement," [ECF No. 56-2 at 2].  The Court finds that "the extrinsic evidence

presented about the parties' intended meaning is [not] so one-sided" as to make summary

judgment appropriate for either party.  Bank, 145 F.3d at 424 (quoting Den Norske Bank AS, 75

F.3d at 52).

## 2.   Rule Against Perpetuities

As noted above, the Trust separately argues that it is entitled to summary judgment

because the Purchase Option is void and unenforceable, first asserting that the Purchase Option

violates the rule against perpetuities ("RAP").  [ECF No. 51-1 at 28–31].  Specifically, the Trust

argues that the common-law RAP applies to and invalidates the Purchase Option.  [Id. at 30–31].

DFA, on the other hand, asserts that, assuming any RAP applies to Purchase Option,[7] it is the

statutory rather than common-law RAP, which does not invalidate the Purchase Option.  [ECF

No. 39 at 16–17].  If the common-law RAP applies, as the Trust argues, DFA does not appear to

contest that the Purchase Option would be void.[8]  [ECF No. 51-1 at 30–31; ECF No. 39 at 16–

17].  Likewise, if the statutory RAP applies, as DFA asserts (assuming any RAP applies), the

Trust seems to concede that it would not invalidate the Purchase Option.[9]  [ECF No. 51-1 at 30–

---

[7] DFA notes that "it is . . . not clear that the common law rule against perpetuities *ever* applied to purchase options appurtenant to commercial leases," and thus may not apply to the Purchase Option.  [ECF No. 39 at 17 n.3].

[8] Under the common-law RAP, "a contingent future interest is void unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest."  Certified Corp. v. GTE Prod. Corp., 467 N.E.2d 1336, 1338 (Mass. 1984).  The only time limitation provided for in the Purchase Option, is the duration of the Lease, see [ECF No. 9-2 ¶ 3 (providing that the Purchase Option "is exercisable by written notice . . . given to the Trust at least 6 months and no more than 12 months prior to the expiration of the Lease, as extended pursuant to the Lease Extension or as thereafter extended in accordance with the Lease.").  As the Trust points out, [ECF No. 51-1 at 29], "DFA does not dispute that there is no life in being measuring the duration of the Lease or Option," and thus the Purchase Option would seem to violate the common-law RAP.

[9] Pursuant to the statutory RAP,

    (a)  A nonvested property interest is invalid unless:

    (1) when the interest is created, it is certain to vest or terminate no later than twenty-one years after the death of an individual then alive; or

    (2) the interest either vests or terminates within ninety years after its creation.

Mass. Gen. Laws Ann. ch. 184A, § 1 (1989).  Given that DFA sought to exercise the option well within the prescribed 90-year period after its termination, the statutory RAP does not appear to invalidate the Purchase Option.  See Pond v. Pond, 678 N.E.2d 1321, 1324 (Mass. 1997) ("The common law rule against perpetuities has been modified by statute" to apply "the second look, or wait-and-see, principle."); § 14:26. Rule against perpetuities—Statutory modification, 14C Mass. Prac., Summary of Basic Law § 14:26 (5th ed.) ("Since a wait-and-see rule against perpetuities . . . makes validity or invalidity turn on actual post-creation events, it requires that an actual period of time be measured off during which the contingencies attached to an interest are

31; ECF No. 39 at 16–17].

"Massachusetts enacted a statutory rule against perpetuities, supplanting the common law rule, effective June 30, 1990." Peterson v. Tremain, 621 N.E.2d 385, 386 n.1 (Mass. 1993) (citing Mass. Gen. Laws ch. 184A). This statutory RAP "applie[d] only to property interests created on or after June 30, 1990." Hochberg v. Proctor, 805 N.E.2d 979, 984 n.10 (Mass. 2004);[10] see also Peterson, 621 N.E.2d at 387 n.2 ("We note that the perpetuities problem encountered in this case is resolved by statute, as to options entered into after June 30, 1990." (citing Mass. Gen. Laws ch. 184A, § 5(a)); Eng. v. Longo, No. 326126, 2008 WL 597615, at *5 n.14 (Mass. Land Ct. Mar. 6, 2008) ("The statute applied only to documents created after its effective date."), judgment entered, No. 326126, 2008 WL 597611 (Mass. Land Ct. Mar. 6, 2008). Although the Purchase Option was executed in 1997, after the statutory RAP went into effect, the Trust argues that the common-law RAP applies because the Purchase Option was "embedded" in or integrated with the Lease, as the bankruptcy court concluded, and thus the Lease's effective date, in 1986, rather than the date of the Purchase Option, should control. See [ECF No. 51-1 at 29; ECF No. 40-20 at 34:16–19 ("I do find that the option is embedded within the lease agreement, the lease agreement within the option, and on that basis with the acknowledgment that the lease itself can be assumed and assigned.")]. DFA does not address

---

allowed to work themselves out to a final resolution." (quoting Official Comment C to § 1 of the Statutory Rule)); Foley v. Evans, 570 N.E.2d 179, 181 (Mass. 1991) (this "wait-and-see" approach "determines validity of remainders and similar interests on the basis of events that actually have happened rather than those that might have happened . . ." (describing earlier iteration of the statute)).

[10] Chapter 184A § 1 has since been repealed and replaced by Mass. Gen. Laws ch. 190B, § 2-901. Although neither party argues that ch. 190B applies here, the relevant language in the statutes is essentially verbatim. Compare Mass. Gen. Laws Ann. ch. 184A, § 1 (1989) with Mass. Gen. Laws ch. 190B, § 2-901.

whether the Purchase Option was embedded in or integrated with the Lease but asserts

nonetheless that the execution date of the Purchase Option should control for RAP purposes.

[ECF No. 39 at 16–17].

  Neither party points the Court to caselaw that directly addresses the issue of whether the

common-law or statutory RAP applies to an option like this, executed after 1990 but tied to an

agreement executed before 1990.[11]  That said, Massachusetts courts have been "hesitan[t] to

invalidate voluntarily entered agreements based on violations of the Rule Against Perpetuities."

Longo, 2008 WL 597615, at *6 (citing Peterson, 621 N.E.2d at 387).  For example,

Massachusetts caselaw counsels against interpreting a contract to "create a perpetuities problem

unnecessarily . . . where it would enable[e] [a party] to escape the enforcement of a contract they

entered into freely and knowledgeably."  Peterson, 621 N.E.2d at 387 (construing contract that

provided that a party could exercise an option on a specific date (10 years after the contract was

signed) or "any time thereafter," to require that the party exercise the option "within a reasonable

time" to avoid a perpetuities issue); see Johnson v. Cohan, No. 9607352, 2000 WL 282594, at *5

(Mass. Super. Jan. 14, 2000) ("Where reasonable alternative interpretations [of a contract] exist,

one of which would invalidate the agreement under the rule against perpetuities and one of

---

[11] In fact, the Trust argues that it is "a question of first impression in Massachusetts whether a later executed option that is integrated within a commercial lease relates back to the date of the execution of the lease for purposes of analyzing its validity under the RAP," and requests that if the Court's decision turns on which RAP applies, that it certify this question to the Supreme Judicial Court.  [ECF No. 51-1 at 30].  The Court declines in its discretion to certify this question.  See In re Hundley, 603 F.3d 95, 98 (1st Cir. 2010) ("At its discretion, a federal court of appeals may certify questions of state law to the state's highest court. . . . [and] the SJC has provided that federal courts may certify questions to [the SJC,] where we 'find[ ] no controlling precedent and where the questions may be determinative of the pending cause of action.'") (emphasis added) (citing Lehman Bros. v. Schein, 416 U.S. 386, 391 (1974); then quoting In re Engage, Inc., 544 F.3d 50, 52 (1st Cir. 2008); and then citing S.J.C. R. 1:03)).

which would not, the Court is bound to adopt the latter[.]  This principle of interpretation serves the parties' overriding intent that the agreement be enforceable." (citing Warner v. Whitman, 233 N.E.2d 14, 16 (Mass. 1968); Childs v. Sherman, 221 N.E.2d 748, 751 (Mass. 1966); Gray v. Whittemore, 78 N.E. 422, 427 (Mass. 1906); Fisher v. Fisher, 500 N.E.2d 821, 822 n.5 (Mass. App. Ct. 1986)).  "Massachusetts Courts have applied this principle particularly in situations where the facts known as of the time of the litigation establish that the impermissibly remote vesting did not actually occur."  Johnson, 2000 WL 282594, at *5 (citing Warner, 233 N.E.2d at 16; Peterson, 621 N.E.2d at 387).[12]  In keeping with these principles and given that DFA has already sought to exercise the Purchase Option (such that the "impermissibly remote vesting did not actually occur"), the Court finds that for purposes of determining which RAP applies, it is appropriate to treat the interest conferred by the Purchase Option as having been created in 1997 rather than 1986.  Thus, the statutory RAP applies but does not invalidate the Purchase Option.

3.   Unreasonable Restraint on Alienation

The Trust further argues that the Purchase Option is void as an unreasonable restraint on alienation.  [ECF No. 51-1 at 30–32].

> The following factors, if found, tend to support a conclusion that [a] restraint is reasonable: "1. the one imposing the restraint has some interest in land which he is seeking to protect by the enforcement of the restraint; 2. the restraint is limited in duration; 3. the enforcement of the restraint accomplishes a worthwhile purpose; 4. the type of conveyances prohibited are ones not likely to be employed to any substantial degree by the one restrained; 5. the number of persons to whom alienation is prohibited is small."

---

[12] Another provision of Chapter 184A, § 6(a), allowed, at the request of an interested party, for the reformation of "nonvested property interest[s]," created before June 30, 1990 found to violate the applicable RAP in judicial proceedings brought after June 30, 1990 to comport with the applicable RAP.  See, e.g., Johnson, 2000 WL 282594, at *6.

Franklin v. Spadafora, 447 N.E.2d 1244, 1246 (Mass. 1983) (quoting Restatement of Property § 406 comment i (1944)).  "None of these factors is determinative, nor is the list exhaustive. Each case must be examined in light of all the circumstances."  Id. (quoting Restatement of Property § 406 comment i (1944)).  The Court finds, as the Trust argues, [ECF No. 72 at 14–15], that there are various material issues that cannot be evaluated on the current record, including whether DFA paid consideration for the Purchase Option and the present-day market value of the Franklin Premises.  Summary judgment, for either party, therefore, is not appropriate on this ground.

                4.        Equitable Considerations

       Finally, the Trust argues that there are equitable considerations that counsel against granting DFA's motion for specific performance.  [ECF No. 51-1 at 32–34].  The Court "has 'a reasonable range of discretion . . . with respect to granting or denying specific performance.'" Curley v. Mobil Oil Corp., 860 F.2d 1129, 1134–35 (1st Cir. 1988) (alteration in original) (first quoting Raynor v. Russell, 231 N.E.2d 563, 564 (Mass. 1967); and then citing Freedman v. Walsh, 119 N.E.2d 419, 423 (1954) ("Specific performance is not a matter of absolute right.")). Although "damages are normally regarded as an inadequate remedy for the breach of a promise to convey land . . . [and] [t]hus, '[s]pecific performance of contracts to convey land is usually granted,'" the Court may deny a motion for specific performance for various equitable reasons. Id. (first citing Restatement of Contracts § 360, at 642–43 (1932); then quoting Allen v. Rakes, 267 N.E.2d 628, 631 (Mass. 1971); and then citing Kaplan v. Bessette, 235, 257 N.E.2d 926, 927 (Mass. 1970)).  As the Trust argues is relevant here, [ECF No. 51-1 at 32–34], such reasons can include "undue hardship upon the seller or an inequitable advantage to the purchaser that would

result if specific performance were ordered." Id. (citing Raynor, 231 N.E.2d at 564; Freedman, 119 N.E.2d at 423).[13]

Additionally, "[a] judgment ordering specific performance of an option contract may also 'be made conditional upon [the purchaser's] paying the reasonable value of improvements made . . . by reason of some compulsion of law.'" Roberts-Neustadter Furs, Inc., 457 N.E.2d at 673 (first quoting 1A Corbin, Contracts § 269 at 565 (1963); and then citing Spadea v. Stewart, 214 N.E.2d 72 (Mass. 1966)).

The Court finds that there are material, disputed factual issues, including the reasonable market value of the property, which may bear on the equities of specific performance and whether imposing a condition on specific performance could be warranted.  As such, summary judgment is not appropriate on this ground.

Given that there are various, material factual disputes related to this and other issues, both parties' motions for summary judgments on Count I and Counterclaim I are DENIED.

## B.    DFA's Motion on the Rent Claim and Counterclaim (Count II and Counterclaim II)

DFA argues that it is entitled to summary judgement on Count II and dismissal of Counterclaim II because the "only reasonable interpretation" of the Lease's rent provision is that the "monthly rent for the Franklin premises is calculated as the lesser of 115% of the previous term's rent *or* the previous term's rent multiplied by the change in the Cost of Living," not both, and thus, the Trust's request for monthly rent that is both 115% of the previous term's rent *and* reflects the change in the Cost of Living, is a breach of the Lease's terms.  [ECF No. 39 at 17–

---

[13] Other equitable reasons for denying specific performance, which the Trust does not indicate are relevant here, include: "fraud, overreaching or other inequitable conduct by the purchaser" and "where the contract is unconscionable or induced by mistake."  Curley, 860 F.2d at 1134–35 (first citing Allen, 267 N.E.2d at 631; then citing Kaplan, 257 N.E.2d at 927; and then citing Chute v. Quincy, 30 N.E. 550, 551 (Mass. 1892)).

18].  The Trust responds that where the Lease is "clearly subject to multiple reasonable interpretations," and the extrinsic evidence is "contested or contradictory," DFA's motion must be denied.  [ECF No. 51-1 at 19, 35].  As noted above, the Lease provides:

> The fixed annual rental for each five (5) year option period shall be equal to the **lesser of (a)** one hundred fifteen percent (115%) of the fixed annual rental payable during the preceding five (5) year period, multiplied by the change in the Cost of Living, measured by the Consumer Price Index (the "Index").

[ECF No. 9-1 § 3.02 (emphasis added)].  DFA concedes that this provision includes a drafting error, which it characterizes as the omission of the conjunction "or."  [ECF No. 39 at 19].  Nevertheless, DFA argues that this drafting error does not create ambiguity where the only reasonable interpretation is that provision presents two separate options for calculating the rent.  [Id.].  The Court agrees that, based on the use of the phrase "lesser of (a)," this provision may be reasonably interpreted as providing two options for calculating the monthly rent, despite the drafting error.  That said, merely adding an "or" does not resolve the matter.  Instead, something like the following language would need to be added:

> The fixed annual rental for each five (5) year option period shall be equal to the lesser of (a) one hundred fifteen percent (115%) of the fixed annual rental payable during the preceding five (5) year period, **or (b) the fixed annual rental payable during the preceding five (5) year period** multiplied by the change in the Cost of Living, measured by the Consumer Price Index (the "Index").

The Court thus finds that there are other reasonable interpretations.  The parties could have intended for everything after (a) to serve as a single option and could have omitted an entirely separate, second option.  The parties could have also intended to remove the phrase "lesser of (a)," such that there only one option for calculating rent.  Either would align with the Trust's recent interpretation.  Because "the phraseology can support reasonable difference[s] of opinion as to the meaning of the words employed and obligations undertaken," Rey, 990 F.2d at 1384

(citation omitted), the Court finds the provision is ambiguous.  The Court therefore evaluates the extrinsic evidence.  See Bank, 145 F.3d at 424.

As noted above, prior to the Lease's assignment to DFA, the Trust calculated the rent in line with DFA's interpretation of the Lease, for all but one or potentially all previous lease terms. Additionally, DFA cites to a December 2006 email from Robert B. Berkelhammer, [ECF No. 39 at 19–20], who became Trustee sometime after the Lease was executed in 1986 and before 1997, [Trust CSOF ¶¶ 19, 28], to Alan Bernon, stating "[y]ou may remember that the language in the lease is garbled, but we have followed what we believe is the intent-namely the rent will increase by the lesser of the CPI increase or 115%," [DFA SOF ¶ 70].  On the other hand, the Trust points to present-day declarations from Trust beneficiaries, Alan Bernon and Ronnie Bernon, which state that rent was never intended to be so much lower than average market rent, which provides support for the Trust's alternative interpretation resulting in a higher rent calculation.  See [ECF No. 53 ¶¶ 17–18; ECF No. 54 ¶ 11].  ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████  [Trust CSOF ¶ 130].  The Trust also points out that, prior to filing its motion, DFA did not take any depositions, which could have provided more information on the parties' negotiations of the Lease.  [ECF No. 51-1 at 35].  Although DFA may ultimately have the better of the evidence at trial, the Court finds that the extrinsic evidence is not "so one-sided" as to warrant summary judgment.  Bank, 145 F.3d at 424 (quoting Den Norske Bank AS, 75 F.3d at 52).  DFA's motion as to Count II and Counterclaim II is therefore DENIED.

IV.     **CONCLUSION**

For the reasons set forth herein, both parties' motions are DENIED.

**SO ORDERED.**

September 29, 2023                                    /s/ Allison D. Burroughs
                                                     ALLISON D. BURROUGHS
                                                     U.S. DISTRICT JUDGE