**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

)
DAIRY FARMERS OF AMERICA, INC.    )
                                  )
        Plaintiff,                )
                                  )        No. 1:22-cv-10422-JEK
v.                                )
                                  )
BERNON LAND TRUST, LLC,           )
                                  )
        Defendant.                )
_____ )


## FINDINGS OF FACT AND CONCLUSIONS OF LAW

January 28, 2025

**TABLE OF CONTENTS**

FINDINGS OF FACT......................................................................................................2

I.      The Parties and the Dairy Industry. .................................................................. 2

II.     The Formation of Garelick Farms, Inc.. ............................................................ 5

III.    The Separation of the Franklin Premises and Garelick Farms, Inc.. ............................ 7

IV.     The 1986 Lease of the Franklin Premises. .......................................................... 8

V.      The 1997 Option to Purchase and Stock Purchase Agreement................................... 12

        A.  Background and Status of the Parties. ................................................... 12

        B.  The Negotiations. ............................................................................ 13

        C.  The Stock Purchase Agreement. .......................................................... 20

        D.  The Option to Purchase..................................................................... 22

            1.  Text of the Option to Purchase. .................................................. 22

            2.  Testimony Regarding Disputed Provisions. .................................... 24

            3.  Benefits to the Trust. .............................................................. 27

VI.     The 1998 Creation of Suiza GTL, LLC. .......................................................... 29

VII.    Corporate Reorganizations from 1999 to 2006.................................................... 31

VIII.   Course of Performance from 2001 to 2017......................................................... 34

        A.  Estoppel Agreements. ...................................................................... 35

        B.  Negotiations and Business Developments from 2007 to 2017. ......................... 37

            1.  2007 Communications and Calculation of 2012 Purchase Price. ............ 38

            2.  2010 Negotiations. ................................................................. 39

            3.  2011 and 2012....................................................................... 43

            4.  Changes at BLT in 2012. .......................................................... 44

            5.  2013 Lease Amendment. ........................................................... 46

            6.  2014 Negotiations. ................................................................. 47

       7.  2014 to 2017. ........................................................................... 50

IX.    Dairy Farmers' Acquisition of Garelick Farms, LLC in the Dean Foods
       Bankruptcy. ........................................................................................ 51

     A.  Dean Foods Company's Bankruptcy. .................................................. 51

     B.  Dairy Farmers' Acquisition of Garelick Farms. ................................. 53

X.     Dairy Farmers' Exercise of the Option to Purchase. ................................. 56

XI.    The Franklin Premises Today. .................................................................. 58

XII.   Course of Performance of the Lease. ........................................................ 59

PROCEDURAL HISTORY ....................................................................................... 61

CONCLUSIONS OF LAW ....................................................................................... 63

I.      Enforceability of the Option to Purchase. ............................................... 63

     A.  Choice of Law. .................................................................................... 63

     B.  Effect of the 1997 Stock Purchase Agreement. ................................... 64

     C.  Effect of the Corporate Reorganizations from Garelick Farms, Inc. to
        Garelick Farms, LLC. ........................................................................ 66

        1.   Meaning of the Term "Exclusive" in Section 1 of the Option to
           Purchase. ..................................................................................... 67

              a.  Evidence of the Parties' Intent During Negotiations. ............. 68

              b.  Course-of-Performance Evidence. ........................................... 70

              c.  Summary. ............................................................................... 73

        2.  The Suiza GTL, LLC Merger Did Not Effectuate an Assignment of the
           Option to Purchase. ....................................................................... 74

              a.  Merger and Assignment Under Massachusetts Law .............. 75

              b.  Merger and Assignment Under Delaware Law. ..................... 80

        3.  Even If the Suiza GTL, LLC Merger Did Effectuate an Assignment,
           Suiza GTL, LLC Was a "Related Entity or Affiliate" of Garelick
           Farms, Inc.. .................................................................................. 84

      4.   The Option to Purchase Remained Valid Through the Subsequent Corporate Reorganizations............................................................................ 87

  D.  Dairy Farmers Acquired a Valid Option to Purchase Through the Dean Foods Bankruptcy. ..................................................................................... 89

  E.  BLT Did Not Terminate the Option to Purchase by Invoking Section 17............ 93

II.    Equitable Relief for the Breach of the Option to Purchase........................................ 96

  A.  The Option to Purchase Is Not an Unreasonable Restraint Against Alienation.................................................................................................. 96

  B.  The Balance of Equities Favors Specific Performance..................................... 100

  C.  Dairy Farmers Is Not Entitled to Restitution for Rent Paid Since March 2022....................................................................................................... 104

III.   The Lease Claims...................................................................................................... 105

CONCLUSIONS AND ORDERS ........................................................................................109

**KOBICK, J.**

This case involves the validity of an option to purchase land in Franklin, Massachusetts that is home to the Garelick Farms milk processing plant. The plaintiff, Dairy Farmers of America, Inc., acquired the milk processing plant in 2020 after it successfully bid for certain assets of Dean Foods Company in bankruptcy proceedings. With those assets, Dairy Farmers contends, came an option to purchase the approximately 175 acres of land in Franklin (the "Franklin Premises") on which the processing plant sits. The owner of the Franklin Premises, defendant Bernon Land Trust, LLC ("BLT"),[1] currently leases the land to Dairy Farmers. BLT disputes that Dairy Farmers acquired a valid option to purchase the Franklin Premises through the Dean Foods bankruptcy. Consistent with that position, BLT declined to appear at the March 2022 closing after Dairy Farmers gave notice of its intent to exercise the purchase option.

Dairy Farmers asserts two breach of contract claims against BLT. The first claim requests specific performance of the option to purchase, permitting Dairy Farmers to acquire the Franklin Premises for ten times the fixed annual rent in effect at the time of the option's exercise. In the second claim, Dairy Farmers contends that BLT's most recent calculation of the fixed annual rent incorrectly diverged from decades of practice and, having paid BLT's requested rent under protest, it is owed damages. BLT has brought corresponding counterclaims for declaratory judgment. It contends that the option to purchase is invalid or, in the alternative, that ordering specific performance of the option would be inequitable and amount to an unreasonable restraint on alienation. BLT separately seeks a declaration that the new rent calculation better reflects the original intent of the parties to the lease.

---

[1] The Bernon Land Trust was initially set up as a trust and then converted to a limited liability company in 2012. Throughout this opinion, the Court uses "BLT" to refer to the trust and the LLC.

The Court held a four-day bench trial on all of the parties' claims. For the reasons below, the Court concludes that Dairy Farmers acquired a valid option to purchase the Franklin Premises in the Dean Foods bankruptcy. Finding BLT's equitable arguments unconvincing, the Court will grant Dairy Farmers' request for specific performance. The Court further concludes that BLT's most recent rent calculation amounted to a breach of contract and that Dairy Farmers is accordingly entitled to damages.

## FINDINGS OF FACT

### I.    The Parties and the Dairy Industry.

The Court begins by briefly canvassing the mechanics of how milk moves from the farm to the table. Cows on dairy farms produce raw milk, which must be transported off the farm within about two days via tanker truck.[2] The raw milk is taken to a milk processing plant, where it is tested for quality, unloaded, and then processed.[3] At the facility, it may be processed into fluid milk that can be sold to consumers at grocery stores or elsewhere.[4] Raw milk may also be processed into other products, like milk powders for use in baking, that may be transported to other manufacturers before ultimately being sold.[5] Because cows must be milked every day and raw

---

[2] ECF 144, at 11:22-14:21, Testimony of Gregory Wickham. Wickham is "emeritus" at Dairy Farmers and holds the title of "Executive Vice President"; he is also the former Chief Financial Officer of Dairy Farmers and Chief Operating Officer of Dairy Farmers' "northeastern geography." *Id.* at 8:4-12. Wickham spent his entire professional career in agriculture and most of it in the dairy industry. *Id.* at 9:18-11:6. The Court found Wickham to be knowledgeable and his testimony to be clear, consistent, and credible.

[3] ECF 144, at 12:5-20, Testimony of Gregory Wickham.

[4] ECF 144, at 12:5-20, Testimony of Gregory Wickham.

[5] ECF 144, at 12:5-20, Testimony of Gregory Wickham.

milk must be processed quickly, dairy farmers need a reliable milk processing facility to take their raw milk, or else they must dump the milk and suffer losses.[6]

Dairy Farmers is a farmer-owned cooperative that sells milk and offers services to its farmer members.[7] Among other things, it negotiates prices with milk processing plants and hauling companies, negotiates bulk rates on supplies, sells insurance products, and lobbies on behalf of the dairy industry.[8] Under its cooperative model, farmer members make a financial investment in the business and, in exchange, gain an ownership interest, the right to vote and participate in corporate governance, and a share in profitability.[9] Dairy Farmers consists of 6,000-8,000 farmer members and over 4,000 individual farms.[10] Its members' farms range in size from farms with 10 to 20 cows to farms with more than 20,000 cows.[11] Over the past decade, Dairy Farmers has also acquired milk processing plants to help ensure that farmer members have reliable processing plants to buy their raw milk, even during periods of market fluctuation.[12] Dairy Farmers is one of the largest businesses in the country, with net sales of $24.5 billion in 2022.[13]

---

[6] ECF 144, at 13:14-15:4, Testimony of Gregory Wickham.

[7] ECF 144, at 15:14-16:24, Testimony of Gregory Wickham.

[8] ECF 144, at 15:14-16:24, Testimony of Gregory Wickham.

[9] ECF 144, at 19:19-20:1, Testimony of Gregory Wickham.

[10] ECF 144, at 16:25-17:3, Testimony of Gregory Wickham.

[11] ECF 144, at 17:4-14, Testimony of Gregory Wickham.

[12] ECF 144, at 18:5-19:15, Testimony of Gregory Wickham.

[13] ECF 144, at 97:16-22, Testimony of Gregory Wickham; ECF 146, at 7:2-8, Testimony of Alan Bernon. Alan Bernon is an executive at Dairy Farmers, with the title CEO of Dairy Farmers Dairy Brands, and is also a member of BLT. ECF 146, at 6:16-21, 7:9-10. Alan has pecuniary interests in both parties, but his interest in Dairy Farmers outweighs his interest in BLT. *Id.* at 7:22-8:22. The Court generally found Alan Bernon to be knowledgeable. Although most of his testimony was credible, portions of his testimony, noted below, were inconsistent or not credible.

Initially set up as a trust, BLT is now a limited liability company that holds real estate, including the approximately 175 acres[14] in Franklin, Massachusetts that make up the Franklin Premises.[15] The members of BLT are descendants of (or a trust that benefits descendants of) Israel Garelick, the co-founder of Garelick Farms, the iconic New England dairy brand. The following graphic is not a complete family tree of Israel Garelick's descendants, but it depicts those descendants who feature in this case:



---

[14] The Franklin Premises were historically believed to comprise approximately 195 acres. *See, e.g.*, ECF 144, at 204:3-12, Testimony of Drew Kaplan; Exhibit 4, Option to Purchase, at 1. In connection with this litigation, however, BLT commissioned Emmet T. Logue, a Senior Appraiser and Advisor at LandVest, Inc., to prepare an Appraisal Report of the Franklin Premises. *See* Exhibit 249, Appraisal Report, at 2. According to that report, which is dated March 10, 2023, the Franklin Premises "includ[e] a total land area of 176.39 acres." *Id.* at 3.

[15] ECF 144, at 189:20-23, Testimony of Drew Kaplan; *see generally* Exhibit 5, Declaration of Trust for Bernon Land Trust II (describing the various pieces of real estate owned by the trust); Exhibit 179, Declaration of Ronnie Bernon Gallina, ¶¶ 14-16, 25 (averring that BLT has, since the 1970s, owned the Franklin Premises). Drew Kaplan has been the manager of BLT since February 2020. ECF 144, at 185:5-10, Testimony of Drew Kaplan. Kaplan is a lawyer, *id.* at 185:11-12; was a founding partner with the previous manager/trustee of BLT, Robert Berkelhammer, of Chace Ruttenberg & Freedman, LLP, *id.* at 185:15-23; has provided legal services to members of the Bernon family since 1988, *id.* at 186:12-14; and, beginning in 1992, acted as the lead corporate attorney for Garelick Farms, Inc., *id.* at 186:15-17.

Today, the following individuals are members of BLT: Ronnie Bernon Gallina, with a 13.45% beneficial interest; the Ronnie Bernon Gallina Irrevocable Trust, with a 46.2% beneficial interest; Alan Bernon, with a 13.45% beneficial interest; Jonathan Bernon, with a 13.45% beneficial interest; and Paul Bernon, son of Peter Bernon, with a 13.45% beneficial interest.[16] The beneficiaries of the Ronnie Bernon Gallina Irrevocable Trust are Ronnie Bernon Gallina and her son, Andrew Gallina, and the trustee is Alan Bernon.[17]

## II.    The Formation of Garelick Farms, Inc.

Most of the property that is now the Franklin Premises was purchased by Israel Garelick during the Great Depression, with abutting land acquired over the years.[18] Israel Garelick formed Garelick Brothers Farms,[19] a dairy business, with his brother Max Garelick in 1931.[20] In 1948,

---

[16] ECF 144, at 190:12-24, Testimony of Drew Kaplan; Exhibit 6, Operating Agreement of Bernon Land Trust, LLC, § 1.02 (detailing the membership interests at the time of the formation of the LLC); Exhibit 179, Declaration of Ronnie Bernon Gallina, ¶¶ 1, 27 (averring that Elinor's interest was transferred to the Ronnie Bernon Gallina Irrevocable Trust on October 16, 2014).

[17] Exhibit 179, Declaration of Ronnie Bernon Gallina, ¶ 27; Exhibit 8, Ronnie Bernon Gallina Irrevocable Trust, at 1, 15; Exhibit 9.

[18] ECF 146, at 11:10-18, Testimony of Alan Bernon.

[19] Garelick Brothers Farms was the predecessor to Garelick Farms, Inc. *See* Exhibit 178, Declaration of Alan Bernon, ¶¶ 4, 6.

[20] ECF 146, at 89:19-21, Testimony of Alan Bernon; ECF 146, at 169:2-8, Testimony of Ronnie Bernon Gallina. This Court found the testimony of Ronnie Bernon Gallina to generally be credible and consistent. It does not, however, discuss or credit Ronnie Bernon Gallina's testimony concerning the purpose of the lease and option to purchase, because she testified that she had no role in the negotiation or formation of those contracts, nor was she consulted as the contracts were being drafted. ECF 146, at 186:4-8, 199:15-201:20, Testimony of Ronnie Bernon Gallina.

Israel Garelick's daughter, Elinor,[21] married the elder Paul Bernon,[22] who joined Garelick Brothers Farms[23] along with Israel Garelick's son, Daniel Garelick.[24]

Elinor and the elder Paul Bernon had four children. They raised their first two children, Peter Bernon and Ronnie Bernon Gallina, on the Franklin Premises for the first few years of the children's lives.[25] The family moved out after the third child, Alan Bernon, was born.[26] Ronnie Bernon Gallina worked on the Franklin Premises during summers while she went to school.[27] Alan and Peter Bernon also worked on the farm, though Jonathan Bernon, the fourth and youngest child, never did.[28]

By the 1960s, the dairy operation on the Franklin Premises had grown and included a milk processing plant.[29] Daniel Garelick and the elder Paul Bernon held the common stock in Garelick Brothers Farms, while Israel Garelick held the preferred stock.[30] The late 1960s, however, ushered in a tragic period for the Garelick/Bernon family. In 1968, Daniel Garelick died suddenly of a heart

---

[21] Elinor was remarried and appears to have changed her name more than once. This Court follows the practice of the parties in referring to her as just "Elinor."

[22] As discussed below, the younger Paul Bernon, Peter Bernon's son, plays a larger role in this case. For clarity, the Court will refer to the father of Alan Bernon, Peter Bernon, Jonathan Bernon, and Ronnie Bernon Gallina as the "elder Paul Bernon."

[23] ECF 146, at 170:5-13, Testimony of Ronnie Bernon Gallina.

[24] ECF 146, at 90:12-14, Testimony of Alan Bernon. Ronnie Bernon Gallina testified that Max Garelick also lived on the farm on the Franklin Premises with his wife and children. ECF 146, at 169:17-21, Testimony of Ronnie Bernon Gallina.

[25] ECF 146, at 170:14-16, 171:10-13, Testimony of Ronnie Bernon Gallina.

[26] ECF 146, at 171:10-13, Testimony of Ronnie Bernon Gallina.

[27] ECF 146, at 172:1-8, Testimony of Ronnie Bernon Gallina.

[28] ECF 146, at 172:14-22, Testimony of Ronnie Bernon Gallina; ECF 146, at 9:9-14, Testimony of Alan Bernon.

[29] ECF 146, at 12:2-17, Testimony of Alan Bernon.

[30] ECF 146, at 90:12-14, Testimony of Alan Bernon.

attack when he was 43 years old.[31] The elder Paul Bernon bought Daniel Garelick's widow's shares in the company.[32] In May 1969, the elder Paul Bernon died unexpectedly at 44 years of age.[33] Israel Garelick managed the company for a short time after, but Elinor soon bought out his shares and became owner along with her four children.[34] The next year, in 1970, Israel Garelick died, too.[35]

For a short time after buying out her father's shares, Elinor ran the Garelick Farms business with the expectation that Alan and Peter Bernon would take it over.[36] In 1971, Elinor married Larry Zelkind, who took over managing the business.[37] Garelick Brothers Farms was reorganized as Garelick Farms, Inc. in 1973.[38] Alan Bernon began working full time at Garelick Farms in 1976.[39]

## III.   The Separation of the Franklin Premises and Garelick Farms, Inc.

In the 1970s, after the death of the elder Paul Bernon, the Garelick Farms business was legally separated from the land on which the business sat.[40] The land—that is, the Franklin Premises—was conveyed in a trust to Elinor and the other heirs of the elder Paul Bernon.[41] That

---

[31] ECF 146, at 90:5-7, Testimony of Alan Bernon; ECF 146, at 173:7-8, Testimony of Ronnie Bernon Gallina.

[32] ECF 146, at 90:14-15, Testimony of Alan Bernon.

[33] ECF 146, at 90:5-25, Testimony of Alan Bernon; ECF 146, at 173:8-10, Testimony of Ronnie Bernon Gallina.

[34] ECF 146, at 90:15-91:4, Testimony of Alan Bernon; ECF 146, at 173:12-16, Testimony of Ronnie Bernon Gallina; Exhibit 178, Declaration of Alan Bernon, ¶ 5.

[35] ECF 146, at 173:16-19, Testimony of Ronnie Bernon Gallina.

[36] ECF 146, at 174:2-7, Testimony of Ronnie Bernon Gallina.

[37] ECF 146, at 174:8-11, Testimony of Ronnie Bernon Gallina.

[38] Exhibit 178, Declaration of Alan Bernon, ¶ 6.

[39] ECF 146, at 83:17-20, Testimony of Alan Bernon.

[40] ECF 146, at 91:15-25, Testimony of Alan Bernon.

[41] ECF 146, at 174:22-175:22, Testimony of Ronnie Bernon Gallina. The precise mechanics of this conveyance are not clear, but they are not material. *Id.* at 197:6-198:7; ECF 146, at 14:11-

7

trust, the Bernon Land Trust, was formed in January 1977 with the Rhode Island Hospital Trust National Bank as trustee.[42] In 1977, 56.72% of the beneficial interest in the trust was owned by Elinor, while Peter Bernon, Ronnie Bernon Gallina, Alan Bernon, and Jonathan Bernon each had 10.82%.[43] One of the assets of BLT was the Franklin Premises.[44]

In the early years after BLT was set up, Garelick Farms leased the land from BLT but did not make regular rent payments.[45] Eventually, Garelick Farms' financial performance improved, and it began making more regular rent payments to BLT, which were distributed to the trust beneficiaries in proportion to their beneficial interests.[46] During this time, the beneficial ownership of the Garelick Farms business remained with Elinor, Peter Bernon, Ronnie Bernon Gallina, Alan Bernon, and Jonathan Bernon.[47]

## IV.    **The 1986 Lease of the Franklin Premises.**

In 1984, Ronnie Bernon Gallina needed money to buy a house in Scarsdale, New York for her new family.[48] She asked Larry Zelkind, Elinor's then-husband, if she could borrow against her shares in Garelick Farms or perform legal services for the business.[49] He refused and said the only

---

21, Testimony of Alan Bernon ("[A]fter my father's death . . . they looked at the assets in his estate, and things got put into different entities.").

[42] Exhibit 1, Declaration of Trust, at 1-3, 12 (unless otherwise indicated, the Court uses the pagination the parties have appended to the exhibits, not the exhibits' internal pagination); ECF 146, at 14:6-21, Testimony of Alan Bernon.

[43] Exhibit 1, Declaration of Trust, at 28; ECF 146, at 92:1-13, Testimony of Alan Bernon.

[44] ECF 144, at 188:16-19, Testimony of Drew Kaplan.

[45] ECF 146, at 14:11-15:3, Testimony of Alan Bernon.

[46] ECF 146, at 14:11-15:3, Testimony of Alan Bernon; Exhibit 1, Declaration of Trust, at 4.

[47] ECF 146, at 197:16-198:7, Testimony of Ronnie Bernon Gallina.

[48] ECF 146, at 179:25-180:12, Testimony of Ronnie Bernon Gallina.

[49] ECF 146, at 180:14-19, Testimony of Ronnie Bernon Gallina.

way she would receive money was if she sold her Garelick Farms shares at a predetermined price.[50]
Ronnie Bernon Gallina agreed and received $900,000, a price she did not believe to be fair.[51]

During the 1980s, Alan Bernon was managing the operations of Garelick Farms.[52] In 1985, upon the death of Zelkind, he became president of Garelick Farms, Inc.[53] During this time, Alan Bernon focused on operations, while Peter Bernon focused on business deals and relationships with customers and farmers.[54]

In 1986, two significant and related transactions occurred: (1) Elinor sold her shares in Garelick Farms, Inc. to her sons Peter, Alan, and Jonathan Bernon; and (2) Garelick Farms, Inc. entered into a 100-year lease with BLT (the "Lease"), with BLT as landlord and Garelick Farms as tenant.[55] The purpose of the Lease was to give Elinor, who had the largest beneficial interest in BLT, an income stream in the form of rent payments.[56] At the time, Elinor was only 58 years old and would need income for years to come.[57] In exchange, Elinor sold her stock in Garelick Farms to her sons at a reduced rate.[58]

---

[50] ECF 146, at 180:14-181:1, Testimony of Ronnie Bernon Gallina.

[51] ECF 146, at 180:22-23, 181:6-8, Testimony of Ronnie Bernon Gallina.

[52] ECF 146, at 83:21-23, Testimony of Alan Bernon.

[53] ECF 146, at 9:21-23, Testimony of Alan Bernon.

[54] ECF 146, at 9:15-21, 9:24-10:7, Testimony of Alan Bernon.

[55] ECF 146, at 92:14-94:2, Testimony of Alan Bernon; *see generally* Exhibit 2, Indenture of Lease.

[56] ECF 144, at 193:20-194:3, Testimony of Drew Kaplan; ECF 146, at 15:6-16, 93:8-94:2, Testimony of Alan Bernon. The Court does not credit Alan Bernon's assertion in his pretrial declaration that he and his brothers "wanted Elinor to receive the maximum amount of rent possible and would not have agreed to be a party to a Lease that calculated the rent as less than market value." Exhibit 178, ¶ 11. That pretrial assertion was inconsistent with Alan Bernon's trial testimony, in which he stated that he and his brothers "didn't have any input in [the] lease." ECF 146, at 95:18-20, Testimony of Alan Bernon.

[57] ECF 146, at 15:6-16, 93:17-94:2, Testimony of Alan Bernon.

[58] ECF 146, at 15:6-16, Testimony of Alan Bernon.

Several provisions of the Lease are important to this case. Article 2 of the Lease establishes a lease term of five years, with the first term beginning on March 1, 1987 and ending on February 29, 1992.[59] The tenant has the option of renewing the Lease for nineteen additional five-year terms—that is, 100 years in total.[60] Unless the tenant gives more than six months' notice that it will not renew, the tenant is deemed to automatically renew the Lease for each successive five-year term.[61] Article 3 of the Lease, which concerns the rent calculation, set rent for the initial five-year term at $480,000 per year.[62] For each five-year term to follow, the Lease provides, "The fixed annual rental for each five (5) year option period shall be equal to the lesser of (a) one hundred fifteen percent (115%) of the fixed annual rental payable during the preceding five (5) year period, multiplied by the change in the Cost of Living, measured by the Consumer Price Index."[63] The Lease was assignable by the tenant.[64]

The Lease also contained an option to purchase, referred to hereinafter as the "1986 Option to Purchase."[65] It provided that "[c]ontemporaneously with or within six (6) months following the sale or transfer of a majority of the stock or the assets of Tenant to owners unrelated by blood or marriage to Peter M. Bernon, Alan J. Bernon, or Jonathan R. Bernon, Tenant shall have the option to purchase all or any portion of the [Franklin] Premises . . . . The purchase price shall be equal to Twenty Thousand ($20,000.00) Dollars per acre as to which Tenant exercises the said option."[66]

---

[59] Exhibit 2, § 2.01.

[60] Exhibit 2, § 2.02.

[61] Exhibit 2, § 2.02.

[62] Exhibit 2, § 3.01.

[63] Exhibit 2, § 3.02.

[64] Exhibit 2, Article 8.

[65] Exhibit 2, Article 27.

[66] Exhibit 2, Article 27.

The Lease thus gave any non-family buyer of Garelick Farms an option to purchase the Franklin Premises from BLT, either on the day of the closing or within six months of that day.[67] The parties to the Lease—BLT and Garelick Farms—included the 1986 Option to Purchase to ensure that any future third-party buyer of the Garelick Farms business would have the ability to buy the land on which the business sat.[68]

In 1989, Alan and Peter Bernon bought Jonathan Bernon's shares in Garelick Farms, Inc. and thus became the sole shareholders of the company.[69] Throughout the 1980s and 1990s, Alan and Peter Bernon continued to grow the Garelick Farms business.[70] They also founded other dairy companies, a spring water company, and several plastics companies that largely produced plastic bottles.[71] One of the plastics businesses, Franklin Plastics, shared the Franklin Premises with Garelick Farms.[72] By 1997, Peter and Alan Bernon owned 21 fluids and plastics companies across the country.[73]

---

[67] ECF 146, at 94:17-95:11, Testimony of Alan Bernon.

[68] ECF 146, at 95:12-96:14, Testimony of Alan Bernon. Alan Bernon also testified that the $20,000 per acre purchase price in the 1986 Option to Purchase was inserted by Elinor's attorneys as a "placeholder." *Id.* at 95:12-96:2. He did not explain what he meant by characterizing the specific purchase price as a "placeholder." Since Alan Bernon also testified that he and his brothers did not have input into the Lease, *id.* at 95:18-20, the Court does not credit his characterization of the purchase price, or potentially the 1986 Purchase Option itself, as a "placeholder" provision.

[69] ECF 146, at 85:1-4, Testimony of Alan Bernon.

[70] ECF 146, at 12:20-14:5, Testimony of Alan Bernon.

[71] ECF 146, at 16:17-22, 18:1-9, Testimony of Alan Bernon.

[72] ECF 146, at 14:1-5, Testimony of Alan Bernon.

[73] ECF 146, at 18:1-12, Testimony of Alan Bernon. In addition to Garelick Farms, Inc., these included fluids companies Fairdale Farms, Inc. (Vermont), Grant's Dairy, Inc. (Maine), and Miscoe Springs, Inc. (Massachusetts), and plastics companies Plastics Management Group, LLC (Massachusetts), Marlborough Plastics, Inc. (Massachusetts), Maine Plastics, Inc. (Maine), First Capital Plastics, Inc. (Pennsylvania), Sherman Plastics, Inc. (Texas), New Jersey Plastics, Inc. (New Jersey), Illinois Plastics, Inc. (Illinois), Allentown Plastics Inc. (Pennsylvania), Kentwood Plastics, Inc. (Louisiana), Franklin Plastics, Inc. (Massachusetts), Richmond Container, Inc. (Virginia), North Carolina Plastics, Inc. (North Carolina), Florida Plastics, Inc. (Florida), Chester

**V.** **The 1997 Option to Purchase and Stock Purchase Agreement.**

In 1997, Alan and Peter Bernon decided to sell Garelick Farms and their other fluids and plastics companies to a Texas-based business named Suiza Foods Corporation. In connection with that sale, BLT also granted Garelick Farms an option to purchase the Franklin Premises, referred to hereinafter as the "Option to Purchase." Because the validity of the Option to Purchase is the central dispute in this case, the Court describes the background of these related transactions in detail.

A.    Background and Status of the Parties.

In 1997, Alan and Peter Bernon were the sole shareholders of Garelick Farms, Inc., along with trusts for the benefit of their children.[74] That same year, Elinor held a 46.2% beneficial interest in BLT, while Alan Bernon, Peter Bernon, Jonathan Bernon, and Ronnie Bernon Gallina each held 13.45% beneficial interests.[75] Robert Berkelhammer, an attorney who was a founding partner of the law firm Chace Ruttenberg & Freedman, LLP, was the trustee of BLT.[76]

During the early 1990s, Gregg Engles, who had co-founded a private equity firm in Dallas and successfully invested in packaged ice businesses, began to acquire dairy companies, including

---

County Container Corporation (Pennsylvania), Atlanta Container, Inc. (Georgia), Ohio State Plastics, Inc. (Ohio), and Middlesex Container, Inc. (Connecticut). Exhibit 15, Stock Purchase Agreement, at 1.

[74] ECF 146, at 84:8-18, Testimony of Alan Bernon.

[75] ECF 144, at 190:12-14, Testimony of Drew Kaplan; ECF 146, at 15:17-25, Testimony of Alan Bernon. Alan Bernon testified that Elinor's beneficial interest in BLT was 46.7% in 1997, while Drew Kaplan testified that her beneficial interest in 2012 was 46.2%. Both testified that each of Elinor's children held a 13.45% beneficial interest at both dates. Because 13.45 multiplied by 4 is 53.8%, the Court concludes that Alan's testimony regarding Elinor's beneficial interest was a half a percentage point off, and that Elinor held at 46.2% beneficial interest in BLT in 1997 and 2012.

[76] ECF 144, at 185:2-23, Testimony of Drew Kaplan; Exhibit 4, Purchase Option, at 1.

Suiza Foods Corporation.[77] In 1996, with Engles as CEO and Chairman, Suiza went public with the goal to "consolidate the U.S. liquid milk business and to continue to consolidate the packaged ice business."[78] By the end of 1997, it was one of the leading dairy processing companies in the country, with net sales over $1.79 billion.[79]

For the 1997 transactions, Gregg Engles was the principal negotiator for Suiza, Alan Bernon was the principal negotiator for Garelick Farms, and Robert Berkelhammer was the principal negotiator for BLT. Peter Bernon was not meaningfully involved with the negotiations because one of his children was experiencing a medical crisis at the time.[80] At trial, the Court heard testimony from Gregg Engles and Alan Bernon, but did not hear testimony from Robert Berkelhammer, who passed away in February 2020.[81]

B.    The Negotiations.

In advance of the 1997 transactions, Peter and Alan Bernon discussed finding a buyer for their dairy and spring water companies.[82] They hired an investment bank, J.P. Morgan, to act as

---

[77] ECF 145, at 7:15-8:13, Testimony of Gregg Engles. The Court found Engles' testimony to be consistent, clear, and credible, notwithstanding that Engles had some financial dealings with Dairy Farmers, appeared to testify without the compulsion of a subpoena, and met with Dairy Farmers or its counsel to prepare for his testimony. *Id.* at 34:10-11, 34:19-21, 77:3-12. Alan Bernon suggested that, at least for a time, there was some personal animosity between him and Engles stemming from Engles' firing of Bernon in 2007. *See* ECF 146, at 70:4-10, Testimony of Alan Bernon ("In 2007, I had no relationship with Gregg, and the way [Harold Ginsburg and I] stayed friends is we didn't talk about Gregg and we didn't talk about Dean Foods . . . . [W]e didn't talk about business because it just wasn't going—it wouldn't go anywhere positive.").

[78] ECF 145, at 8:13-19, Testimony of Gregg Engles.

[79] ECF 145, at 9:9-11, 9:15-21, Testimony of Gregg Engles; Exhibit 25, Suiza Foods Corporation Form 10-K, at 4-5.

[80] ECF 146, at 36:8-18, Testimony of Alan Bernon.

[81] ECF 144, at 185:5-10, Testimony of Drew Kaplan.

[82] ECF 146, at 16:19-23, Testimony of Alan Bernon.

an intermediary in the sale.[83] Alan Bernon's first choice for a buyer was Dean Foods Company, a publicly traded company that, he thought, would maintain the Garelick Farms business and keep its long-term employees.[84] However, through one of their plastics companies, Alan and Peter Bernon also had a preexisting business relationship with Suiza Foods Corporation.[85] Thus, in early 1997, Engles was approached by J.P. Morgan, acting on behalf of Alan and Peter Bernon, to determine if Suiza was interested in acquiring their businesses.[86] Although Alan Bernon initially explained to Engles that he and Peter were considering selling the fluids businesses but not the plastics businesses, Engles told Alan that he might be interested in buying all the businesses.[87]

The negotiations began in earnest in the spring of 1997.[88] Engles testified that he primarily negotiated with Alan Bernon, but that J.P. Morgan was involved in many of the communications.[89] The Court found Engles' testimony on the negotiations to be credible. He clearly answered the questions put to him about the negotiations, and his testimony was consistent. The Court found Alan Bernon's testimony on the negotiations to be less credible than Engles' testimony. Alan Bernon repeatedly testified that he could not remember key portions of the negotiations, including whether he or J.P. Morgan negotiated with Suiza about the purchase of Garelick Farms, whether he or J.P. Morgan negotiated an important term sheet appended to the ultimate Stock

---

[83] ECF 146, at 98:2-16, Testimony of Alan Bernon.

[84] ECF 146, at 17:3-13, Testimony of Alan Bernon.

[85] ECF 146, at 16:24-17:3, 17:14-20, Testimony of Alan Bernon.

[86] ECF 145, at 10:1-14, 37:22-38:5, Testimony of Gregg Engles.

[87] ECF 146, at 17:14-20, 18:1-12, Testimony of Alan Bernon.

[88] ECF 145, at 10:15-16, Testimony of Gregg Engles; ECF 146, at 98:17-19, Testimony of Alan Bernon.

[89] ECF 145, at 11:11-20, Testimony of Gregg Engles.

Purchase Agreement, and who drafted key language in the Option to Purchase.[90] Alan Bernon's hazy memory at trial about the negotiations stood in contrast with his pretrial declaration, in which he expressed certainty that he had negotiated various key parts of the agreement with Suiza.[91] It also stood in contrast with his claim that he *did* remember the negotiations about the Option to Purchase with Berkelhammer, which happened in the same time period as the negotiations with Suiza.[92] While Alan Bernon's testimony was not wholly incredible—indeed, for the most part, his testimony was credible—Alan Bernon was less credible than Gregg Engles in describing the negotiations leading to the Option to Purchase and Stock Purchase Agreement.

The parties negotiated in person, over the phone, and via letters.[93] During the negotiations, Gregg Engles told Alan Bernon that his goal was to consolidate Garelick Farms, Inc. into Suiza Foods Corporation's milk business.[94] Suiza's public filings with the Securities and Exchange Commission made it clear that industry consolidation was its goal, and J.P. Morgan was aware of that intention.[95] Alan and Peter Bernon understood that Suiza's strategy was to "buy the leading dairy in a given marketplace and use it as a regional platform . . . into which to consolidate other dairies in the region," including via mergers, while maintaining the existing management of those dairies.[96]

---

[90] ECF 146, at 103:6-104:2, 105:23-106:16, 107:20-25, 122:9-24, Testimony of Alan Bernon.

[91] Exhibit 178, Declaration of Alan Bernon, ¶¶ 17-18.

[92] ECF 146, at 103:14-22, Testimony of Alan Bernon.

[93] ECF 145, at 11:18-20, Testimony of Gregg Engles.

[94] ECF 145, at 11:21-12:18, Testimony of Gregg Engles.

[95] ECF 145, at 11:21-12:18, Testimony of Gregg Engles.

[96] ECF 145, at 12:8-18, Testimony of Gregg Engles; ECF 146, at 21:8-22, Testimony of Alan Bernon.

During the negotiations, Suiza sent Alan and Peter Bernon offer letters signed by Engles on April 25, 1997 and June 10, 1997.[97] In the April 25 letter, Suiza made an initial offer to buy Garelick Farms, Inc. and the other fluids and plastics companies for $280 million.[98] The letter described Suiza as "a holding company" whose "objective [wa]s to acquire strong regional dairy and ice companies and use them as the basis for additional consolidation in their regions."[99] It also expressed Suiza's intention to "keep the people of the strong regional businesses we acquire" and to "urge them to grow within their regions and . . . provide them the capital to do so."[100] Alan Bernon testified that he understood this language to mean that Suiza "would buy primary dairies in different parts of the country, and then use those dairies, like Garelick Farms, as a platform to do add-ons and buy other businesses" and "roll them up."[101] He clarified, however, that he thought the "philosophy was to . . . continue to operate as separate businesses," keeping management and brands separate rather than consolidating them into the regional dairy.[102] Alan Bernon also understood the letter to confirm Engles' prior representation that he would have an ongoing role at Suiza.[103]

Under a heading titled "Real Estate," the April 25 letter stated that Engles understood the "sensitivities to the real estate lease issues as [he] discussed them with Alan, particularly as they relate[d] to the Franklin real estate."[104] It then continued: "We will need, however, a long term

---

[97] Exhibit 13, April 25, 1997 Letter; Exhibit 14, June 10, 1997 Letter.

[98] *See generally* Exhibit 13, April 25, 1997 Letter.

[99] Exhibit 13, April 25, 1997 Letter, at 1.

[100] Exhibit 13, April 25, 1997 Letter, at 1.

[101] ECF 146, at 20:18-21:7, Testimony of Alan Bernon.

[102] ECF 146, at 21:8-22, Testimony of Alan Bernon.

[103] ECF 146, at 21:23-22:11, Testimony of Alan Bernon.

[104] Exhibit 13, April 25, 1997 Letter, at 3.

lease at rates established today, and a formula for acquiring the fee interest in the leased real estate in the future at a multiple of the existing rental rate."[105] Engles understood the "sensitivities" to refer to the fact that the Lease had been "established to provide income to Alan's mother" after she sold her interest in Garelick Farms, Inc. to her sons.[106] Alan Bernon agreed that the "sensitivities" referred to keeping an income stream for Elinor, who was almost 70 years old at the time of the negotiations.[107] For that reason, Alan testified, he had told Engles that the Bernon family was not interested in selling the land.[108] In Alan's view, the "sensitivities" also referred to the fact that the milk processing plant had, over the years, continued to take up more space and that he wanted to ensure the land remained with the Garelick Farms business, not with an entity unrelated to the processing facility.[109] While Engles understood these sensitivities, he thought it necessary, due to the intensive capital investments needed for milk processing plants, that Suiza have a way to unite the business with the land in the future.[110] Engles credibly testified that he would not have agreed to acquire Garelick Farms, Inc. and the other businesses without an option to purchase the Franklin Premises, and that it was not typical for Suiza to own a business without owning the land on which it operated.[111] After receiving the April 25 letter, Alan Bernon thought that if these issues were addressed, an agreement could be reached.[112] Overall, Alan testified, he

---

[105] Exhibit 13, April 25, 1997 Letter, at 3.

[106] ECF 145, at 15:10-16:7, Testimony of Gregg Engles.

[107] ECF 146, at 22:12-23:8, Testimony of Alan Bernon.

[108] ECF 146, at 22:12-23:8, Testimony of Alan Bernon.

[109] ECF 146, at 23:9-16, 104:21-24, Testimony of Alan Bernon.

[110] ECF 145, at 16:8-17:11, Testimony of Gregg Engles.

[111] ECF 145, at 17:12-18, 29:16-23, Testimony of Gregg Engles.

[112] ECF 146, at 105:15-22, Testimony of Alan Bernon.

liked Suiza's proposal and the financial security it would give his family, and he appreciated that under the proposal, he could continue to run and grow Garelick Farms, Inc.[113]

The second letter, dated June 10, 1997, made a revised offer to buy Garelick Farms, Inc. and the other fluids and plastics companies for somewhere between $295 and $300 million.[114] Under the heading "Real Estate," the letter made the following proposal: "Suiza would lease property used by the Companies and owned by the Bernon family and affiliated entities at current rental rates for 15 years with an option to acquire such property at the end of the lease term for 6X the annual rental rate."[115] In the Option to Purchase and the term sheet for the Stock Purchase Agreement, discussed in more detail below, it is not "Suiza," but "Garelick Farms, Inc.," that holds the Lease and Option to Purchase.[116] Alan testified that he understood the June 10 letter to indicate Suiza's position that *it* would hold the Lease and Option to Purchase, but that he later negotiated for *Garelick Farms, Inc.* to hold the Lease and Option to Purchase.[117] Engles disputed this testimony.[118] He testified that the June 10 letter did not literally mean that "Suiza" would hold the Lease and Option to Purchase, because:

> The whole point of the option was to have the ability in the future to unify the lease hold estate and the fee estate. . . . [T]he lease hold improvements were owned by

---

[113] ECF 146, at 25:4-7, Testimony of Alan Bernon.

[114] *See* Exhibit 14, June 10, 1997 Letter, at 1.

[115] Exhibit 14, June 10, 1997 Letter, at 3. Alan Bernon initially testified that he understood "affiliated entities" in this section of the letter to refer to Franklin Plastics. ECF 146, at 29:6-14. He later conceded that the letter could not have been referring to Franklin Plastics, as an affiliate of Garelick Farms, Inc., because the letter refers to "property . . . owned by the Bernon family and affiliated entities," and neither Garelick Farms, Inc. nor any of the other fluids or plastics companies owned the property in question. *Id.* at 127:16-128:8.

[116] *See* Exhibit 4, Option to Purchase, ¶¶ 1-2; Exhibit 17, Lease and Option Agreement Term Sheet, at 1.

[117] ECF 146, at 28:7-29:5, Testimony of Alan Bernon; Exhibit 178, Declaration of Alan Bernon, ¶ 17 ("Suiza originally requested that it be the holder of the Option.").

[118] ECF 145, at 30:10-18, Testimony of Gregg Engles.

Garelick Farms, Inc. And, therefore, the option to reacquire the fee needed to be at the Garelick Farms level. So had Suiza owned the option, it would have, at the time of its exercise, had to reconvey the option to Garelick Farms or convey the improvements to put them together. . . . [T]he idea was to unify the estate. And to do that, it had to happen at one entity level.[119]

Engles also testified that the letter was in the context of an offer *from* Suiza, *to* Alan and Peter Bernon, so it made sense for the language refer to "Suiza" rather than "Garelick Farms."[120]

Engles' testimony on this point is more credible. In context, the June 10 letter was an offer: in brief, Suiza offered to give Alan and Peter Bernon approximately $300 million, and in exchange, Suiza would gain control of their fluids and plastics companies and, via its control of those companies, the Lease and an option to purchase the Franklin Premises. BLT has given no convincing explanation for why Suiza—a holding company with 12 to 15 direct employees[121] that stated multiple times during negotiations it had no interest in directly managing its subsidiaries— would have any interest in directly holding a lease and purchase option concerning the land on which one of its future subsidiaries would operate. Such an arrangement would make little business sense.[122] The Court does not, accordingly, attach significance to Engles' reference to "Suiza" rather than "Garelick Farms" in the "Real Estate" section of the June 10, 1997 letter.

---

[119] ECF 145, at 18:16-19:6, Testimony of Gregg Engles.

[120] ECF 145, at 48:5-12, Testimony of Gregg Engles ("This letter, just to be clear, contemplates not now, but it contemplates the future. This letter is about a transaction that is going to happen or is proposed to happen, and a structure that is yet undetermined, and that is going to be implemented with contracts and rights that exist beyond the closing date. Right? This is—I don't know how else you would say it here, right? That we were Suiza. Suiza was making the offer.").

[121] ECF 146, at 24:23-25:2, Testimony of Alan Bernon.

[122] ECF 145, at 30:19-22, Testimony of Gregg Engles.

19

C. <u>The Stock Purchase Agreement.</u>

On June 20, 1997, a Stock Purchase Agreement was executed between Suiza and the 21 fluids and plastics businesses owned by Alan and Peter Bernon, including Garelick Farms, Inc.[123] The sale took the form of a stock acquisition, whereby Suiza acquired the stock of the 21 companies in exchange for approximately $315 million.[124] Because the sale took the form of a stock acquisition, Garelick Farms, Inc. as an entity survived the sale, but it became subject to the control of Suiza, as the new owner of its stock.[125]

One of the closing conditions of the Stock Purchase Agreement read, "Garelick and The Bernon Land Trust shall have entered into a real estate purchase option agreement containing the terms set forth on Schedule 6.02(*l*) of the Disclosure Schedule."[126] The term sheet in Schedule 6.02(*l*) identified the seller as Berkelhammer, in his capacity as trustee for BLT; the buyer as Garelick Farms, Inc.; and the property as the Franklin Premises.[127] It set the purchase price for the Franklin Premises at 10 times the annual rent in effect during the final year of the Lease and described the process for exercising the Option to Purchase.[128] To guarantee 15 more years of rental income for Elinor, it required Garelick Farms, Inc. to extend the Lease with BLT for two

---

[123] *See* Exhibit 15, Stock Purchase Agreement.

[124] ECF 145, at 36:19-22, Testimony of Gregg Engles; ECF 146, at 98:20-99:1, 108:24-109:4, Testimony of Alan Bernon.

[125] ECF 144, at 201:3-16, Testimony of Drew Kaplan; ECF 145, at 36:16-37:1, Testimony of Gregg Engles.

[126] Exhibit 15, Stock Purchase Agreement, § 6.02(*l*).

[127] Exhibit 17, Lease and Option Agreement Term Sheet, at 1.

[128] Exhibit 17, Lease and Option Agreement Term Sheet, at 1. Engles testified that the fact that the Purchase Option price was ten times the yearly rent, rather than six times, was the result of negotiations between himself and Alan Bernon. ECF 145, at 23:11-18, Testimony of Gregg Engles.

additional five-year periods, through "at least February 29, 2012."[129] It further required BLT "not to market or sell the [Franklin Premises] to a third party so long as the Option Agreement remains in effect," and it contained a "No Assignments" provision reading, "Buyer may not assign its rights under the Option Agreement."[130]

Another provision of the Stock Purchase Agreement, Section 9.04, provided that "neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any party hereto without the prior written consent of the other party, nor is this Agreement intended to confer upon any other person except the parties hereto any rights or remedies hereunder, except that the Buyer may assign any or all of its rights, but not its obligations, hereunder to one or more wholly owned subsidiaries."[131] This provision applied only to the parties defined by the agreement—that is, Suiza Foods Corporation, as the buyer, and the 21 fluids and plastics companies, as well as the parties named on Exhibit A to the Stock Purchase Agreement,[132] as the sellers.[133] It did not apply to BLT, which was not a party to the Stock Purchase Agreement.

An amendment to the Stock Purchase Agreement indicates that Ronnie Bernon Gallina was to receive $900,000 after the closing.[134] Ronnie Bernon Gallina credibly testified that she never received the money and was not aware of the provision until this litigation.[135]

---

[129] Exhibit 17, Lease and Option Agreement Term Sheet, at 1.

[130] Exhibit 17, Lease and Option Agreement Term Sheet, at 1.

[131] Exhibit 15, Stock Purchase Agreement, § 9.04.

[132] Those parties include Peter Bernon, Alan Bernon, and trusts established for the benefit of their children. See Exhibit 16, Exhibit A to the Stock Purchase Agreement.

[133] Exhibit 15, Stock Purchase Agreement, at 1.

[134] Exhibit 20, Amendment No. 1 to Stock Purchase Agreement, at 4.

[135] ECF 146, at 182:13-23, Testimony of Ronnie Bernon Gallina.

D.    <u>The Option to Purchase.</u>

After the June 20, 1997 signing of the Stock Purchase Agreement, the parties were working toward a July 31, 1997 closing. On July 30, 1997, Alan Bernon satisfied the aforementioned closing condition by, on behalf of Garelick Farms, Inc., executing the Option to Purchase with BLT, which was represented by Berkelhammer.[136]

     *1.   Text of the Option to Purchase.*

The provisions of the Option to Purchase that are either in dispute or relevant to the parties' interpretations are as follows:

Section 1 is titled "<u>Grant of Option</u>" and reads, "The Trust hereby grants to Garelick an exclusive and irrevocable option to purchase the Premises ("<u>Option</u>") upon the terms and conditions hereinafter set forth."[137]

Section 2 is titled "<u>Lease Extension</u>" and reads, "Garelick agrees to extend the Lease for not less than two (2) additional 5-year option periods as permitted under the Lease, thereby extending the Lease through at least February 29, 2012 ("<u>Lease Extension</u>"). Notwithstanding such Lease Extension, Garelick shall be entitled to terminate the Lease in accordance with the terms of and rights granted in the lease."[138]

Section 3 is titled "<u>Exercise</u>" and reads, "The Option is exercisable by written notice ("<u>Exercise Notice</u>") given to the Trust at least 6 months and no more than 12 months prior to the expiration of the Lease, as extended pursuant to the Lease Extension or as thereafter extended in accordance with the Lease ("<u>Termination Date</u>")."[139] After describing the particulars for giving

---

[136] Exhibit 4, Option to Purchase, at 1, 7-8.

[137] Exhibit 4, Option to Purchase, § 1.

[138] Exhibit 4, Option to Purchase, § 2.

[139] Exhibit 4, Option to Purchase, § 3.

notice and setting a closing time and date, the section reads, "The Option shall not be exercised if at the time of the Exercise Notice or the Closing Date Garelick shall be in default in the payment of rent or any other financial obligation to the Trust under the Lease or if Garelick shall have received written notice as specified in the Lease from the Trust of any other material default under the Lease and shall not have cured such default or, if such default is not capable of cure within thirty (30) days, be diligently prosecuting cure thereof; provided, however, if Garelick is diligently prosecuting cure of such default and such default is not capable of cure before the Closing Date, Garelick may exercise the Option at Garelick's option and the Closing Date shall be extended for such time as required for Garelick to cure such default."[140]

Section 4 is titled "Purchase Price" and reads, "The purchase price for the Premises covered by the Option . . . shall be ten (10) times the then current annual rental amount in effect under the Lease at the time the Option is exercised."[141]

Section 13 is titled "No Assignment" and reads, "Garelick may not assign its rights under this Option to Purchase except that Garelick may assign this Option to Purchase to a related entity or affiliate of Garelick."[142]

Section 14 is titled "Covenant Not to Market" and reads, "The Trust covenants not to market or sell the Premises to a third party so long as the Option to Purchase remains in effect."[143]

Section 16 is titled "Default by the Trust" and reads, "In the event that the Trust breaches a covenant or obligation under this Option to Purchase (except as a result of a default by Garelick), Garelick shall have the right with respect to the Trust's default, (a) to terminate this Option to

---

[140] Exhibit 4, Option to Purchase, § 3.

[141] Exhibit 4, Option to Purchase, § 4.

[142] Exhibit 4, Option to Purchase, § 13.

[143] Exhibit 4, Option to Purchase, § 14.

23

Purchase by giving written notice thereof to the Trust, whereupon neither party shall have any further rights or obligations under this Option to Purchase except as specifically provided otherwise in this Option to Purchase, (b) to enforce specific performance of the Trust's obligations under this Option to Purchase, or (c) in the event specific performance is not available, to sue for damages."[144]

Section 17 is titled "<u>Default by Garelick</u>" and reads, "In the event Garelick fails to purchase the Premises (other than because of a permitted termination or as a result of a default by the Trust), then the Trust, as the Trust's sole and exclusive remedy, shall have the right to terminate this Option to Purchase by giving written notice thereof to Garelick, whereupon neither party hereto shall have any further rights or obligations hereunder except as expressly provided otherwise in this Option to Purchase."[145]

### 2. *Testimony Regarding Disputed Provisions.*

Alan Bernon and Gregg Engles testified to their intent in the negotiations and their understanding of several disputed provisions of the Option to Purchase. Alan Bernon's testimony bears on Garelick Farms, Inc.'s intent in the negotiations over the Option to Purchase. Although the Court considers Engles' testimony because he negotiated the term sheet in the Stock Purchase Agreement, the value of his testimony is somewhat limited since Suiza was not a party to the Option to Purchase, and there is no evidence that Engles or Suiza's agents were directly involved in the negotiations between Garelick Farms, Inc. and BLT. Engles did, however, testify that it would have been typical for buyer's counsel in an acquisition such as Suiza's to review the Option

---

[144] Exhibit 4, Option to Purchase, § 16.

[145] Exhibit 4, Option to Purchase, § 17.

to Purchase "to ensure it complied with [his] intent."[146] BLT could locate no contemporaneous evidence of its intent in the negotiations over the Option to Purchase.[147]

First, the parties dispute the meaning of the term "exclusive" in Section 1.[148] Alan Bernon testified that, in his recollection, "exclusive" meant that "Garelick Farms was the only one . . . no one else had [the Option to Purchase]. It was to that entity."[149] He later testified that he understood the option to operate against both BLT and Garelick Farms—that is, BLT could not grant another option to purchase to a separate entity, and Garelick Farms could not give the Option to Purchase to another entity, either.[150] Alan's concern in limiting the Option to Purchase to Garelick Farms was that "Suiza had been in business for a relatively short period of time," and he "was concerned that the land stayed with the business."[151] He "wanted to make sure that [Engles] didn't cut a deal to buy the land and then sell off the land to reduce his purchase price of buying the company."[152] Engles testified that, in his recollection, the word "exclusive" meant that "only Garelick [would] hold an option," and that "no other party [would] hold any rights to potentially acquire this land."[153] To Engles, "exclusive" meant that "there's only one option."[154] Engles did not believe that the

---

[146] ECF 145, at 80:12-18, Testimony of Gregg Engles.

[147] ECF 144, at 211:8-13, Testimony of Drew Kaplan.

[148] Exhibit 4, Option to Purchase, § 1.

[149] ECF 146, at 31:13-18, Testimony of Alan Bernon.

[150] ECF 146, at 114:9-13, Testimony of Alan Bernon.

[151] ECF 146, at 32:3-11, Testimony of Alan Bernon.

[152] ECF 146, at 32:3-11, Testimony of Alan Bernon.

[153] ECF 145, at 26:19-24, Testimony of Gregg Engles.

[154] ECF 145, at 26:19-24, Testimony of Gregg Engles.

word "exclusive" limited Garelick's ability to, subject to the limitations in the anti-assignment provision, assign the option to a related entity.[155]

Second, the parties dispute the meaning of "a related entity or affiliate of Garelick" in Section 13, the anti-assignment provision.[156] Alan Bernon testified that the purpose of the anti-assignment provision was to prevent the Option to Purchase from being "assigned to a third party unrelated to the running of the Garelick Farms business."[157] He "wanted [the land] to stay with the business for future growth of the company," including possible expansions on the Franklin Premises.[158] Alan and Peter Bernon had previously rejected offers to sell off real estate for commercial development, because they did not want the plant on the Franklin Premises to compete with other businesses for workers in Franklin, Massachusetts.[159] Alan Bernon believed that he would continue to manage the milk processing plant on the Franklin Premises, and either make or have input into any decision to purchase the property.[160]

Alan Bernon testified that, in his view, the phrase "related entity or affiliate" referred to the 20 other fluids and plastics companies owned by him and Peter Bernon before the closing of the Stock Purchase Agreement.[161] He further testified that he remembered having conversations with Berkelhammer about the "related entity or affiliate" language.[162] He recalled telling Berkelhammer that "the only entities that could be assigned to are the ones that we owned at that

---

[155] ECF 145, at 28:1-20, Testimony of Gregg Engles.

[156] Exhibit 4, Option to Purchase, § 13.

[157] ECF 146, at 122:25-123:5, Testimony of Alan Bernon.

[158] ECF 146, at 33:13-34:7, 123:10-13, Testimony of Alan Bernon.

[159] ECF 146, at 34:16-35:1, Testimony of Alan Bernon.

[160] ECF 146, at 34:8-16, Testimony of Alan Bernon.

[161] ECF 146, at 32:16-33:12, Testimony of Alan Bernon.

[162] ECF 146, at 122:11-12, Testimony of Alan Bernon.

particular time."[163] When Alan Bernon was questioned about the apparent conflict in his view that the anti-assignment provision permitted Garelick to assign the Option to related entities or affiliates, and his view that the term "exclusive" in Section 1 meant that only Garelick could hold the Option, he demurred.[164]

Engles rejected the interpretation of "related entity or affiliate" advanced by Alan Bernon and testified that Alan never suggested that interpretation to him during negotiations.[165] Engles offered a different take on the language. In his view, it meant that after Suiza acquired all the shares of Garelick Farms, Inc., it could not cause Garelick Farms to assign the option to a third party unrelated to Suiza, but that it could cause Garelick Farms to assign the option "within the . . . beneficial ownership structure of Suiza, Suiza and its affiliates."[166]

### 3. Benefits to the Trust.

When the parties were negotiating the Stock Purchase Agreement and Option to Purchase, the precise terms of the existing Lease were not the subject of negotiations.[167] Alan Bernon told Engles that it was "a long-term, 100-year lease between the different parts of the family."[168] He did not provide a copy of the Lease to Suiza during the negotiations over the Stock Purchase Agreement, nor did he tell Engles that the Lease contained its own 1986 Option to Purchase.[169] Under that 1986 Option to Purchase, Suiza—as a buyer of Garelick Farms unrelated to the Bernon

---

[163] ECF 146, at 130:4-12, Testimony of Alan Bernon.

[164] ECF 146, at 115:5-10, Testimony of Alan Bernon.

[165] ECF 145, at 28:21-29:12, Testimony of Gregg Engles.

[166] ECF 145, at 28:11-20, Testimony of Gregg Engles.

[167] ECF 145, at 48:19-49:7, Testimony of Gregg Engles.

[168] ECF 146, at 100:12-17, Testimony of Alan Bernon.

[169] ECF 146, at 29:20-30:3, Testimony of Alan Bernon.

brothers by blood or marriage—could have directed Garelick Farms to purchase the Franklin Premises for $20,000 per acre on the day of or within six months of the closing, unless the 1997 Option to Purchase could have been construed to supersede the 1986 Option to Purchase.[170]

Drew Kaplan, the present-day trustee for BLT, testified about how the existence of the 1986 Option to Purchase affected the benefits BLT realized from the 1997 transactions. In 1997, the 1986 Option to Purchase for $20,000 per acre would have allowed the buyer of Garelick Farms, Inc.'s stock to force the sale of the Franklin Premises for $3.5 million, assuming the Franklin Premises are 175 acres.[171] But under the 1997 Option to Purchase, BLT received both a minimum guarantee of $9,249,450 from the fifteen years of rent,[172] as well as a new purchase option price (assuming the rent did not increase, which, under the terms of the Lease, it would) of $6,342,480.[173] That amounted to a more than $12 million benefit to the trust and its beneficiaries. The 1997 Option to Purchase was, accordingly, a far better deal for BLT than the preexisting 1986 Option to Purchase and, correspondingly, a worse deal for Garelick Farms, Inc.[174]

---

[170] ECF 144, at 198:2-14, 201:3-16, 229:8-230:24, Testimony of Drew Kaplan.

[171] ECF 144, at 204:8-20, Testimony of Drew Kaplan.

[172] ECF 144, at 205:8-25, Testimony of Drew Kaplan.

[173] ECF 144, at 207:3-13, Testimony of Drew Kaplan.

[174] ECF 144, at 207:20-208:23, Testimony of Drew Kaplan. The Court does not credit Alan Bernon's testimony that "[b]eing on both sides of this . . . the [Bernon] family could change [the 1986 Option to Purchase] at any time." ECF 146, at 101:15-18. At the time of the 1997 negotiations, Alan and Peter Bernon (the sole shareholders, with their children's trusts, of Garelick Farms, Inc.) held, individually and collectively, minority beneficial interests in BLT. They had no power, at least legally, to unilaterally decide the Lease would have new terms on behalf of BLT. Instead, they had to negotiate those changes with the trustee of BLT. Furthermore, while members of the Bernon family held interests in both BLT and Garelick Farms, Inc., the entities were not identical—they did not even have identical ownership in 1997—and the 1997 Option to Purchase was a better deal for BLT.

## VI.    The 1998 Creation of Suiza GTL, LLC.

The Stock Purchase Agreement closed on July 31, 1997.[175] After the sale, Alan Bernon

joined Suiza Foods Corporation's Board of Directors and continued running Garelick Farms, Inc.

from Massachusetts.[176]

In December 1998, the year after Suiza's acquisition of Garelick Farms, Inc., a new entity

called Suiza GTL, LLC was formed.[177] The new LLC was a joint venture between Suiza and Dairy

Farmers, and it came about because Dairy Farmers, like Suiza, wished to be a part of the

consolidation of the dairy industry in the northeast region of the United States.[178] Suiza GTL, LLC

was created principally by merging Garelick Farms, Inc., a Suiza subsidiary, with the Tuscan and

Lehigh Dairies, subsidiaries of Dairy Farmers (though other businesses were involved).[179] Tuscan

was a New Jersey-based dairy processing company, and Lehigh was a Pennsylvania-based dairy

processing company.[180] The "G" in "GTL" came from Garelick Farms, the "T" from Tuscan Dairy,

and the "L" from Lehigh Dairy.[181] The Tuscan and Lehigh Dairies had no legal relationship with

---

[175] ECF 146, 98:20-99:1, Testimony of Alan Bernon.

[176] ECF 145, at 30:23-31:8, Testimony of Gregg Engles; ECF 146, at 85:5-12, Testimony of Alan Bernon.

[177] ECF 144, at 117:13-15, Testimony of Gregory Wickham; ECF 145, at 63:14-21, Testimony of Gregg Engles.

[178] ECF 144, at 117:16-24, Testimony of Gregory Wickham; ECF 145, at 32:2-11, Testimony of Gregg Engles.

[179] ECF 144, at 117:13-18, Testimony of Gregory Wickham; ECF 145, at 31:17-24, 63:18-21, Testimony of Gregg Engles; *see* Exhibit 26, Suiza Foods Corporation Northeast Dairy Entities as of December 8, 1998 (depicting the mechanics of the merger); Exhibit 30, Delaware Certificate of Merger of Suiza GTL, LLC, at 1 (the merged entities included "Garelick Farms, Inc., Miscoe Springs, Inc., Scangas Bros. Holdings, Inc., West Lynn Creamery, Inc., and West Lynn Creamery Realty Corp.").

[180] ECF 146, at 39:20-24, Testimony of Alan Bernon.

[181] ECF 146, at 39:17-19, Testimony of Alan Bernon.

Garelick Farms before the merger.[182] At the end of the merger, Suiza Foods Corporation owned 75% of Suiza GTL, LLC; Dairy Farmers owned 24.4%; and an individual named Timothy Natole owned 0.6%.[183]

Dairy Farmers has not been able to locate any copies of the merger agreement for Suiza GTL, LLC,[184] but certificates of merger were filed with the Secretary of the Commonwealth of Massachusetts and the Delaware Secretary of State.[185] Engles' understanding was that the merger, which took place the year after Suiza's acquisition of Garelick Farms, Inc., would have no impact on the validity of the Option to Purchase.[186] From his perspective as a businessman, Engles testified: "[T]he rights and obligations of each of the merging entities continue in the form of the new entity. You're not extinguishing an entity. You're giving it a different form, and those entities continue as the merged entity."[187] Alan Bernon never suggested to Engles that he believed the Suiza GTL, LLC merger may have affected the validity of the Option to Purchase.[188]

As a member of Suiza's Board of Directors, Alan Bernon was provided details of the Suiza GTL, LLC deal and voted to approve the merger.[189] At the time, he was more focused on acquiring New England Dairies, a Connecticut-based company, for Suiza than he was on the Suiza GTL,

---

[182] ECF 144, at 130:12-19, Testimony of Gregory Wickham.

[183] ECF 144, at 120:5-17, Testimony of Gregory Wickham; Exhibit 31, Suiza GTL, LLC Limited Liability Company Agreement, at 13.

[184] ECF 144, at 122:20-123:8, 124:2-17, Testimony of Gregory Wickham.

[185] *See* Exhibit 30, Delaware and Massachusetts Certificates of Merger of Suiza GTL, LLC.

[186] ECF 145, at 32:12-16, Testimony of Gregg Engles.

[187] ECF 145, at 32:24-33:11, Testimony of Gregg Engles.

[188] ECF 145, at 33:17-20, Testimony of Gregg Engles.

[189] ECF 145, at 81:17-82:3, Testimony of Gregg Engles; ECF 146, at 43:7-13, 138:4-16, Testimony of Alan Bernon.

LLC deal, and he did not have a role in structuring Suiza GTL, LLC.[190] He did, however, testify that he was aware that Suiza GTL, LLC was "a joint venture with the Dairy Farmers . . . that involved the business of Garelick Farms and the businesses of Tuscan and Lehigh."[191]

After Suiza GTL, LLC was formed, Alan Bernon became its President, responsible for the day-to-day performance of the dairies, and began to split his time between managing the dairies.[192] Although initially there were two layers of management at the Tuscan and Lehigh Dairies, Alan eliminated the "upper" management, leading the local managers of the dairies to report directly to him.[193] Shortly after the Suiza GTL, LLC merger, the processing plant on the Franklin Premises began to source the vast majority of its milk from farmer members of Dairy Farmers, rather than independent farmers, pursuant to a milk supply agreement between Suiza GTL, LLC and Dairy Farmers.[194] At some point before Suiza's subsequent merger with Dean Foods Company, Alan Bernon became Suiza's Chief Operating Officer for the Northeast Region.[195]

**VII.    Corporate Reorganizations from 1999 to 2006.**

In the years that followed the Suiza GTL, LLC merger, Suiza Foods Corporation, along with Suiza GTL, LLC, underwent a series of corporate reorganizations, including transfers in ownership interests and corporate name changes.

---

[190] ECF 146, at 38:18-39:16, Testimony of Alan Bernon.

[191] ECF 146, at 137:16-20, Testimony of Alan Bernon.

[192] ECF 145, at 31:25-32:1, Testimony of Gregg Engles; ECF 146, at 40:24-25, 42:20-43:1, Testimony of Alan Bernon.

[193] ECF 146, at 39:25-40:23, Testimony of Alan Bernon.

[194] ECF 144, at 130:22-134:1, Testimony of Gregory Wickham; ECF 145, at 66:14-70:15, Testimony of Gregg Engles; ECF 146, at 41:10-42:15, Testimony of Alan Bernon; Exhibit 193, Milk Supply Agreement.

[195] ECF 146, at 86:2-5, Testimony of Alan Bernon.

First, on September 20, 1999, Suiza Foods Corporation and Dairy Farmers, among others, executed a "Contribution Agreement, Plan of Merger and Purchase Agreement" to create the Suiza Fluid Dairy Group, L.P., another joint venture between Suiza and Dairy Farmers.[196] As relevant here, under the agreement, the ownership of Suiza GTL, LLC transferred to Suiza Fluid Dairy Group Holdings, Inc., and then to Suiza Fluid Dairy Group, L.P.[197] Suiza GTL, LLC survived the transaction: nothing in the agreement suggests that the transfer in ownership affected Suiza GTL, LLC's continued existence, and Suiza GTL, LLC is excluded from the entities listed in the agreement that did not survive the transaction.[198] The agreement included a provision specifying that Suiza would "transfer to [Suiza Fluid Dairy Group, L.P.] . . . certain assets . . . [and] certain liabilities held by Suiza Foods that directly relate[d] to the operations of the Suiza companies, Suiza GTL and Suiza SoCal."[199] Dairy Farmers has not been able to locate a completed or executed version of any such assignment or transfer.[200] No evidence was introduced that any of Suiza GTL, LLC's interests were assigned in connection with the Suiza Fluid Dairy Group, L.P. deal.

Second, the Suiza Fluid Dairy Group, L.P. agreement was amended on November 12, 1999.[201] This agreement contained a similar promise to, at closing, transfer the ownership interests of Suiza GTL, LLC to Suiza Fluid Dairy Group, L.P.[202] Suiza Fluid Dairy Group, L.P. was managed by Gregg Engles and Tracy Noll of Suiza Foods Corporation and Gary Hanman of Dairy

---

[196] Exhibit 36, Original Suiza Fluid Dairy Group, L.P. Agreement, at 8.

[197] Exhibit 36, Original Suiza Fluid Dairy Group, L.P. Agreement, §§ 2.3-2.5.

[198] *See, e.g.*, Exhibit 36, Original Suiza Fluid Dairy Group, L.P. Agreement, § 2.5(b) (the "Suiza Companies," which excluded Suiza GTL, LLC, did not survive the transaction).

[199] Exhibit 36, Original Suiza Fluid Dairy Group, L.P. Agreement, § 2.5(d).

[200] ECF 144, at 137:6-9, 137:16-25, 138:16-24, Testimony of Gregory Wickham.

[201] Exhibit 38, Amended Suiza Fluid Dairy Group, L.P. Agreement, at 8.

[202] Exhibit 38, Amended Suiza Fluid Dairy Group, L.P. Agreement, §§ 2.3-2.5.

Farmers.[203] On February 25, 2000, Suiza Fluid Dairy Group, L.P. changed its name to Suiza Dairy Group L.P.[204]

Third, in 2001, Suiza Foods Corporation merged with Dean Foods Company, emerging as Dean Foods Company.[205] Alan Bernon voted to approve that merger as a member of Suiza's Board of Directors, but he was not otherwise involved with the merger.[206] Through various transactions involving the transfer of ownership interests, and as part of the merger, Suiza Foods Corporation, which had become Dean Foods, acquired Dairy Farmers' ownership interest in Suiza Dairy Group, L.P.[207] It thus regained ownership of Suiza GTL, LLC.

Fourth, Suiza GTL, LLC changed its name to Dean Northeast, LLC on December 21, 2001.[208] Alan Bernon, who had been the President of Suiza GTL, LLC, became President of Dean Northeast, LLC. Later, he also became the Chief Operating Officer of the Northeast Region for Dean Foods Company and then, following a move to Dallas, the President of Dean Foods Dairy Group.[209] Dean Northeast, LLC continued to operate the milk processing plant on the Franklin Premises and make rent payments to BLT.

Fifth, on April 27, 2006, Dean Northeast, LLC, changed its name to Garelick Farms, LLC.[210] In addition to his other responsibilities, Alan Bernon was the President of Garelick Farms,

---

[203] Exhibit 40, Amended and Restated Limited Partnership Agreement of Suiza Fluid Dairy Group, L.P., at 29.

[204] *See generally* Exhibit 43, Name Change Certificate.

[205] ECF 144, at 142:15-16, Testimony of Gregory Wickham; ECF 146, at 85:24-86:1, Testimony of Alan Bernon.

[206] ECF 146, at 45:4-18, Testimony of Alan Bernon.

[207] Exhibit 50, at 6, 12; *see generally* Exhibits 53-55, 196.

[208] Exhibit 47, Name Change from Suiza GTL, LLC to Dean Northeast, LLC.

[209] ECF 146, at 45:23-46:11, 86:2-11, 143:15-19, 144:2-5, Testimony of Alan Bernon.

[210] Exhibit 62, Name Change from Dean Northeast, LLC to Garelick Farms, LLC.

LLC.[211] Garelick Farms, LLC likewise continued to operate the milk processing plant on the Franklin Premises and make rent payments to BLT.

In September 2007, Gregg Engles informed Alan Bernon that his position leading the Dean Foods Dairy Group was being eliminated and that Engles would take over the responsibilities of that position.[212] Despite being let go, Alan Bernon continued to serve on Dean's Board of Directors until 2008.[213] After leaving Dean, he worked as a consultant for Dairy Farmers, advising its CEO on mergers and acquisitions of milk processing plants.[214] From 2008 to 2020, Dairy Farmers acquired more processing plants.[215] When Alan Bernon officially joined Dairy Farmers in 2020 as President of its Dairy Brands Group, his responsibilities included acquiring processing plants and overseeing their operations.[216]

## VIII.    Course of Performance from 2001 to 2017.

Dairy Farmers introduced several categories of evidence at trial that bore on the parties' understanding of the Option to Purchase and the Lease from 2001 to 2017. This course-of-performance evidence generally falls into three buckets: (1) estoppel agreements signed by Berkelhammer, as trustee for BLT, in 2001 and 2007; (2) communications between Berkelhammer or members of BLT and representatives of Dean Foods Company, including a real estate consultant named Harold Ginsburg, regarding the Lease; and (3) efforts by Paul Bernon and Berkelhammer,

---

[211] ECF 146, at 46:1-2, 144:2-5, Testimony of Alan Bernon.

[212] ECF 146, at 46:14-47:1, Testimony of Alan Bernon.

[213] ECF 146, at 47:3-17, Testimony of Alan Bernon.

[214] ECF 144, at 47:22-48:6, Testimony of Gregory Wickham; *see* ECF 146, at 86:15-89:4, Testimony of Alan Bernon.

[215] ECF 146, at 88:22-89:4, Testimony of Alan Bernon.

[216] ECF 144, at 48:7-9, Testimony of Gregory Wickham; ECF 146, at 89:5-15, Testimony of Alan Bernon.

in consultation with Alan Bernon, on behalf of BLT to renegotiate the Lease and Option to Purchase in 2010 and 2014.

A. Estoppel Agreements.

Estoppel agreements are contracts, often with a bank, to establish the current status of lease terms.[217] When a bank lends money to a landlord, it is important that an estoppel agreement signed by the landlord accurately state the rights of the tenant to occupy the space.[218]

In 2001, Berkelhammer, as trustee for BLT, signed an estoppel agreement with First Union National Bank.[219] The agreement stated that "the Bernon Land Trust u/d/t January 4, 1977 (hereinafter 'Landlord') has heretofore leased certain lands . . . (hereinafter the 'Premises') to GARELICK FARMS, INC., a Massachusetts corporation, predecessor in interest to SUIZA GTL, LLC, a Delaware limited liability company, to be renamed Dean Northeast, LLC (hereinafter 'Tenant')."[220] While the agreement itself does not describe the "Premises," it clearly refers to the Franklin Premises, since it was sent via a fax from Suiza Foods Corporation to BLT, with a copy to Alan Bernon, regarding property leased in Franklin, Massachusetts.[221]

In 2007, Berkelhammer, as trustee for BLT, signed a separate estoppel agreement with JPMorgan Chase Bank, N.A.[222] The agreement stated that "GARELICK FARMS, LLC, a Delaware limited liability company (successor in interest to Garelick Farms, Inc., a Massachusetts

[217] ECF 144, at 216:17-25, Testimony of Drew Kaplan.

[218] ECF 144, at 216:17-25, 219:7-14, Testimony of Drew Kaplan.

[219] Exhibit 199, at 2, 5; *see* ECF 144, at 215:20-216:1, 217:1-10, Testimony of Drew Kaplan.

[220] Exhibit 199, at 2 (underline in original). Berkelhammer corrected the year from 1997 to 1977 in a handwritten note.

[221] Exhibit 199, at 1.

[222] Exhibit 207, at 4-5 (bold text removed).

corporation) ('Tenant') has possession of and occupies the Premises (as defined below) described on <u>Exhibit A</u> attached hereto and made a part of hereof."[223] It also stated that:

> [BLT] hereby represents to the best of its knowledge as of the date hereof and agrees with [JPMorgan] as follows: 1. [BLT] is the current landlord and [Garelick Farms, LLC] is the current tenant under the lease agreement and amendments thereto . . . pursuant to which [Garelick Farms, LLC] leases the Premises described in the Lease. The Lease has not been amended, and there are no other agreements between [BLT] and [Garelick Farms, LLC] relating to the Premises, except as set forth on <u>Exhibit A</u>, including that certain Option to Purchase, dated as of July 30, 1997, granting [Garelick Farms, LLC] an option to purchase the Premises from [BLT] in accordance with the terms and conditions set forth therein. [BLT] is the fee owner of the Premises.[224]

The attachments to the estoppel agreement make clear it is referencing the Franklin Premises.[225]

Drew Kaplan, current trustee for BLT, testified that while Berkelhammer would have wanted these documents to be accurate, he may or may not have inquired into the changing tenants, or may have believed, in 2007, that Garelick Farms, Inc. simply converted to Garelick Farms, LLC.[226] The Court does not credit this speculation. Berkelhammer was an attorney and had been BLT's trustee for years by the time he signed these estoppel agreements.[227] On the 2001 estoppel agreement, Berkelhammer hand-corrected the date of the declaration of trust from 1997 to 1977 and wrote "this is wrong" over the correction, indicating that he strove to make accurate representations to the banks in these contracts.[228] And the 2001 estoppel agreement refers to Suiza

---

[223] Exhibit 207, at 5 (emphases in original).

[224] Exhibit 207, at 5 (underline in original).

[225] Exhibit 207, at 9-21.

[226] ECF 144, at 220:21-221:10, 222:13-19, Testimony of Drew Kaplan.

[227] ECF 144, at 213:4-17, Testimony of Drew Kaplan. Throughout, the parties dispute the legal acumen and business sophistication of certain witnesses. The Court finds that every witness was either a lawyer, trained in the law, or was a sophisticated businessperson with access to able counsel during all relevant negotiations. Therefore, the Court rejects arguments that key players in negotiations did not understand what they were signing or the effects of business transactions.

[228] Exhibit 199, at 2.

GTL, LLC and Dean Northeast, LLC, undercutting any suggestion that Berkelhammer could have believed that Garelick Farms, Inc. simply converted into Garelick Farms, LLC.[229]

In light of these estoppel agreements, the Court makes the following findings. The 2001 estoppel agreement is evidence that Berkelhammer believed, in 2001, that Garelick Farms, Inc. was the predecessor in interest to Suiza GTL, LLC, which was to be renamed Dean Northeast, LLC. The 2007 estoppel agreement is evidence that Berkelhammer believed, in 2007, that Garelick Farms, LLC was the successor in interest to Garelick Farms, Inc. Similarly, based on the 2007 estoppel agreement, Berkelhammer believed in 2007 that Garelick Farms, LLC validly held the Option to Purchase the Franklin Premises. At trial, Drew Kaplan agreed: asked whether Berkelhammer "believed that Garelick Farms, LLC had a valid option to purchase consistent with the Trust's intent because he signed" the 2001 and 2007 estoppel agreements, Kaplan answered, "yes."[230]

B.    Negotiations and Business Developments from 2007 to 2017.

From 2007 to 2017, BLT or its members had a series of communications with representatives of Dean Foods Company, which owned Garelick Farms, LLC, about rent due under the Lease. During that same period, BLT or its members attempted to "recapture" parts of the Franklin Premises not being used by the milk processing plant in order to then sell or lease that land for various commercial ventures. To accomplish these objectives, BLT sought, unsuccessfully, to renegotiate the terms of the Lease and the Option to Purchase with Dean Foods

---

[229] Exhibit 199, at 2.

[230] ECF 144, at 226:23-227:1, Testimony of Drew Kaplan. Kaplan also testified that, "[a]ssuming a careful reading of the document by [Berkelhammer,]" the document shows that Berkelhammer believed that Garelick Farms, LLC held a valid purchase option and, when asked whether Berkelhammer would "sign a document saying that Garelick Farms, LLC has an option to purchase if he didn't believe they had one," he responded, "Probably not." *Id.* at 225:15-226:1.

Company. The Court recounts these communications and negotiations below, but two facts unify them all: During this decade, no one questioned the validity of the Option to Purchase. To the contrary, all involved behaved as though the Option to Purchase was valid and exercisable by Dean Foods Company or Garelick Farms, LLC.

### 1. 2007 Communications and Calculation of 2012 Purchase Price.

Harold Ginsburg, the CEO of Southern Asset Service Corporation ("SASCO"), a real estate consulting and brokerage company, worked for Suiza Foods Corporation and then Dean Foods Company as an outside consultant handling their real estate matters.[231] Among the matters he handled was the Lease for the milk processing plant on the Franklin Premises.[232] SASCO would calculate the rents and coordinate with BLT to verify those rents every five years.[233] Ginsburg talked to four individuals associated with BLT about the Lease: trustee Robert Berkelhammer; Alan Bernon; Paul Bernon, son of Peter Bernon; and Jerry Renza, who runs the "Bernon family office."[234] No one affiliated with BLT ever raised an issue concerning the validity of the Option to Purchase with Ginsburg.[235]

---

[231] ECF 145, at 84:8-19, 85:13-24, Testimony of Harold Ginsburg. The Court generally found Ginsburg credible, though his testimony sometimes lacked clarity and consistency. The Court notes that Ginsburg (1) maintains friendships with both Gregg Engles and Alan Bernon, ECF 145, at 113:3-9, Testimony of Harold Ginsburg; ECF 146, at 69:20-70:10, Testimony of Alan Bernon; (2) maintains a business relationship with Engles, ECF 145, at 113:14-114:17, Testimony of Harold Ginsburg; (3) was not subpoenaed to appear; and (4) was prepared for testimony by counsel for Dairy Farmers, ECF 145, at 110:11-23, Testimony of Harold Ginsburg.

[232] ECF 145, at 86:23-87:1, Testimony of Harold Ginsburg.

[233] ECF 145, at 87:2-17, Testimony of Harold Ginsburg.

[234] ECF 145, at 87:18-23, 88:6-8, Testimony of Harold Ginsburg; ECF 146, at 49:7-15, Testimony of Alan Bernon.

[235] ECF 145, at 98:12-99:6, 109:2-18, Testimony of Harold Ginsburg.

On February 21, 2007, Erin Lewis, an employee of SASCO, emailed Jerry Renza, Harold Ginsburg, and Alan Bernon about the rent calculation for the five-year period running March 1, 2007 to February 29, 2012.[236] The monthly rent for this period was $66,805.24.[237] The version of Lewis' email in evidence had been printed out and contained Alan Bernon's handwriting.[238] The following math equation is written out: 801,662.88 x 10 = 8,016,628.88, with the product circled and the date "2/28/2012" slightly to the left.[239] The Court notes that the monthly rent, $66,805.24, multiplied by 12 months equals $801,662.88 per year, the fixed annual rent for this five-year term.

Alan Bernon testified that it was "possible" that, in his handwritten note, he was calculating the price of the Option to Purchase in 2012.[240] He testified that if he had, he was concerned about estate planning for his mother Elinor, who was then nearly 80.[241] He further testified that he had not thought about the validity of the Option to Purchase at that point.[242] The Court finds that in the note, Alan Bernon was calculating the purchase price when, looking ahead to 2012, Dean Foods could first direct Garelick Farms, LLC to exercise the Option to Purchase.

### 2. 2010 Negotiations.

In 2010, Paul Bernon was asked by his father, Peter Bernon, to attempt to renegotiate the Lease on behalf of BLT and acquire some of the land on the Franklin Premises free and clear of the Option to Purchase.[243] Paul Bernon acted as an informal asset manager for BLT before

---

[236] Exhibit 205.

[237] Exhibit 205.

[238] ECF 146, at 50:20-24, Testimony of Alan Bernon.

[239] Exhibit 205, at 1.

[240] ECF 146, at 51:11-14, Testimony of Alan Bernon.

[241] ECF 146, at 51:13-23, Testimony of Alan Bernon.

[242] ECF 146, at 144:22-145:18, Testimony of Alan Bernon.

[243] ECF 145, at 141:7-13, Testimony of Paul Bernon.

becoming a member in 2012.[244] Although his role was not ongoing and he worked with BLT only on specific real estate matters, he represented himself in negotiations as the "asset manager for the family properties."[245] Throughout his negotiations, Paul Bernon consulted with Berkelhammer and Alan Bernon, and he understood Alan Bernon to be the "key decision maker" for BLT.[246] Although Paul Bernon did not have any formal authority to make decisions on behalf of BLT,[247] Berkelhammer and Alan Bernon treated him as BLT's agent in the negotiations. At no point in the negotiations did Alan Bernon or Berkelhammer indicate to Paul Bernon that they believed the Option to Purchase was invalid as a result of any prior corporate reorganization.

---

[244] ECF 145, at 138:3-139:7, Testimony of Paul Bernon. Paul Bernon is an investor in real estate, venture capital, and media. *Id.* at 137:19-23, Testimony of Paul Bernon. The Court found Paul Bernon's testimony to be evasive but nevertheless largely credits his testimony.

[245] *See, e.g.*, Exhibit 65, at 1; ECF 145, at 139:17-140:4, Testimony of Paul Bernon.

[246] ECF 145, at 143:9-145:20, 160:1-7, Testimony of Paul Bernon. Alan Bernon testified that Paul Bernon reached out to him as a "courtesy" during the negotiations, but that Paul Bernon was operating an independent real estate business and thought that he could create value for the Bernon Family. ECF 146, at 57:24-58:10, 59:3-60:7. Similarly, Alan Bernon testified that he "had nothing to do with [BLT] other than being a minority beneficiary." *Id.* at 151:3-12. The Court does not credit this testimony. The documentary evidence contradicts Alan Bernon's assertions about his limited role in BLT. *See, e.g.*, Exhibit 99, Emails between Alan and Paul Bernon, at 1 (Alan Bernon writing on May 12, 2014: "Paul, I saw Harold last week and he said to have you call him. I told him you handle the family real estate and I'm no longer directly involved. Probably best if you try to do a deal with him directly and keep me posted. I maybe [sic] helpful behind the scenes. Good luck. Keep me posted."); Exhibit 113, Email from Berkelhammer to Alan and Paul Bernon, at 1 (Berkelhammer asking on February 21, 2017 for Paul and Alan Bernon to "review and approve" the rent calculations for the Franklin Premises). It corroborates Paul Bernon's testimony that Alan Bernon was the key decisionmaker for BLT until, as discussed below, Ronnie Bernon Gallina began to assert herself as the majority beneficial owner of BLT. Indeed, even though Ronnie Bernon Gallina held the majority of the beneficial interests in BLT between 2014 and 2020—though most of those interests were indirectly held via the Ronnie Bernon Gallina Irrevocable Trust—Ronnie Bernon Gallina credibly testified that she "never" spoke with Berkelhammer in her life. ECF 146, at 184:23-185:5.

To be clear, the Court credits Alan Bernon's testimony that BLT was not his main focus during this era. But Paul Bernon and Berkelhammer made it a point to keep Alan Bernon in the loop on major BLT business in a way that indicates they viewed his input on key decisions as mandatory.

[247] ECF 145, at 211:16-18, Testimony of Paul Bernon.

Before the 2010 negotiation, Berkelhammer emailed Paul Bernon a copy of the Option to Purchase.[248] As part of this negotiation, Paul Bernon interacted with Tom Davis, the manager of the processing plant on the Franklin Premises.[249] After an initial meeting with Tom Davis, Paul Bernon reached out to Alan Bernon on September 15, 2010, updating him on the state of the negotiations.[250] Alan responded later that day: "[I s]uggest you take the approach that you are in the real estate business and have been asked by your Grandmother to look into the matter for herself and son and daughter that were not involved in the Garelick Farms/Suiza transaction. Together they represent 73.1 percent interest of the trust. Elinor 46.2 Ronnie 13.45 Jonathan 13.45 With Peter and me having the balance of 26.9. If we can make this a non Peter/Alan issue, the chances are probably better we can come to a mutually satisfactory conclusion. Would you mind sharing a draft of your proposal before giving it to Tom Davis."[251] Paul Bernon had not, in fact, been directed by his grandmother to start negotiations.[252]

On September 23, 2010, Paul Bernon emailed Alan Bernon a copy of the note he planned to send to Tom Davis, which stated: "I am writing to open a dialogue between [BLT] and Garelick Farms, regarding the lease at [the Franklin Premises]. Per the Lease dated December 30, 1986, and amended by the Option to Purchase on July 30, 1997, Garelick Farms has a Lease at the subject property, which its current term runs through February 29, 2012. Garelick Farms has been a good

---

[248] ECF 145, at 143:9-25, Testimony of Paul Bernon.

[249] ECF 145, at 142:11-143:3, Testimony of Paul Bernon.

[250] Exhibit 66, at 1.

[251] Exhibit 66, at 1.

[252] ECF 145, at 147:9-12, Testimony of Paul Bernon. Alan Bernon testified that he did not know if Paul Bernon took his advice. ECF 146, at 58:11-22. This does not change the fact that he suggested Paul Bernon lie to the manager of the Franklin Premises to put BLT in a better negotiating position to buy back land and resell it as commercial property.

tenant . . . and [BLT] would be willing to explore restructuring the current Lease and subsequent option."[253] At trial, Paul Bernon did not remember whether, in the final sentence, he was referring to an option to purchase or an option to extend the lease.[254] Alan Bernon's email response later that day approving the text, which discusses Garelick Farms, LLC "purchas[ing] the property," makes it clear that he understood Paul's final sentence to refer to the Option to Purchase.[255]

On September 24, 2010, Paul Bernon emailed Tom Davis the note that Alan Bernon had approved.[256] The email did not represent that Paul had been directed by Elinor to begin negotiations, but it did omit mention of Alan or Peter Bernon.[257] On October 15, 2010, Paul Bernon wrote an email to Harold Ginsburg, indicating that after the September 24 email to Tom Davis, he and Ginsburg had discussed the Lease.[258] In this email, Paul Bernon made a formal proposal that BLT would reduce the rent paid by Dean Foods for the Franklin Premises and give Dean an option to extend the Lease for four ten-year periods.[259] Referencing the "Purchase Option," Paul Bernon further proposed that, in exchange, Dean would "waive all rights to purchase the property."[260]

---

[253] Exhibit 67, at 2.

[254] ECF 145, at 149:21-150:8, Testimony of Paul Bernon.

[255] Exhibit 67, at 1 ("See if Tom will engage with you and agree to some extension of the lease. If they really want to purchase the property, we should see what it would cost to keep the land zoned business or commercial in Franklin and Bellingham[.]"). Alan Bernon also testified that the "they" here was "Garelick" because he understood Tom Davis, the manager of the Franklin Premises, to have some say over real estate decisions, or at least Davis would have been "the place to start." ECF 146, at 61:11-19.

[256] Exhibit 68.

[257] Exhibit 68.

[258] Exhibit 69, at 1.

[259] Exhibit 69, at 2-3; ECF 145, at 152:18-154:19, Testimony of Paul Bernon.

[260] Exhibit 69, at 3; ECF 145, at 154:12-19, Testimony of Paul Bernon.

Ginsburg testified that Dean did not accept the proposal because it did not "appea[l] to them financially."[261] Paul Bernon never received a response from Dean.[262]

### 3. *2011 and 2012.*

On February 24, 2011, Paul Bernon emailed Alan Bernon, informing him that there was "[n]othing on Dean extending the Garelick lease; Their deadline starts March 1, 2011, but my strategy has been to wait them out. Let me know if you'd like to change trac[k]s on that."[263] The next morning, Alan responded: "[C]an you remind me regarding notice from Dean Foods about exercising the purchase for the property[?] When do they have to give notice and, if they miss the date, exactly how long does the lease renew and when do they have the opportunity to give notice again?"[264] Paul responded later that morning:

> [T]heir option to purchase must be exercised by written notice given to [BLT] at least 6 months and no more than 12 months (March 1, 2011). My understanding is that they would next have the opportunity to purchase at least 6 months and no more than 12 months to the end of . . . their next option period (5 years later). The Lease has extensions through 2087, with the rent going up by the lesser of: 115% every five years or CPI. Their lease will automatically renew for five years if they have not notified us that they are leaving or purchasing the property before 6 months of the end of the lease.[265]

That afternoon, Alan Bernon responded: "Thanks, I think at this point it makes sense to just wait and let Dean make the first move. They may not want to spend 8 million in this market without the ability to turn around and sell some of the un[n]eeded land right away to recoup part of their investment. . . . Keep me posted if Harold reaches out to you."[266]

---

[261] ECF 145, at 102:12-16, Testimony of Harold Ginsburg.

[262] ECF 145, at 220:7-9, Testimony of Paul Bernon.

[263] Exhibit 72, at 3 (capitalization omitted).

[264] Exhibit 72, at 2.

[265] Exhibit 72, at 1.

[266] Exhibit 72, at 1.

On May 3, 2011, Paul Bernon emailed Berkelhammer: "Do you have the Owen Haskell survey referenced in the Option to Purchase (attached here)? I'm trying to figure out the exact land that Dean Foods would be purchasing, if they exercise."[267] In his response, Berkelhammer suggested that Paul reach out to a surveyor who had previously done work for Alan Bernon, but he did not question the validity of the Option to Purchase.[268]

The Court finds—based on Paul Bernon's emails with Alan Bernon and efforts to renegotiate the Option to Purchase and Lease in 2010; Paul Bernon's email exchange with Alan Bernon in February 2011; and Paul Bernon's emails with Berkelhammer in May 2011—that Paul Bernon, Alan Bernon, and Robert Berkelhammer all believed, during this time period, that Garelick Farms, LLC or Dean Foods could validly exercise the Option to Purchase in 2012.

Ginsburg testified that he was involved, "in some form or fashion," with helping Dean Foods decide whether to exercise the Option to Purchase in 2012, principally by giving them data.[269] Ultimately, Dean did not exercise the Option to Purchase in 2012.[270]

### 4. Changes at BLT in 2012.

In 2012, Peter Bernon gifted his interest in BLT to Paul Bernon.[271] To accurately pay taxes on the gift, Paul Bernon commissioned an independent appraisal of BLT's property, including the Franklin Premises, by Shuka Associates.[272] As part of this process, Berkelhammer was in contact

---

[267] Exhibit 209, at 2 (capitalization omitted). Given the specificity of this email and Paul Bernon's email to Alan Bernon on February 25, 2011, *see* Exhibit 72, at 1, the Court does not credit Paul Bernon's testimony that he did not read the Option to Purchase during his negotiations with Dean in 2010 and 2011. ECF 145, at 161:1-22, Testimony of Paul Bernon.

[268] Exhibit 209, at 1-2.

[269] ECF 145, at 102:20-103:6, 115:12-21, Testimony of Harold Ginsburg.

[270] ECF 145, at 102:17-19, Testimony of Harold Ginsburg.

[271] ECF 145, at 138:10-15, Testimony of Paul Bernon.

[272] ECF 145, at 162:19-163:12, Testimony of Paul Bernon.

with Shuka Associates and provided them truthful information.[273] On December 17, 2012, an employee of Shuka emailed Paul Bernon and copied Berkelhammer asking whether the 1986 Option to Purchase was still in effect, as it was "fundamental to the appraisal of th[e] property."[274] Berkelhammer responded that same day: "Suiza Foods (now Dean) bought Garelick in 1997 from the Bernon family. They became the 'tenant'. I would argue that once they signed the new option, it superseded the option that was in the lease, but even if someone disagreed with me, . . . they had a maximum of 6 months [under Article 27 of the Lease] to exercise the option. The option has now la[ps]ed."[275]

On December 28, 2012, Shuka Associates appraised the Franklin Premises at $9,350,000.[276] The appraisal was of the leased fee interest, not the fee simple interest.[277] The appraisal accepted Berkelhammer's position—that the 1997 Option to Purchase had superseded the 1986 Option to Purchase—and included the 1997 Option to Purchase in its evaluation.[278] Paul Bernon testified that if the Franklin Premises had not been deemed encumbered by the Option to Purchase, the value of the land would have been different.[279]

In 2012, BLT was converted from a trust into an LLC.[280] At that time, Elinor owned 46.2% of the beneficial interests in the LLC, while Alan Bernon, Ronnie Bernon Gallina, Jonathan

---

[273] ECF 145, at 165:23-166:1, Testimony of Paul Bernon.

[274] Exhibit 79.

[275] Exhibit 79, at 1.

[276] Exhibit 213, at 2.

[277] Exhibit 213, at 22; ECF 145, at 226:15-227:13, Testimony of Paul Bernon.

[278] Exhibit 213, at 21, 56.

[279] ECF 145, at 169:18-171:1, Testimony of Paul Bernon.

[280] ECF 144, at 189:20-23, Testimony of Drew Kaplan; *see generally* Exhibit 6, Operating Agreement of Bernon Land Trust, LLC.

Bernon, and Paul Bernon each owned 13.45%.[281] Berkelhammer was named as the manager of BLT, and as manager, he had the power "to buy, sell, convey, assign, mortgage, lease, rent, or otherwise dispose of" BLT's assets.[282]

### 5. 2013 Lease Amendment.

On August 13, 2013, Berkelhammer emailed Greg Packer, a Vice President at Dean Foods Company, a proposed "Second Amendment to Lease" that made insurance-related changes.[283] That amendment included the following language: "THIS SECOND AMENDMENT TO LEASE . . . is made and entered into by and between Bernon Land Trust, LLC, a Massachusetts limited liability company as successor in interest to Rhode Island Hospital Trust National Bank, Trustee Under the Bernon Land Trust (the 'Landlord') and Garelick Farms, LLC, a Delaware limited liability company *as successor by merger* to Garelick Farms, Inc., (the 'Tenant')."[284] Further on, it refers to "that certain Option to Purchase dated July 30, 1997" entered into by "Landlord and Tenant."[285] The Court finds, and Drew Kaplan testified, that based on the language in this amended lease, Berkelhammer believed that Garelick Farms, LLC was the successor by merger to Garelick Farms, Inc., and believed that "Dean, as the owner of Garelick Farms, LLC, had the right to exercise" the Option to Purchase.[286]

---

[281] Exhibit 6, Operating Agreement of Bernon Land Trust, LLC, at 2, § 1.02.

[282] Exhibit 6, Operating Agreement of Bernon Land Trust, LLC, at 3-4, §§ 4.02, 4.05.

[283] *See generally* Exhibit 255, Emails between Packer to Berkelhammer about Second Amendment.

[284] Exhibit 255, Emails between Packer to Berkelhammer about Second Amendment, at 3 (bold text removed, italics added); ECF 144, at 232:18-24, Testimony of Drew Kaplan.

[285] Exhibit 255, Emails between Packer to Berkelhammer about Second Amendment, at 3; ECF 144, at 232:3-17, Testimony of Drew Kaplan.

[286] ECF 144, at 237:5-24, Testimony of Drew Kaplan.

6. *2014 Negotiations.*

In 2014, Paul Bernon and Robert Berkelhammer attempted again to renegotiate the terms of the Lease and the Option to Purchase.

First, in December 2013, Paul Bernon discussed with Alan Bernon building a gas station or pharmacy on part of the Franklin Premises that was not being used by the milk processing plant.[287] In inquiring how to approach Dean Foods Company about this venture, Paul Bernon wrote, "do you think we could pursue this and try to get the land released (either through amending the lease for 'estate' reasons, building a park on part of the land, or being straight with Dean and offering a slight rent reduction)."[288] The first two reasons—"estate" reasons and building a park for Elinor—were false.[289] On April 10, 2014, after a series of exchanges with Alan Bernon and other associates of BLT,[290] Paul Bernon emailed Alan Bernon, informing him that "I think the best way to approach this is to reach out to the Garelick GM with the idea that we are changing ownership structures for estate planning, and would like to take back four parcels—reducing their taxes by approximately $10,000 a year, and offering to reduce their rent by $25,000, and purchase price calculation by $250,000."[291] In Alan Bernon's recollection, the proposed development would not interfere with any expansion of the processing plant.[292]

---

[287] ECF 145, at 171:12-173:16, Testimony of Paul Bernon; Exhibit 83, at 1.

[288] Exhibit 83, at 1.

[289] ECF 145, at 173:10-16, Testimony of Paul Bernon.

[290] *See* Exhibits 84-91.

[291] Exhibit 92, at 1.

[292] ECF 146, at 67:23-68:8, Testimony of Alan Bernon.

On April 18, 2014, Paul Bernon reached out to Kevin Begin, the manager of the processing plant on the Franklin Premises,[293] writing: "My name is Paul Bernon, and I am a partner in Bernon Land Trust, the landlord for the Garelick Farms property in Franklin. I got your name from Tom Davis at Dean. I am reaching out because my family is in the midst of doing estate planning, and as part of that, I'd like to speak with you regarding the Lease."[294] On April 29, 2014, Paul Bernon emailed Jerry Renza: "I had a good conversation with Kevin Begin at Garelick today. I told him that the family is going through estate planning right now, and are also exploring building a park for Elinor and potentially a small office building on the site we would recapture. In exchange, we would pay taxes on those parcels, as well as offer a rent reduction. (I did not offer a number, nor . . . did I bring up affecting the purchase option rate)."[295] Paul Bernon did not reveal to Kevin Begin that BLT's true plan for the land was a gas station.[296]

On May 12, 2014, Alan Bernon emailed Paul Bernon, writing: "I saw Harold last week and he said to have you call him. I told him you handle the family real estate and I'm no longer directly involved. Probably best if you try to do a deal with him directly and keep me posted. I maybe [sic] helpful behind the scenes."[297] Paul Bernon emailed Harold Ginsburg two days later, writing: "we would like to recapture between 10-15 acres from the Lease . . . . Our family is in the process of doing some estate planning, and now would be a good time for us. As I mentioned to Kevin Begin at Garelick, we are thinking about building a park or garden to honor my grandmother on the land,

---

[293] ECF 145, Testimony of Paul Bernon, at 175:16-176:2.

[294] Exhibit 94, at 2.

[295] Exhibit 216.

[296] ECF 145, at 177:18-178:7, Testimony of Paul Bernon.

[297] Exhibit 99, at 1.

as well as possibly a small office building for my business."[298] On June 2, 2014, Paul Bernon wrote to Alan Bernon, reporting that Ginsburg was not interested in the offer.[299] Paul Bernon did not believe it was worthwhile to negotiate further with Ginsburg at that time.[300]

On June 12, 2014, Ginsburg forwarded Paul Bernon's May 14, 2014 email to Alan Bernon.[301] The next day, Ginsburg sent Alan Bernon an email reading, in totality, "Next option date is 2-29-2017."[302] On the version of the email in evidence, Alan Bernon wrote additional notes.[303] The words "Garelick Farms" are underlined to the right of the email and, at the bottom, the following text appears: "Next Option Date 2-29-2017 15 yr extension 2014 – 2024."[304]

Four months later, in October 2014, Berkelhammer emailed Ginsburg, outlining another proposal for Dean Foods to consider: "The current rent will be reduced by $100,000 per year, retroactive to September 1. Dean will [not] exercise its renewal options (we will figure out the mechanics) until February 28, 2032 and will agree to not exercise its purchase right until that time."[305] Dean did not accept this proposal, and Ginsburg did not respond to the offer.[306] The Court finds, based on BLT's attempts to renegotiate the Lease and Option to Purchase in 2014, that the

---

[298] Exhibit 97, at 1.

[299] Exhibit 99, at 1.

[300] Exhibit 99, at 1.

[301] Exhibit 100.

[302] Exhibit 101, at 1.

[303] Exhibit 101, at 1; ECF 146, at 71:15-72:2, Testimony of Alan Bernon.

[304] Exhibit 101, at 1.

[305] Exhibit 222, at 1; *see* ECF 145, at 106:25-107:3, Testimony of Harold Ginsburg (Q: "What did you understand this to mean?"; A: "They wanted to extend the primary term of the lease until February of 2032 and also an agreement that we *wouldn't* exercise our right to purchase until that time." (emphasis added)).

[306] ECF 145, at 107:4-7, 127:1-2.

decisionmakers for BLT during this era—Alan Bernon, Paul Bernon, and Robert Berkelhammer—all believed that Garelick Farms, LLC or Dean Foods held a valid Option to Purchase.

### 7.  2014 to 2017.

On October 16, 2014, Elinor gifted her shares in BLT to Ronnie Bernon Gallina via the Ronnie Bernon Gallina Irrevocable Trust, and Ronnie Bernon Gallina and her trust thus came to hold 59.65% of the interest in BLT.[307] Ronnie Bernon Gallina credibly testified that she had not been aware of the 1986 Option to Purchase in the Lease when it was negotiated, was not involved in negotiating the Lease, and did not read the Lease until 2020.[308] She also was not aware of the Option to Purchase when it was negotiated in 1997, but she learned of that Option to Purchase before the first opportunity for exercising it came in 2012.[309] At some point between 2014 and 2020, Paul Bernon approached Ronnie Bernon Gallina about potentially developing some of the land on the Franklin Premises, but she did not agree to his proposal.[310] She was not notified by her family members or Berkelhammer of any of the prior negotiations or dealings on behalf of BLT.[311]

---

[307] ECF 146, at 176:10-12, Testimony of Ronnie Bernon Gallina; Exhibit 8, Ronnie Bernon Gallina Irrevocable Trust, u/d/t October 16, 2020, at 16. Elinor passed away in April 2020. ECF 146, at 185:19-21, Testimony of Ronnie Bernon Gallina.

[308] ECF 146, at 199:15-200:17, Testimony of Ronnie Bernon Gallina. Accordingly, the Court does not credit the statements in paragraphs 17 and 18 of Ronnie Bernon Gallina's declaration that discuss BLT's intent in signing the Lease. *See* Exhibit 179, ¶¶ 17-18.

[309] ECF 146, at 200:18-202:16, Testimony of Ronnie Bernon Gallina.

[310] ECF 146, at 189:5-15, Testimony of Ronnie Bernon Gallina. Paul Bernon testified that, after she was gifted a majority of the interests in BLT, Ronnie Bernon Gallina became the "key decision maker" for BLT. ECF 145, at 193:6-9, Testimony of Paul Bernon. The Court does not credit this testimony because it was given in the context of a discussion about settlement negotiations in 2020, such that Paul Bernon may have been confused about the timeline, and because Alan Bernon more credibly testified that Ronnie Bernon Gallina only began to have a major role in BLT's decision-making after Dairy Farmers took over the Lease in 2020. ECF 146, at 161:8-13, Testimony of Alan Bernon.

[311] ECF 146, at 188:23-189:7, Testimony of Ronnie Bernon Gallina.

Dean Foods Company did not direct Garelick Farms, LLC to exercise the Option to Purchase in 2017.[312] Harold Ginsburg, who put together a chart for Dean when it was deciding whether to exercise, "assume[d]" that Dean did not exercise the option in 2017 because "[i]t didn't fit their model at that time."[313]

## IX.  Dairy Farmers' Acquisition of Garelick Farms, LLC in the Dean Foods Bankruptcy.

### A.  Dean Foods Company's Bankruptcy.

In October 2019, Dairy Farmers learned that Dean Foods Company was experiencing financial difficulties and contemplating bankruptcy.[314] Dean was, at the time, one of Dairy Farmers' largest customers of raw milk and owned approximately 30% of the milk processing plants in the United States.[315] That included the processing facility on the Franklin Premises, which took in 80-90% of its raw milk from Dairy Farmers' farmer members.[316] Dairy Farmers was concerned that if Dean declared bankruptcy, its assets, including the plant on the Franklin Premises, could be bought by entities or individuals with no interest in continuing to run processing plants, disrupting Dairy Farmers' members' ability to reliably ship their raw milk.[317]

Dairy Farmers began considering whether to attempt to buy Dean outright or buy specific Dean assets.[318] Dairy Farmers' CEO Rick Smith, CFO Gregory Wickham, Counsel Andy

---

[312] ECF 145, at 107:8-11, Testimony of Harold Ginsburg.

[313] ECF 145, at 107:12-16, 115:22-24, Testimony of Harold Ginsburg.

[314] ECF 144, at 36:8-16, Testimony of Gregory Wickham.

[315] ECF 144, at 34:22-35:11, Testimony of Gregory Wickham.

[316] ECF 144, at 35:16-20, Testimony of Gregory Wickham.

[317] ECF 144, at 36:17-37:18, Testimony of Gregory Wickham.

[318] ECF 144, at 38:4-16, Testimony of Gregory Wickham.

Brummel, and Dairy Brands Group President Alan Bernon led this effort.[319] The team assessed Dean's assets on a plant-by-plant basis, considering, among other things, each plant's importance to their farmers and viability as a business.[320] This process was complicated by a short timeframe, the COVID-19 pandemic, and Dean's outstanding $180 million debt to Dairy Farmers' members.[321]

On November 12, 2019, Dean filed a voluntary petition for reorganization under Chapter 11 of the U.S. Code in the United States Bankruptcy Court for the Southern District of Texas, administered under the caption *In re Southern Foods Group, LLC et al.* (the "Dean Foods Bankruptcy").[322] Dairy Farmers conducted a "desk" appraisal of the assets it considered bidding on from Dean, including the processing plant on the Franklin Premises.[323] While the plant was valuable to Dairy Farmers' members and had additional capacity, Dairy Farmers had concerns about its financial performance and the possibility that acquiring the plant could raise antitrust issues.[324] Alan Bernon argued that the Franklin plant could become financially profitable and was worth pursuing.[325] Dairy Farmers estimated the "book value" of the plant's machinery at $13.4

---

[319] ECF 144, at 39:1-10, Testimony of Gregory Wickham; ECF 146, at 73:13-19, Testimony of Alan Bernon.

[320] ECF 144, at 39:11-40:9, 43:13-45:3, Testimony of Gregory Wickham.

[321] ECF 144, at 38:17-25, 40:10-43:8, Testimony of Gregory Wickham.

[322] *See* Exhibit 119, Voluntary Petition for Non-Individuals Filing for Bankruptcy, *In re Southern Foods Group, LLC and Dean Intellectual Property Services II, Inc.*, No. 19-bk-36313 (Bankr. S.D. Tex.).

[323] ECF 144, at 48:16-52:25, 149:18-150:25, Testimony of Gregory Wickham; *see generally* Exhibit 229, 2019 AgVisory Appraisal.

[324] ECF 144, at 46:2-47:15, Testimony of Gregory Wickham; ECF 146, at 74:8-14, 75:20-24, Testimony of Alan Bernon.

[325] ECF 144, at 47:7-21, 48:7:15, Testimony of Gregory Wickham; ECF 146, at 74:1-15, Testimony of Alan Bernon.

million and the "liquidation value" at $4.7 million.[326] The liquidation value is the value of the machinery if the venture failed and the equipment had to be sold at auction.[327] At the time it made the appraisal, Dairy Farmers did not allocate any value toward land, like the Franklin Premises, that was leased; given the expedited nature of its analysis, Dairy Farmers did not always know the terms of the leases.[328] However, a real estate appraisal company, AgVisory, appraised the Franklin Premises at $44.2 million in November 2019.[329]

        B.    <u>Dairy Farmers' Acquisition of Garelick Farms.</u>

Dairy Farmers submitted a $433 million bid on March 30, 2020 for certain assets of Dean Foods Company, including Garelick Farms, LLC.[330] Its bid was accepted by Dean and approved by the Bankruptcy Court on April 5, 2020.[331] On April 6, 2020, Dairy Farmers submitted an executed asset purchase agreement to the Bankruptcy Court, and the transaction closed on May 1, 2020.[332]

---

[326] ECF 144, at 48:16-52:25, 149:18-150:25, Testimony of Gregory Wickham; *see generally* Exhibit 229, 2019 AgVisory Appraisal.

[327] ECF 144, at 53:1-16, Testimony of Gregory Wickham.

[328] ECF 144, at 51:18-52:11, Testimony of Gregory Wickham.

[329] ECF 144, at 150:8-15, Testimony of Gregory Wickham.

[330] ECF 144, at 55:2-6, Testimony of Gregory Wickham; Strathman Deposition Designation, at 18:16-21; Exhibit 124.

[331] ECF 144, at 55:10-12, Testimony of Gregory Wickham; Exhibit 126, Order (a) Authorizing Sale of Certain of Debtors' Assets to Dairy Farmers of America, Inc. Free and Clear of All Claims, Liens, Interests, and Encumbrances, (b) Authorizing the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement and Related Documents, and (c) Granting Related Relief (Apr. 5, 2020).

[332] ECF 144, at 55:13-56:4, 56:12-14, Testimony of Gregory Wickham; Exhibit 127, Asset Purchase Agreement Dated as of April 6, 2020 by and among Dean Foods Company, each of the Subsidiaries of Dean Foods Company Listed on the Signature Pages Hereto, and Dairy Farmers of America, Inc.

During this time period, Gregory Wickham was speaking daily with Alan Bernon.[333] Before the bid, no one at Dairy Farmers except Alan knew about the Option to Purchase, and Alan chose not to tell anyone about it.[334] The Court does not credit Alan's testimony that the Option to Purchase was not on his mind at this time.[335] Alan was a member of BLT, the trustee of the Ronnie Bernon Gallina Irrevocable Trust, and, on behalf of Garelick Farms, Inc., a signatory to the Option to Purchase. He had consulted with Paul Bernon and Robert Berkelhammer on their efforts to renegotiate the Option to Purchase. He had been informed of, and made notes concerning, the possible exercise of the Option to Purchase in 2012 and 2017. And he was reminded of the Option to Purchase on April 15, 2020 by Greg Packer, a lawyer at Dean, who had emailed Alan a summary of the Franklin plant that discussed the terms of the Lease and the Option to Purchase.[336]

The weekend after the Friday, May 1, 2020 closing of Dairy Farmers' asset purchase agreement, Alan Bernon informed Dairy Farmers' CEO that BLT planned to object in the Bankruptcy Court to the assignment of the Option to Purchase to Dairy Farmers.[337] BLT filed its objections the following Monday, May 4, contending that Dairy Farmers could not assume the Lease and the Option to Purchase.[338] Wickham was furious upon hearing of the objection, in part because it complicated an already complex transaction, in part because it injected uncertainty into Dairy Farmers' capital expenditure plans for the Franklin plant, and in part because Alan, who had been working extensively on Dairy Farmers' bid, had not told anyone at Dairy Farmers that BLT

---

[333] ECF 144, at 56:5-11, 56:15-57:3, Testimony of Gregory Wickham.

[334] ECF 144, at 56:5-11, 56:15-57:3, 147:21-148:8, Testimony of Gregory Wickham.

[335] ECF 146, at 74:16-22, Testimony of Alan Bernon.

[336] *See* Exhibit 231; ECF 146, at 77:7-79:5, 152:5-153:15, Testimony of Alan Bernon.

[337] ECF 144, at 57:7-17, 147:24-148:5, Testimony of Gregory Wickham.

[338] *See* Exhibit 129; Exhibit 130.

might object.[339] When they spoke, however, Alan told Wickham: "Don't worry about it, it's a family matter. We'll work through it."[340]

After the asset purchase agreement was executed, the Department of Justice objected on antitrust grounds to three of the milk processing plants Dairy Farmers had acquired, one of which was the plant on the Franklin Premises.[341] Consequently, Dairy Farmers was required to attempt to divest itself of those assets. Dairy Farmers tried to sell the Franklin processing plant, and when it was unsuccessful, the Department of Justice's trustee also tried, unsuccessfully, to sell the plant.[342] The entire process lasted until December 2020.[343] After the process ended, Dairy Farmers took full possession of the processing plant on the Franklin Premises, which then came within the scope of Alan Bernon's responsibility in his position at Dairy Farmers.[344]

Meanwhile, as Dairy Farmers and the trustee were attempting to sell the plant, Paul Bernon and Drew Kaplan, who had become BLT's manager upon Berkelhammer's death in February 2020, were negotiating on behalf of BLT with Dairy Farmers. In the summer of 2020, they offered to accept the validity of the Option to Purchase with an extension of the exercise date to 2030, as well as a rent reduction, in exchange for some of the land on the Franklin Premises not being used by the plant.[345] Despite holding the majority interest in BLT, Ronnie Bernon Gallina was not

---

[339] ECF 144, at 58:14-19, 59:8-19, Testimony of Gregory Wickham.

[340] ECF 144, at 58:20-24, Testimony of Gregory Wickham.

[341] ECF 144, at 59:25-60:7, Testimony of Gregory Wickham.

[342] ECF 144, at 60:8-61:18, Testimony of Gregory Wickham.

[343] ECF 144, at 61:2-4, Testimony of Gregory Wickham.

[344] ECF 146, at 75:16-19, Testimony of Alan Bernon.

[345] ECF 144, at 66:7-15, 67:2-13, Testimony of Gregory Wickham; *see generally* Exhibit 134, BLT's June 26, 2010 Proposal to Dairy Farmers. This was similar to the negotiations Paul Bernon had previously engaged in, ECF 145, at 184:21-185:16, Testimony of Paul Bernon, though this new proposal explicitly limited the exercise of the Option to Purchase to "an entity conducting

involved in those discussions.[346] Negotiations broke down in December 2020, and BLT's objection was brought before the Bankruptcy Court.

On January 15, 2021, the Bankruptcy Court overruled BLT's objections and assigned the Lease and Option to Purchase to Dairy Farmers.[347] The Court determined, however, that Dairy Farmers had acquired whatever rights Dean Foods had under the Lease and Option to Purchase, and thus ruled that "all rights of [Dairy Farmers] and BLT under the Lease and Option, including with respect to the enforceability or validity thereof under non-bankruptcy law, are preserved."[348]

## X.    Dairy Farmers' Exercise of the Option to Purchase.

After the Bankruptcy Court's decision, Dairy Farmers considered whether it would make financial sense to exercise the Option to Purchase, understanding that BLT might nevertheless object.[349] Although Wickham initially intended to sell off the "unused" parcels of land on the Franklin Premises,[350] by August 2021, he had concluded that such a plan was not feasible.[351]

---

dairy operations on the premises," Exhibit 134, BLT's June 26, 2010 Proposal to Dairy Farmers, at 3.

[346] ECF 146, at 189:20-190:12, Testimony of Ronnie Bernon Gallina.

[347] Exhibit 12, Bankruptcy Court Order, at 4.

[348] *See* Exhibit 11, Bankruptcy Court Hearing Transcript, at 34-36; Exhibit 12, Bankruptcy Court Order, at 4; ECF 144, at 68:6-69:24, Testimony of Gregory Wickham.

[349] ECF 144, at 71:5-72:9, 72:23-73:9, Testimony of Gregory Wickham.

[350] ECF 144, at 168:6-169:15, Testimony of Gregory Wickham; Exhibit 150, March 10, 2021 Email from Wickham to Dairy Farmers' Accountant, Kevin Cody, at 2 ("[M]y plan is to pay $10 million for option and sell excess land for at least 5-7 million within same fiscal year.").

[351] ECF 144, at 84:8-85:8; Exhibit 244, Email from Rick Smith to Deana Lagessie forwarding Presentation by Wickham, at 10 ("Lot of excess acreage, but much of it is wetland and not possible to develop[.] Originally, we thought we could sell the excess for $3-5 million – Not sure that is practical now after more discussion with our operators [of the processing plant].").

Around August 2021, Wickham learned from Alan Bernon that BLT was prepared to contest any exercise of the Option to Purchase.[352] At this time, Wickham had not been discussing the issues surrounding the Franklin Premises with Alan.[353] Alan had told Wickham after the bankruptcy filing that he did not believe that BLT's objection to the Option to Purchase was valid, but at some point his view shifted, and he told Wickham that he believed BLT would prevail.[354]

On August 25, 2021, Dairy Farmers notified BLT by letter that it had decided to exercise the Option to Purchase.[355] Dairy Farmers told BLT that the closing would occur on March 15, 2022, at 9:00 a.m., Central Time, at 1405 N. 98th Street in Kansas City, Kansas.[356] Its notice complied with all of the notice requirements in Section 3 of the Option to Purchase.[357] Between 2017 and 2022, the fixed annual rent was $961,118.88, meaning the purchase price under the Option was $9,611,188.80.[358] BLT notified Dairy Farmers on September 1, 2021, via its counsel, of its view that the Option to Purchase was void.[359] In that letter, BLT also took the position that it was exercising the power under Section 17 to terminate the Option to Purchase.[360] Although

---

[352] Exhibit 244, Email from Rick Smith to Deana Lagessie forwarding Presentation by Wickham, at 10.

[353] ECF 144, at 85:22-86:3, Testimony of Gregory Wickham.

[354] ECF 144, at 86:4-15, Testimony of Gregory Wickham.

[355] ECF 144, at 89:11-13, Testimony of Gregory Wickham; Exhibit 192, Notice of Exercise of Option.

[356] Exhibit 192, Notice of Exercise of Option.

[357] ECF 144, at 242:15-18, Testimony of Drew Kaplan.

[358] ECF 11, at 12, ¶ 31.

[359] Exhibit 164, BLT's Option to Purchase Response, at 1-3.

[360] Exhibit 164, BLT's Option to Purchase Response, at 3.

Dairy Farmers was ready, willing, and able to pay the purchase price, BLT did not appear at the closing.[361]

Ronnie Bernon Gallina testified that she has no issues with Dairy Farmers as a tenant and is not, at this point in time, seeking to evict the company.[362]

## XI.    **The Franklin Premises Today.**

Today, the processing plant on the Franklin Premises is operated by Dairy Farmers.[363] Dairy Farmers maintains the plant and employs between 450 and 500 people there.[364] The plant primarily serves dairy farms within a 100-to-150-mile radius,[365] and it processes about 200,000 gallons of milk a day.[366] Since Dairy Farmers has taken over, the plant has become profitable.[367] Dairy Farmers has made $12 million in capital expenditures since acquiring the plant.[368]

Dairy Farmers almost always owns the land on which its processing plants sit because of the intensive capital investment required to operate a plant and the difficulty of moving the equipment.[369] BLT commissioned a real estate appraisal, entered into evidence, that valued the Franklin Premises in January 2023 at $48.7 million.[370]

---

[361] ECF 144, at 89:8-90:18, Testimony of Gregory Wickham; ECF 144, at 242:19-22, Testimony of Drew Kaplan; Exhibit 192, Notice of Exercise of Option.

[362] ECF 146, at 194:11-16, Testimony of Ronnie Bernon Gallina.

[363] ECF 144, at 92:15-17, Testimony of Gregory Wickham.

[364] ECF 144, at 27:6-20, 30:8-14, Testimony of Gregory Wickham.

[365] ECF 144, at 29:24-30:3, Testimony of Gregory Wickham.

[366] ECF 144, at 28:11-15, Testimony of Gregory Wickham.

[367] ECF 144, at 95:7-14, Testimony of Gregory Wickham; ECF 146, at 75:20-76:10, Testimony of Alan Bernon.

[368] ECF 144, at 95:15-18, Testimony of Gregory Wickham.

[369] ECF 144, at 32:4-17, Testimony of Gregory Wickham.

[370] Exhibit 249, LandVest Appraisal Report, at 4, 10.

**XII.    Course of Performance of the Lease.**

A separate dispute in this case concerns the method for calculating rent under the Lease. The provision for calculating rent in the Lease for rental periods after the initial five-year term is as follows: "The fixed annual rental for each five (5) year option period shall be equal to the lesser of (a) one hundred fifteen percent (115%) of the fixed annual rental payable during the preceding five (5) year period, multiplied by the change in the Cost of Living, measured by the Consumer Price Index."[371]

From 1992 until 2022, the rent was the "lesser of" either the fixed annual rent during the prior five-year lease term multiplied by 115%, or the fixed annual rent during the prior five-year lease term multiplied by the Consumer Price Index ("CPI").[372] This method was agreed upon to calculate rent in 1992 by Alan and Peter Bernon, for Garelick Farms, Inc., and the BLT trustee; in 1997 by Alan and Peter Bernon, for Garelick Farms, Inc., and Berkelhammer, as trustee of BLT; in 2002 by Alan Bernon, in his capacity as President of Dean Northeast, LLC, and Berkelhammer, as trustee of BLT; in 2007 by Alan Bernon, in his capacity as an executive of Dean Foods Company, and Berkelhammer, as trustee of BLT; and in both 2012 and 2017 by Dean Foods Company and Berkelhammer, as trustee of BLT.[373]

The other course-of-performance evidence supports this method of calculation. An email from Berkelhammer to Alan Bernon on December 12, 2006 reads, "[y]ou may remember that the language in the lease is garbled, *but we have followed what we believe is the intent*—namely the

---

[371] Exhibit 2, Lease, § 3.02. The parties do not dispute how to compute the CPI.

[372] ECF 144, at 244:22-245:4, Testimony of Drew Kaplan.

[373] ECF 144, at 245:5-248:4, Testimony of Drew Kaplan; ECF 146, at 157:23-161:15, Testimony of Alan Bernon; Exhibit 113, February 21, 2017 Email from Berkelhammer to Alan and Paul Bernon, at 2-3.

rent will increase by the lesser of the CPI increase or 115%."[374] Paul Bernon's February 25, 2011 email to Alan Bernon explains that "[t]he Lease has extensions through 2087, with the rent going up by the lesser of: 115% every five years or CPI."[375] Harold Ginsburg, who managed the rent calculations on behalf of Dean Foods Company and Suiza Foods Corporation, testified that this method of calculation was never challenged by BLT or Alan Bernon.[376] Alan Bernon testified that, when he ran Garelick Farms, Inc., Berkelhammer would send him rent calculations, but that he never verified them.[377]

In a June 2020 letter, BLT took the position, for the first time, that rent would be calculated by multiplying the previous term's rent by 115% *and* the CPI increase.[378] The change came about after Kaplan took over as manager of BLT and "look[ed] at the lease with a fresh set of eyes and [came] up with a different interpretation."[379] When asked how he arrived at the new interpretation, Kaplan testified: "I will admit I didn't have specific discussions about the prior interpretations. I had a discussion with the members saying this is how I read this."[380] Alan Bernon testified that, "after the bankruptcy at Dean Foods, my sister got involved, because she became the primary beneficiary and she asked a bunch of questions. So at the time I was aware and she hired a law firm to represent her, that there may be a question on how it was calculated for years. . . . But that

---

[374] Exhibit 204, December 12, 2006 Email from Berkelhammer to Alan Bernon (emphasis added).

[375] Exhibit 72, February 2011 Emails between Alan and Paul Bernon, at 1.

[376] ECF 145, at 99:7-21, Testimony of Harold Ginsburg.

[377] ECF 146, at 50:2-19, Testimony of Alan Bernon.

[378] ECF 144, at 253:14-19, Testimony of Drew Kaplan.

[379] ECF 144, at 253:20-23, 254:5-12, Testimony of Drew Kaplan.

[380] ECF 144, at 255:2-7, Testimony of Drew Kaplan.

was her, not me."[381] Beginning on March 1, 2022, Dairy Farmers began to pay, under protest, rent in accordance with BLT's new method of calculation for the current five-year term.[382] Under that approach, Dairy Farmers has paid a fixed annual rent of $1,289,339.54, with fixed monthly installments of $107,444.96.[383] Under the prior method of calculation, Dairy Farmers would have paid $1,105,286.71 in rent per year, with monthly installments of $92,107.23.[384]

Since Alan and Peter Bernon sold Garelick Farms, Inc. in 1997, BLT has received over $21 million in rental income from the Lease.[385] Rent payments under the Lease have not, however, kept up with inflation, and the current rent is about half the market rate for comparable real estate.[386]

## PROCEDURAL HISTORY

Dairy Farmers filed its initial complaint on March 21, 2022 and its amended complaint on May 6, 2022. ECF 1, 9. Its first claim asserts that BLT breached the terms of the Option to Purchase by failing to convey the Franklin Premises for a purchase price of $9,611,188.80. ECF 9, ¶¶ 42-47. Its second claim asserts that BLT breached the terms of the Lease by demanding monthly rent payments of $107,444.96, a sum that reflects BLT's new method for rent calculation, rather than monthly payments of $92,107.23, a sum consistent with the prior method of rent calculation. *Id.* ¶¶ 48-53. Dairy Farmers seeks specific performance of the Option to Purchase and damages for

---

[381] ECF 146, at 161:9-15, Testimony of Alan Bernon.

[382] *See* Exhibit 169, Exhibits 172-174; ECF 144, at 257:5-9, Testimony of Drew Kaplan.

[383] ECF 144, at 256:19-24, Testimony of Drew Kaplan.

[384] ECF 144, at 256:7-18, Testimony of Drew Kaplan.

[385] Exhibit 181, BLT's Responses and Objection to Dairy Farmer's Requests for Admission, at 22; ECF 146, at 204:7-18, Testimony of Ronnie Bernon Gallina.

[386] ECF 144, at 181:13-24, Testimony of Gregory Wickham; ECF 145, at 228:6-18, Testimony of Paul Bernon.

each month of rent it has overpaid BLT since March 23, 2022. *Id.* at 11. BLT answered and asserted counterclaims seeking a declaration that the Option to Purchase is void and unenforceable, and a declaration that the proper monthly rent is $107,444.96. ECF 11, ¶¶ 72-86 & at 37.

In early 2023, the parties filed cross-motions for summary judgment. The Court denied both parties' motions in September 2023. ECF 74. The Court first concluded that the text of the Option to Purchase was ambiguous. *Id.* at 13-17. Because the extrinsic evidence of the parties' intent regarding the meaning of the Option to Purchase cut in both directions, the Court determined that summary judgment on Dairy Farmers' first breach-of-contract claim and BLT's corresponding counterclaim must be denied. *Id.* at 17-18. The Court rejected BLT's argument that the Option to Purchase violated the Rule Against Perpetuities, *id.* at 18-22, and found that whether the Option to Purchase was an unreasonable restraint on alienation or whether specific performance should be denied or modified depended on contested questions of fact, *id.* at 22-24. Similarly, the Court concluded that the language concerning rent calculations in the Lease was ambiguous. *Id.* at 24-26. It noted that although the course of performance and extrinsic evidence from Berkelhammer supported Dairy Farmers' position, declarations from Ronnie Bernon Gallina and Alan Bernon pointed in the other direction, and a trial was necessary. *Id.* at 26.

After the Court declined to empanel an advisory jury on Dairy Farmers' first breach-of-contract claim and BLT's corresponding counterclaim for declaratory relief, the parties stipulated to a bench trial on all claims. ECF 118, ECF 120. A bench trial was held on all claims in May 2024. Two hundred fifty-eight exhibits were admitted into evidence and eight witnesses testified: Gregory Wickham, Drew Kaplan, Gregg Engles, Harold Ginsburg, Paul Bernon, Alan Bernon, land appraiser Emmet Logue, and Ronnie Bernon Gallina. The parties also submitted a deposition designation of Kevin Strathman, Executive Vice President and CFO at Dairy Farmers, pursuant to

Fed. R. Civ. P. 32(a). Closing arguments were held in June 2024. In July 2024, the Court denied

BLT's post-trial motion to supplement the trial record. ECF 154.

## CONCLUSIONS OF LAW

### I.    Enforceability of the Option to Purchase.

The principal dispute between the parties is the enforceability of the Option to Purchase

the Franklin Premises. Dairy Farmers contends that it was assigned a valid and enforceable Option

to Purchase through the decision in the Dean Foods Bankruptcy case, and that BLT's challenges

to the enforceability of the Option to Purchase fail as a matter of law and fact. In Dairy Farmers'

view, the Option to Purchase traveled from Garelick Farms, Inc. to Suiza GTL, LLC through the

merger; stayed with Suiza GTL, LLC through its name changes to Dean Northeast, LLC and

Garelick Farms, LLC; and then was validly assigned to Dairy Farmers through the bankruptcy

decision when Dairy Farmers acquired Garelick Farms, LLC. BLT, for its part, contends that after

the 1997 Stock Purchase Agreement, Garelick Farms, Inc. held a valid and enforceable Option to

Purchase. But the Option to Purchase was not, in BLT's view, validly conveyed from Garelick

Farms, Inc. to Suiza GTL, LLC in the merger, because the Option to Purchase was "exclusive" to

Garelick, and because the conveyance was an assignment that violated the anti-assignment

provision of the Option to Purchase. BLT also argues that, for similar reasons, the Option to

Purchase did not survive the various corporate reorganizations and cannot now be enforced by

Dairy Farmers. And even if the Option was valid when acquired by Dairy Farmers, BLT contends

that it terminated the Option in September 2021 under Section 17 of the contract.

### A.    Choice of Law.

Where, as here, subject matter jurisdiction is premised on diversity of citizenship, "state

law supplies the substantive rules of decision." *Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 528

(1st Cir. 2023). The parties generally agree that Massachusetts law governs this dispute. When parties agree on the state law that applies, the Court "is free to 'forego an independent [choice-of-law] analysis and accept the parties' agreement.'" *Hershey v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 317 F.3d 16, 20 (1st Cir. 2003) (quoting *Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370, 375 (1st Cir. 1991)). The only choice-of-law question on which the parties arguably disagree is whether Massachusetts or Delaware law governs the effect of the merger of Garelick Farms, Inc. into Suiza GTL, LLC. Rather than conduct a choice-of-law analysis, the Court will apply both jurisdictions' laws to the dispute. Because the outcome is the same under either approach, the Court need not decide which law applies. *See Kaufman v. Richmond*, 442 Mass. 1010, 1011 (2004) ("Choice of law analysis is unnecessary when that choice will not affect the outcome of the case.").

      B.    <u>Effect of the 1997 Stock Purchase Agreement.</u>

The Court starts the analysis where the parties agree: Garelick Farms, Inc. signed a contractual Option to Purchase the Franklin Premises with BLT on July 30, 1997, and was then acquired through a stock acquisition by Suiza Foods Corporation the following day. The Option to Purchase was valid, enforceable, and supported by consideration. In that contract, BLT granted to Garelick Farms, Inc. "an exclusive and irrevocable option to purchase the [Franklin] Premises" for "ten . . . times the then current annual rental amount in effect under the Lease at the time the Option is exercised."[387] In exchange, Garelick Farms, Inc. agreed to extend the Lease for at least two additional five-year periods, "through at least February 29, 2012."[388] The contract gave BLT over $9 million in guaranteed rental income through February 29, 2012, as well as a guaranteed purchase price of at least $6,342,480 for the land, far higher than the $3.5 million purchase price

---

[387] Exhibit 4, Option to Purchase, §§ 1, 4.

[388] Exhibit 4, Option to Purchase, § 2.

then in effect under the 1986 Option to Purchase.[389] As Drew Kaplan testified, BLT's negotiation of the 1997 Option to Purchase yielded at least $12 million for BLT's beneficiaries above and beyond what they could have obtained through the 1986 Option to Purchase then in effect.[390]

The next question is which entity—Garelick Farms, Inc. or Suiza Foods Corporation— held the Option to Purchase after Suiza acquired Garelick Farms' stock. BLT argues, and Dairy Farmers does not meaningfully dispute, that after the Stock Purchase Agreement, Garelick Farms, Inc. continued to exist as a distinct entity and continued to hold the Option to Purchase. The Court agrees. Under Massachusetts law, "'[t]here are three basic forms in which business acquisitions are structured: acquisition of stock, merger, and acquisition of assets.'" *Mass Printing & Forms, Inc. v. RKS Health Ventures Corp.*, No. 98-00489-F, 2000 WL 744564, at *1 (Mass. Super. Ct. May 22, 2000) (Gants, J.) (quoting Tafe, *The de facto Merger Doctrine Comes to Massachusetts Wherein the Exception to the Rule Becomes the Rule*, Boston Bar J., at 12 (Nov. / Dec. 1998)). "With an acquisition of stock in a corporation, there is no change in the corporate entity, simply in the ownership of the shares of the corporate entity, so the acquired corporation remains responsible for all liabilities." *Id.*; *see also Seagram Distillers Co. v. Alcoholic Beverages Control Comm'n*, 401 Mass. 713, 720 (1988) ("'Once the corporate existence has begun, even though the stockholders, directors and corporate name may change, the corporation retains the same rights, liabilities and responsibilities until dissolved.'" (quoting Fletcher, Cyclopedia of Corporations § 2456 (perm. ed. 1979 & Supp. 1986))); *SCA Disposal Servs. of New England, Inc. v. Cent. Nat. Ins. Co. of Omaha*, No. 900393, 1994 WL 879689, at *6 (Mass. Super. Ct. Apr. 12, 1994) ("When

---

[389] ECF 144, at 204:8-20, 206:14-207:13, Testimony of Drew Kaplan.

[390] ECF 144, at 207:20-208:23, Testimony of Drew Kaplan.

acquisition is accomplished by stock purchase, all legal attributes of the acquired entity continue. Leases, contracts, and licenses remain with the acquired entity[.]").

There is no dispute that Suiza Foods Corporation took control of Garelick Farms, Inc. by purchasing all of its stock. Thus, while Suiza "control[led] the acquired corporation" such that it could direct Garelick Farms, Inc. to exercise the Option to Purchase once that option became exercisable, Suiza did not own or hold the Option to Purchase. *Mass Printing & Forms, Inc.*, 2000 WL 744564, at *1. This legal conclusion is consistent with Alan Bernon and Gregg Engles' testimony regarding the effect of the Stock Purchase Agreement: Both understood that Garelick Farms, Inc. would continue to hold the Option to Purchase.[391] And it is consistent with the language of the term sheet to the Stock Purchase Agreement, which identified "Garelick Farms, Inc." as the buyer of the Option,[392] as well as with the Option to Purchase itself, which states that the "Trust hereby grants to Garelick an exclusive and irrevocable option to purchase the Premises."[393]

C.    Effect of the Corporate Reorganizations from Garelick Farms, Inc. to Garelick Farms, LLC.

In the years following the Stock Purchase Agreement, Suiza Foods Corporation and Garelick Farms, Inc. went through a series of corporate reorganizations. The key reorganization among these was the merger of Garelick Farms, Inc. into Suiza GTL, LLC. The parties dispute the legal effect of that merger on the Option to Purchase. BLT contends that Suiza GTL, LLC could not have acquired the Option to Purchase through the merger, for two reasons: (1) Section 1 of the Option to Purchase makes the Option "exclusive" to Garelick, and only Garelick; and (2) to the

---

[391] *See* ECF 145, at 18:16-19:6, 48:5-12, Testimony of Gregg Engles; ECF 146, at 28:22-29:5, Testimony of Alan Bernon.

[392] Exhibit 17, at 1.

[393] Exhibit 4, Option to Purchase, § 1.

extent the Option to Purchase was assigned to Suiza GTL, LLC through the merger, such assignment was prohibited by the "related entity or affiliate" language of the anti-assignment provision. Separately, BLT contends that the Option to Purchase did not survive the subsequent corporate reorganizations. For the reasons that follow, the Court rejects each of these arguments. The Option to Purchase validly traveled from Garelick Farms, Inc. to Suiza GTL, LLC in the merger, and then remained valid and enforceable through Suiza GTL, LLC's name changes to Dean Northeast, LLC and Garelick Farms, LLC.

*1. Meaning of the Term "Exclusive" in Section 1 of the Option to Purchase.*

The Court begins by addressing whether the term "exclusive" in Section 1 of the Option to Purchase prevented Suiza GTL, LLC from acquiring the Option to Purchase through the merger. The Court's decision on summary judgment concluded that the text of the Option to Purchase was ambiguous. "Where a contract's terms are ambiguous, extrinsic evidence may be admitted" to elucidate the parties' intent. *Wortis v. Trustees of Tufts Coll.*, 493 Mass. 648, 663 (2024). This may include evidence of "the parties' negotiations during contracting, their course of performance under the contract, their course of dealing prior to the contract, and trade usage in the relevant industry." *Mercury Sys., Inc. v. S'holder Representative Servs., LLC*, 820 F.3d 46, 52 (1st Cir. 2016) (applying Massachusetts law).[394] In this case, the Court focuses first on evidence about the

---

[394] In its summary judgment decision, the Court characterized these categories of evidence in a hierarchical manner, suggesting that evidence of the parties' negotiations carried more weight than evidence of the parties' course of performance. ECF 74, at 17 (citing *Den Norske Bank AS v. First Nat'l Bank of Bos.*, 75 F.3d 49, 52-53 (1st Cir. 1996)); *see also Lanier Pro. Servs., Inc. v. Ricci*, 192 F.3d 1, 4 (1st Cir. 1999). It is not clear whether Massachusetts courts consider extrinsic evidence in such a hierarchical fashion, or even in the order listed by *Den Norske. See, e.g.*, *T.F. v. B.L.*, 442 Mass. 522, 525 (2004) ("There is no surer way to find out what parties meant, than to see what they have done." (quotation marks omitted)). And more recent decisions from the First Circuit omit the hierarchical modifiers of the older decisions. *See Mercury Sys.*, 820 F.3d at 52. Nevertheless, because the parties reasonably relied on the Court's summary judgment decision, the Court will continue to privilege evidence from the negotiations over course-of-performance

parties' contract negotiations, and then on evidence concerning the course of performance under the contract. In all events, the "'contract should be construed to give it effect as a rational business instrument and in a manner which will carry out the intent of the parties.'" *Starr v. Fordham*, 420 Mass. 178, 192 (1995) (quoting *Shane v. Winter Hill Fed. Sav. & Loan Ass'n*, 397 Mass. 479, 483 (1986)).

### a. Evidence of the Parties' Intent During Negotiations.

Alan Bernon and Gregg Engles both testified about what they understood the term "exclusive" in Section 1 to mean during the parties' negotiations. As discussed, the Court does not give significant weight to Gregg Engles' testimony on this point because Suiza Foods Corporation was not formally a party to the Option to Purchase between BLT and Garelick Farms, Inc. But it does consider and give some weight to Engles' recollection because (1) Suiza negotiated the term sheet of the Stock Purchase Agreement that set the contours of the Option to Purchase with Garelick Farms, Inc.; (2) the negotiation of the Option to Purchase was a condition of the Stock Purchase Agreement between Garelick Farms, Inc. and Suiza; and (3) the Stock Purchase Agreement and Option to Purchase were related contractual events that happened one day apart.[395]

Alan Bernon testified that, in his recollection, the grant of an "exclusive" option to purchase land to Garelick Farms, Inc. meant that "Garelick Farms was the only one . . . no one else

---

evidence. Of course, less credible or ambiguous evidence of negotiations can be overcome by the cumulative weight of unambiguous course-of-performance evidence.

[395] The April 25, 1997 and June 10, 1997 letters between Suiza and Peter and Alan Bernon are also evidence of the parties' negotiations. *See* Exhibit 13, Exhibit 14. That BLT relies on these letters in support of its construction of the Option to Purchase suggests that BLT agrees that evidence from Engles and Suiza is relevant to the parties' negotiations on the Option to Purchase. However, as discussed in the Findings of Fact, the Court places little significance on the fact that the letters referred to "Suiza" rather than "Garelick Farms." The Court has already concluded that Garelick Farms, Inc., not Suiza, held the Option to Purchase after the Stock Purchase Agreement.

had [the Option to Purchase]. It was to that entity."[396] He recalled negotiating an option that limited both BLT and Garelick Farms—put otherwise, BLT could not grant another option to purchase to a separate entity, and Garelick Farms could not give its Option to another entity, either.[397] The Court gives this testimony little weight because it is inconsistent with another provision in the Option to Purchase. Specifically, Section 13 of the Option to Purchase, the anti-assignment provision, contemplated that Garelick Farms, Inc. *could* assign the Option to Purchase to another entity—namely, any "related entity or affiliate of Garelick."[398] When asked at trial to explain the incongruity between his interpretation of "exclusive" and the text of the anti-assignment provision, Alan Bernon did not clarify his recollection and simply said, "I don't know."[399]

Alan Bernon separately testified that his concern in limiting the Option to Purchase to Garelick Farms was that "Suiza had been in business for a relatively short period of time," and he "was concerned that the land stayed with the business."[400] The Court gives this testimony more weight. Indeed, this testimony aligns with Gregg Engles' recollection of the purpose of the Option to Purchase. Because the goal of the Option to Purchase was, in Engles' view, to allow the owner of Garelick Farms, Inc. to eventually unify the land and the business,[401] the word "exclusive" meant that "no other party [could] hold any rights to potentially acquire this land."[402] That

---

[396] ECF 146, at 31:13-18, Testimony of Alan Bernon.

[397] ECF 146, at 114:9-13, Testimony of Alan Bernon.

[398] Exhibit 4, Option to Purchase, § 13.

[399] ECF 146, at 114:6-115:11, Testimony of Alan Bernon.

[400] ECF 146, at 32:3-11, Testimony of Alan Bernon.

[401] ECF 145, at 18:16-19:6, Testimony of Gregg Engles.

[402] ECF 145, at 26:19-24, Testimony of Gregg Engles.

recollection dovetails with Alan Bernon's memory that the word "exclusive" was also a limitation on *BLT*—that is, BLT could not grant additional purchase options to other entities.[403]

On balance, the weight of the credible evidence concerning the parties' negotiations supports Dairy Farmers' argument that the word "exclusive" meant that BLT could not grant a subsequent option to purchase to an entity uninvolved in the operation of the Garelick Farms business.

### b.  Course-of-Performance Evidence.

The course-of-performance evidence uniformly favors Dairy Farmers' interpretation of Section 1. Although BLT now contends that the Option to Purchase was invalidated when it was conveyed from Garelick Farms, Inc. to Suiza GTL, LLC in 1998, the parties to the Option to Purchase, as well as the members and fiduciaries of BLT, consistently acted as if the Option to Purchase was valid until Dairy Farmers acquired Garelick Farms, LLC in bankruptcy in 2020. BLT attempts to undermine the importance of this evidence, but its cumulative effect is overwhelming given the lack of contrary evidence supporting BLT's position.

First, in 2001 and 2007, BLT trustee Robert Berkelhammer signed estoppel agreements affirming that Garelick Farms, Inc. was a predecessor in interest to Suiza GTL, LLC; that Suiza GTL, LLC was to be renamed Dean Northeast, LLC; that Garelick Farms, LLC was the successor in interest to Garelick Farms, Inc.; and that Garelick Farms, LLC held the Option to Purchase. By signing these contracts, Berkelhammer made legal representations that he believed these facts to be true. Thus, the estoppel agreements are powerful evidence that he believed the Option to Purchase remained valid after it had been conveyed to Suiza GTL, LLC, and after Suiza GTL, LLC had undergone its subsequent name changes to Dean Northeast, LLC and Garelick Farms,

---

[403] ECF 146, at 114:9-13, Testimony of Alan Bernon.

LLC. The Court rejects BLT's argument that Berkelhammer might have signed these contracts without considering the truth of the matters in them. Berkelhammer was an attorney and a long-serving trustee of BLT. And the evidence demonstrates that he *did* consider the estoppel agreements carefully; as discussed, the 2001 estoppel agreement had been corrected by hand.

Second, members and affiliates of BLT consistently acted as if the Option to Purchase was valid. In 2007, Alan Bernon handwrote a note multiplying Garelick Farms, LLC's fixed annual rent by ten. He was, at that time, calculating the price of the Option to Purchase because he was planning for its exercise in 2012. In 2010, Paul Bernon, in consultation with Alan Bernon, attempted to negotiate a deal on behalf of BLT in which Garelick Farms, LLC, then owned by Dean Foods Company, would waive its right to purchase the Franklin Premises. It would make little sense to propose such a deal unless BLT thought the Option to Purchase was valid. In 2011, Paul and Alan Bernon's emails indicate they were preparing for the possible exercise of the Option to Purchase in 2012, but in none of those communications did either of them question the validity of the Option. In 2012, Paul Bernon had the Franklin Premises appraised after receiving an interest in BLT, and the appraisal included an assumption—developed after consultation with Berkelhammer—that the property was encumbered by the Option to Purchase. In 2013, in negotiations with Dean Foods Company concerning a lease amendment, Berkelhammer described Garelick Farms, LLC as the "successor by merger to Garelick Farms Inc."[404] He further described BLT as the "Landlord" and "Garelick Farms, LLC" as the "Tenant," and referred to the "Option to Purchase" between the "Landlord and Tenant."[405] The amendment indicates that Berkelhammer understood that Garelick Farms, LLC was created by a merger, not a mere name change or

---

[404] Exhibit 255, at 3.

[405] Exhibit 255, at 3.

conversion of a corporation to an LLC, and that Garelick Farms, LLC validly held the Option to Purchase. In 2014, Robert Berkelhammer and Paul Bernon, in consultation with Alan Bernon, attempted to renegotiate the Lease again, though this time they attempted to convince Garelick Farms, LLC to not exercise the Option to Purchase until 2032. This proposal, which endorses the validity of the Option to Purchase, is evidence that BLT believed that Garelick Farms, LLC validly held and could enforce the Option to Purchase.

BLT's only affirmative argument from the course-of-performance evidence is that the Court should infer from Dean Foods Company's decision not to exercise the Option to Purchase in 2012 or 2017 an acknowledgement that the Option was invalid. The evidence does not support this inference. Harold Ginsburg testified that Dean, which controlled Garelick Farms, LLC, did not exercise the Option to Purchase in 2012 or 2017 because it did not fit Dean's business needs at the time. Alan Bernon's contemporaneous communications reinforce this view. He wrote in a 2011 email to Paul Bernon that "[Dean] may not want to spend 8 million in this market without the ability to turn around and sell some of the un[n]eeded land right away to recoup part of their investment."[406] The evidence thus supports the conclusion that, in 2012 and 2017, all parties believed the Option to Purchase was valid, and Dean Foods Company did not cause Garelick Farms, LLC to exercise the Option because doing so was not in its economic interest at that time.

BLT's remaining argument on the course-of-performance evidence is that no one affirmed the Option to Purchase's validity in subsequent negotiations. But unless the Option's validity was in question—and no one questioned its validity until 2020[407]—there would be no reason to affirm

---

[406] Exhibit 72, at 1.

[407] ECF 146, at 161:8-13, Testimony of Alan Bernon ("[W]hen [Dairy Farmers] took over this lease, after the bankruptcy at Dean Foods, my sister got involved, because she became the primary beneficiary, and she asked a bunch of questions.").

its validity. In contrast, if someone suspected a provision to be invalid, they would—and did—speak up, as when Berkelhammer argued in 2012 that the 1986 Option to Purchase was superseded by the later one and that, in any case, the time to exercise it had long passed. As BLT conceded at closing arguments, it has no evidence that *anyone* believed the Option to Purchase was invalid until right before this litigation.[408]

The course-of-performance evidence, taken as a whole, shows that BLT's members and affiliates consistently acted as if the Option to Purchase was validly conveyed to Suiza GTL, LLC through the 1998 merger, and then was validly held by Suiza GTL, LLC through its name changes to Garelick Farms, LLC. The evidence is compelling and weighty. Collectively, it demonstrates that the parties did not intend the term "exclusive" in Section 1 to foreclose conveyance of the Option to Purchase to Suiza GTL, LLC.

c.   Summary.

In light of the extrinsic evidence introduced at trial, the Court construes the term "exclusive" in Section 1 to mean that BLT could not grant a separate option to purchase to an entity uninvolved in the operation of the Garelick Farms business. That construction aligns with the credible evidence concerning the parties' intent during their 1997 negotiations. It also aligns with the evidence on the course of the parties' performance, which demonstrates that all parties involved believed the Option to Purchase was validly conveyed to Suiza GTL, LLC and eventually to Garelick Farms, LLC. Thus, the word "exclusive" imposed a limitation on BLT, but not on the travel of the Option to Purchase through the reorganization of corporate entities that remained the operator of the milk processing business on the Franklin Premises.

---

[408] ECF 142, at 41:23-42:2.

BLT contends that this construction runs afoul of the canon against superfluity because it would make a separate provision of the Option to Purchase—Section 14's covenant not to market—superfluous. While there is a presumption against superfluity in contract construction, *Wortis*, 493 Mass. at 662, the Court is not convinced that it applies here. The term "exclusive" in Section 1 prevents BLT from giving an option to purchase to an entity not involved in the Garelick Farms business, whereas the covenant not to market in Section 14 prevents BLT from selling the Franklin Premises to a third party while the Option to Purchase remains in effect. The two provisions work in tandem, reinforcing each other. Furthermore, insofar as BLT argues that the term "exclusive" makes the Option to Purchase "exclusive to Garelick after the Suiza acquisition," such that it "could not be assigned to anyone, with limited exceptions for 'related entit[ies] or affiliate[s]' of Garelick as of the date of the Option," ECF 150, ¶ 175, BLT's construction would render the anti-assignment provision of the Option to Purchase superfluous. Under the circumstances, the canon against superfluity does scant work in the interpretation of Section 1.

The term "exclusive" in Section 1 did not, accordingly, prevent the Option to Purchase from being conveyed to Suiza GTL, LLC in the 1998 merger.

2.    *The Suiza GTL, LLC Merger Did Not Effectuate an Assignment of the Option to Purchase.*

BLT argues, in the alternative, that the transfer of the Option to Purchase from Garelick Farms, Inc. to Suiza GTL, LLC through the merger violated Section 13 of the Option to Purchase, i.e., the anti-assignment provision. This argument assumes that the merger effectuated an assignment of the Option to Purchase. That assumption, however, is inconsistent with the applicable law of mergers. Applying both Massachusetts and Delaware law, the Court concludes that the Option to Purchase was not assigned when Garelick Farms, Inc. merged into Suiza GTL, LLC, and that the anti-assignment provision was not, accordingly, implicated by that merger.

a.  Merger and Assignment Under Massachusetts Law.

State laws have historically varied on whether a merger of corporate entities effectuates an assignment of rights and obligations to the surviving entity, or instead whether the constituent entities' rights and liabilities are conveyed by operation of law to the surviving entity without an assignment. *See* Steven E. Ballew, *The Assignment of Rights, Franchises, and Obligations of the Disappearing Corporation in a Merger*, 38 BUS. LAW. 45, 45-53 (1982); Note, *Effect of Corporate Reorganization on Nonassignable Contracts*, 74 HARV. L. REV. 393, 396-97 (1960). At the time of the Suiza GTL, LLC merger, Massachusetts had two statutes that governed the merger of corporate entities: M.G.L. c. 156B, § 80, which governs the merger of corporations, and M.G.L. c. 156C, § 62, which governs the merger of LLCs.[409] Dairy Farmers assumes, without argument, that Chapter 156C applies, while BLT argues that Chapter 156B applies. Because the certificate of merger filed with the Secretary of the Commonwealth references Chapter 156B,[410] the Court will assume, favorably to BLT, Chapter 156B applied to the 1998 merger of a corporation (Garelick Farms, Inc.) into an LLC (Suiza GTL, LLC). *See Braga v. Genlyte Grp., Inc.*, 420 F.3d 35, 36-37, 39 (1st Cir. 2005) (analyzing Chapter 156B in assessing 1998 merger of corporation into an LLC).

---

[409] Had the merger occurred today, it likely would be governed by a provision of the Massachusetts Business Corporation Act, M.G.L. c. 156D, § 11.07(a). That statute provides that "[w]hen a merger becomes effective . . . all property owned by, and every contract right possessed by each corporation or other entity that merges into the survivor is vested in the survivor without reversion or impairment." M.G.L. c. 156D, § 11.07(a)(3); *see also* M.G.L. c. 156D, § 11.07, comment ("[Merger] does not give rise to a claim that a contract with a party to the merger is no longer in effect on the ground of nonassignability, unless the contract specifically provides that it does not survive a merger."). The statute, which became effective in 2004, post-dated the 1998 Suiza GTL, LLC merger and is not retroactive. *See* Mass. St. 2003, c. 127, §§ 17, 24, as amended by Mass. St. 2004, c. 178, § 48; *Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 109 n.13 (D. Mass. 2006); *In re Parkway Professional Bldg., Inc.*, 835 N.E.2d 324, 2005 WL 2414281, at *2 (Mass. App. Ct. Sept. 30, 2005) (Rule 1:28 decision).

[410] *See* Exhibit 30, at 4.

Section 80 of Chapter 156B provides that, upon a merger, "all of the estate, property, rights, privileges, powers and franchises of the constituent corporations and all of their property, real, personal and mixed, and all the debts due on whatever account to any of them . . . shall be transferred to and vested in the resulting or surviving corporation, *without further act or deed*." M.G.L. c. 156B, § 80(a)(5) (emphasis added). The statute makes clear that the surviving corporation in a merger succeeds to the constituent corporations' rights and obligations automatically by operation of law, without requiring further action by the parties. *See Comm'r of Revenue v. SCA Disposal Servs. of New England, Inc.*, 383 Mass. 734, 735, 737 (1981) (mergers under Section 80(a)(5) "[take] place by operation of law," whereby "the surviving corporation is deemed by law to have assumed all liabilities and obligations of each of the merged corporations" (comma omitted)). The First Circuit has explained that, in a merger or consolidation of solvent corporations, the goal "'is not usually to wind up the business of the old corporations but to continue as a unit that which theretofore had been separate.'" *Braga*, 420 F.3d at 43 (quoting *Proprietors of Locks & Canals on Merrimack River v. Boston & M.R.R.*, 245 Mass. 52, 58 (1923)).

Consistent with this reading of Section 80(a)(5), courts in Massachusetts have held that because, in a merger, rights and liabilities are conveyed to the surviving corporation by operation of law, the merger does not effectuate an assignment. In *U.S. Security Associates, Inc. v. Parretti*, another session of this Court held that a non-competition agreement that transferred via merger was enforceable. 405 F. Supp. 3d 328, 331-32 (D. Mass. 2019). The Court rejected the argument that the agreement did not permit assignment to the corporate entity that survived the merger, because "regardless of whether the 2014 Agreement provided for assignment, [the constituent corporation's] right to enforce the post-employment obligations in the 2014 Agreement automatically transferred to [the surviving corporation] upon completion of the merger." *Id.* at 332

76

(citing M.G.L. c. 156B, § 80(a)(5)). Similarly, in *EMC² v. Advance Manufacturing Company, Inc.*, the Appellate Division of the District Court rejected an argument that the enforceability of a contract that had been conveyed via merger was dependent on a finding that the constituent corporation assigned its contract to the surviving corporation. 2007 Mass. App. Div. 126, 2007 WL 2409847, at *2 (Dist. Ct. App. Div. Aug 20, 2007). The Court explained that the "clear language" of Section 80(a)(5) "puts . . . the surviving corporation in the shoes of . . . its constituent corporation by operation of law," regardless of whether the underlying contract was or was not assignable. *Id.* (commas removed). The Court also noted that the underlying contract had no language suggesting that a "merger or consolidation affects its validity." *Id.*; *see also SCA Disposal Servs.*, 1994 WL 879689, at *6 ("In cases where the acquired company has lost its separate corporate identity and has been merged into the acquiring company according to the terms of a state's merger statute, courts have held that the rights under the insurance policy of the merged company are deemed to have been transferred and vested in the surviving corporation, even if the policy contained a no-assignment clause. . . . Courts have justified overriding the no-assignment clause of the policy because such a transfer does not increase the risk to the insurer when the coverage transferred is limited to pre-acquisition occurrences." (citations omitted)).[411] Taken together, the available Massachusetts case law holds that, absent affirmative contractual language

---

[411] This approach accords with pre-Chapter 156B case law, which indicates that, under Massachusetts law, rights and liabilities have historically transferred from the constituent to the resulting corporation by operation of law during a merger. The Supreme Judicial Court explained in 1923 that "[w]hen different corporations are consolidated, commonly the franchises, privileges, rights and properties continue their existence, to be enjoyed and exercised by the new or enlarged or reorganized corporate entity." *Proprietors of Locks & Canals*, 245 Mass. at 58. Later that decade, the SJC emphasized that, for the purpose of contractual obligations, "the identity of corporations consolidated under the provisions of law is continued in the absorbing corporation." *Worcester Cnty. Nat. Bank of Worcester*, 263 Mass. 444, 452, *modified sub nom. Ex parte Worcester Cnty. Nat. Bank of Worcester*, 279 U.S. 347 (1929).

addressing the effect of a merger, a constituent corporation's contracts pass by operation of law to the surviving corporation in a merger, regardless of whether those contracts contain any anti-assignment provision.

BLT attempts to blunt the force of this Massachusetts authority by relying on a 1979 decision from the Sixth Circuit, *PPG Industries, Inc. v. Guardian Industries Corporation*, that analyzed the interaction of Ohio and Delaware merger statutes and federal common law applicable to patent licenses. *See* 597 F.2d 1090, 1093-97 (6th Cir. 1979). The Sixth Circuit held that patent licenses are presumed under federal common law to be non-assignable and non-transferrable during a merger. *Id.* at 1093-94; *see Cincom Sys., Inc. v. Novelis Corp.*, 581 F.3d 431, 436 (6th Cir. 2009) (describing its holding in *PPG*). Because federal common law applied in the context of patent licenses, it displaced the Ohio and Delaware merger statutes, which, like Chapter 156B, provided that upon a merger, "licenses would automatically transfer to and vest in the successor corporation." *Cincom Sys., Inc.*, 581 F.3d at 436 (describing *PPG*); *see PPG*, 597 F.2d at 1093, 1095. Thus, in the unique context of patent licenses governed by federal common law, the Sixth Circuit explained, such licenses are "personal and not assignable" during a merger "unless expressly made so" in the contract itself. *PPG*, 597 F.2d at 1093. The Sixth Circuit took care to distinguish other types of contracts that are not subject to the same rule, including contractual "shop rights" and real estate leases. *See id.* at 1094-95.

For multiple reasons, *PPG* has no bearing on this case. *PPG* applied federal common law, not Massachusetts law, and applied it to contractual intellectual property rights. *See Cincom Sys., Inc.*, 581 F.3d at 435-37 (describing *PPG*). In that narrow context, *PPG* adopted the converse of the presumption adopted by courts construing Chapter 156B: the presumption under *PPG* is that patent licenses cannot be transferred or assigned by merger unless the license itself expresses the

intent to so allow, whereas the presumption under Chapter 156B is that a merger does not implicate an anti-assignment provision unless the contractual language indicates that the parties intended the provision to apply to mergers. *Compare PPG*, 597 F.2d at 1093-95, *with Parretti*, 405 F. Supp. 3d at 331-32, *and EMC*[2], 2007 WL 2409847, at *2. BLT also contends that the language of the Ohio merger statute was similar to Chapter 156B, and that the Massachusetts Legislature's failure to modify Chapter 156B in response to *PPG* suggests that it implicitly endorsed the Sixth Circuit's analysis. This argument is nonsensical. *PPG* held that, because it was applying federal common law, the contrary "Ohio law could not override [the federal] presumption." *Cincom Sys., Inc.*, 581 F.3d at 436 (citing *PPG*, 597 F.2d at 1093). It would have made no sense for the Legislature to amend a Massachusetts merger statute of general applicability in response to a non-binding circuit court decision holding that federal common law displaced state law in the domain of patent licenses. In no way did the Legislature endorse *PPG*'s reasoning by not modifying Chapter 156B in response to it. *Cf. Chelsea Collaborative, Inc. v. Sec'y of Commonwealth*, 480 Mass. 27, 46 n.36 (2018) ("[W]e have long recognized the need to be wary of any supposed inference based on legislative nonaction." (quotation marks omitted)).

Accordingly, under Chapter 156B, § 80(a)(5), the Option to Purchase was vested in Suiza GTL, LLC by operation of law in the merger between Garelick Farms, Inc. and the Tuscan and Lehigh Dairies. And because the Option to Purchase contains no clear indication that the parties intended the anti-assignment provision to apply to mergers, that merger did not effectuate an assignment. BLT contends that Section 12's reference to the parties' "permitted successors and assigns" suggests that a merger implicates the Option's anti-assignment clause.[412] Whatever is

---

[412] Exhibit 4, Option to Purchase, § 12.

meant by that language—and BLT does not elaborate on this point—it is not explicit enough to clearly indicate that a merger would implicate the anti-assignment provision.

The Court thus concludes that, under Massachusetts law, (1) the Suiza GTL, LLC merger did not effectuate an assignment of the Option to Purchase, (2) the Option's anti-assignment provision was therefore not implicated, and (3) the Option to Purchase was vested in Suiza GTL, LLC by operation of law through the merger.[413]

### b.  Merger and Assignment Under Delaware Law.

Under Delaware law, a court must look to the intent of the contracting parties to determine whether an anti-assignment provision applies to a transfer of interests via merger. *See Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 62 A.3d 62, 81-82 (Del. Ch. 2013); *Star Cellular Tel. Co. v. Baton Rouge CGSA, Inc.*, 1993 WL 294847, at *4-*7 (Del. Ch. Aug. 2, 1993), *aff'd*, 647 A.2d 382 (Del. 1994). The court first examines the plain text of the contract. *See Tenneco Auto. Inc. v. El Paso Corp.*, No. 18810-NC, 2002 WL 453930, at *2-*3 (Del. Ch. Mar. 20, 2002); *ClubCorp, Inc. v. Pinehurst, LLC*, 2011 WL 5554944, at *8-*9 (Del. Ch. Nov. 15, 2011). If the language is ambiguous, the court next consults extrinsic evidence of the parties' intent. *See Star Cellular*, 1993 WL 294847, at *7-*8. If ambiguity cannot be resolved with extrinsic evidence, the court considers whether performance by the original contracting party is a "material condition" and whether the transfer of rights creates "unreasonable risks for the other contracting parties." *Id.* at *8 ("[W]here an antitransfer clause in a contract does not explicitly prohibit a transfer of

---

[413] The Court further concludes that Dairy Farmers has met its evidentiary burden to show that the interests of Garelick Farms, Inc.—including the Option to Purchase—passed to Suiza GTL, LLC through the merger. The certificates of merger filed with the Secretary of the Commonwealth of Massachusetts and the Delaware Secretary of State were admitted into evidence, *see* Exhibit 30, and there was extensive trial testimony about the Suiza GTL, LLC merger itself, *see Hoy v. Nat'l Sch. Bus Serv., Inc.*, No. 04-2238-G, 2005 WL 1473776, at *1-*2 (Mass. Super. Ct. June 15, 2005) (finding a merger certificate adequate proof of transfer); *EMC²*, 2007 WL 2409847, at *2 (same).

property rights to a new entity by a merger, and where performance by the original contracting party is not a material condition and the transfer itself creates no unreasonable risks for the other contracting parties, the court should not presume that the parties intended to prohibit the merger.").

The Court concluded on summary judgment that the text of the Option to Purchase is ambiguous. Thus, the first question is whether the extrinsic evidence demonstrates that Garelick Farms, Inc. and BLT intended the anti-assignment provision to prevent the transfer of the Option to Purchase via merger. For the reasons discussed in Sections I.C.1 and I.C.3—which examine the meaning of the term "exclusive" in Section 1 and "related entity or affiliate" in Section 13—the extrinsic evidence demonstrates that the contracting parties did not intend the anti-assignment provision to prevent a transfer of the Option to Purchase via a merger. For that reason alone, under Delaware law, the Suiza GTL, LLC merger did not effectuate an assignment of the Option to Purchase that implicated the anti-assignment provision.

Nevertheless, the Court will also address whether performance of the Option to Purchase by Garelick Farms, Inc. was a "material condition" of that contract, and whether the transfer of the Option to Purchase to Suiza GTL, LLC created "unreasonable risks" for BLT. *Star Cellular*, 1993 WL 294847, at *8. No credible evidence was introduced that Garelick Farms, Inc.'s personal performance of the Option to Purchase was a material condition of the contract. Instead, as described, Alan Bernon and Gregg Engles both credibly testified that the purpose of the anti-assignment provision and exclusivity clause in Section 1 was to ensure that the land and the milk processing business stayed together.[414] That the Option could be transferred to "a related entity or

---

[414] *See* ECF 145, at 18:16-19:6, Testimony of Gregg Engles; ECF 146, at 32:3-11, 33:10-34:7, 122:25-123:13, Testimony of Alan Bernon.

affiliate of Garelick" further indicates that the parties did not intend that *only* Garelick Farms, Inc. would perform under the contract.[415]

BLT argues that Garelick Farms, Inc.'s performance of the Option to Purchase was a material condition because it "provide[d] an income stream for Elinor and . . . ensure[d] the land remained intact to support the Garelick business." ECF 150, ¶ 218. No evidence exists that Garelick Farms, Inc. needed to remain the tenant in order to ensure steady rent payments for Elinor. To the contrary, the evidence shows that every corporate entity to operate the milk processing business made steady rent payments to BLT. Nor does BLT connect the Suiza GTL, LLC merger with any danger that the Franklin Premises would not remain intact. No evidence was introduced that Suiza GTL, LLC was any more likely than Garelick Farms, Inc. to sell off parcels of the Franklin Premises when the Option to Purchase first became exercisable in 2012. Indeed, it was *BLT*, not Suiza GTL, LLC and its successors, that repeatedly sought to break up the Franklin Premises—to, among other things, build a gas station—around the time the Option to Purchase first became exercisable.

There also is no evidence that the transfer of the Option to Purchase to Suiza GTL, LLC through the merger created "unreasonable risks" for BLT. *Star Cellular*, 1993 WL 294847, at *8. The focus of the "unreasonable risks" inquiry is not whether the merger changed one of the parties, but whether the merger "altered the parties' bargain in any significant way." *Id.* at *10. BLT's arguments do not address how the Suiza GTL, LLC merger might have threatened the bargain it struck with Garelick Farms, Inc. in the Option to Purchase, under which BLT secured guaranteed rent payments until February 2012 and a higher purchase price for the Franklin Premises. Instead, BLT contends that it did not want Suiza Foods Corporation or Dairy Farmers to have "managerial

---

[415] Exhibit 4, Option to Purchase, § 13.

control" of the milk processing plant under the original deal. ECF 150, ¶ 218. But neither entity had managerial control as a result of the merger, notwithstanding their joint ownership of Suiza GTL, LLC. Rather, Suiza GTL, LLC, like Garelick Farms, Inc., was led by Alan Bernon, who, as President, oversaw the operation of the Garelick, Tuscan, and Lehigh dairies. *See Star Cellular*, 1993 WL 294847, at *10 ("After the Merger, operational control of the Partnership remained in the hands of BellSouth, which made no material changes in the Partnership's management.").

Nor did the milk supply agreement with Dairy Farmers that happened in connection with the merger, or the related consolidation of the dairy industry, significantly alter the parties' bargain or affect the likelihood that Suiza GTL, LLC would perform under the contract. These developments were foreseeable to Garelick Farms, Inc. and BLT at the time of contracting in 1997. Whatever the merits of consolidation, Suiza Foods Corporation was clear from its first interaction with Alan and Peter Bernon that its strategy was to use Garelick Farms, Inc. as a regional platform to "roll . . . up" competitors.[416] It wanted to keep the managers of Garelick Farms, Inc. on, not only as managers running the day-to-day operations of the plant, but also as entrepreneurs. And its strategy worked: Alan Bernon helped Suiza acquire and consolidate multiple regional dairy businesses before and after the Suiza GTL, LLC merger. That merger did not pose a risk to BLT— let alone an unreasonable risk—concerning the performance of the Option to Purchase.

The Court accordingly concludes, under Delaware law, that the anti-assignment provision of the Option to Purchase was not implicated by the merger of Garelick Farms, Inc. into Suiza GTL, LLC.

---

[416] ECF 146, at 20:18-21:7, Testimony of Alan Bernon.

### 3. Even If the Suiza GTL, LLC Merger Did Effectuate an Assignment, Suiza GTL, LLC Was a "Related Entity or Affiliate" of Garelick Farms, Inc.

Nevertheless, even if the Suiza GTL, LLC merger did effectuate an assignment of the Option to Purchase that implicated the anti-assignment provision, the Court concludes, based on the trial evidence, that Suiza GTL, LLC was a "related entity or affiliate" of Garelick Farms, Inc., such that it could acquire the Option to Purchase through the merger.

The Court held on summary judgment that the phrase "related entity or affiliate of Garelick" was ambiguous. Dairy Farmers reads the phrase to permit assignment of the Option to Purchase to an entity involved in the operation of the Garelick Farms milk processing plant. BLT contends that the phrase permits assignment to only the 20 other fluids and plastics companies sold by Peter and Alan Bernon to Suiza Foods Corporation the day after the Option to Purchase was signed. As with the analysis of the term "exclusive" in Section 1, the Court looks first to evidence concerning the parties' negotiations, and then to evidence concerning the course of performance of the Option to Purchase, to determine the intent of the contracting parties. *See Mercury Sys.*, 820 F.3d at 52; *Den Norske*, 75 F.3d at 52-53. Much of the extrinsic evidence discussed in the analysis of the term "exclusive" also bears on the meaning of the phrase "related entity or affiliate," and will not be repeated. The Court focuses here on the extrinsic evidence uniquely pertinent to the anti-assignment provision.

In Alan Bernon's recollection, the parties negotiated the anti-assignment provision to prevent the Option to Purchase from being "assigned to a third party unrelated to the running of the Garelick Farms business."[417] He "wanted [the land] to stay with the business for future growth of the company," including a possible expansion of the milk processing plant or the Franklin

---

[417] ECF 146, at 122:25-123:5, Testimony of Alan Bernon.

Plastics business.[418] From his communications with Gregg Engles during the negotiation of the Stock Purchase Agreement, Alan Bernon knew that Suiza Foods Corporation's strategy was to buy up leading regional dairies for use as platforms for consolidation, while leaving the management of individual dairies intact. Alan Bernon testified that, in a conversation with Berkelhammer before signing the Option to Purchase, he expressed that "the only entities that could be assigned to are the ones that we owned at that particular time."[419] Alan Bernon did not convey this understanding of the anti-assignment provision to Gregg Engles during the negotiations.

While the evidence is somewhat mixed on the parties' intent in negotiating, Dairy Farmers' construction of the anti-assignment provision more closely aligns with Alan Bernon's testimony regarding the purpose of that provision. If the goal of the provision was to ensure that the land stayed with the entity running the Garelick Farms business, an anti-assignment provision allowing assignment to entities involved with the operation of the milk processing business would make good sense. But under BLT's interpretation, a "related entity or affiliate" could include any one of the plastic bottling companies—located in Illinois, Florida, Texas, and other distant states—that had little to do with the dairy business that had defined the Franklin Premises since Israel Garelick began purchasing land. Dairy Farmers' construction also makes more business sense. Both parties to the Option to Purchase understood that Garelick Farms, Inc., along with the other fluids and plastics businesses, were to be sold to Suiza Foods Corporation and subject to Suiza's control the day after the Option was signed. Only one of those subsidiaries, Franklin Plastics, operated on the Franklin Premises with Garelick Farms, Inc. BLT has offered no sound explanation as to why, in 1997, the parties to the Option would have wished to secure Suiza Foods Corporation's ability, in

---

[418] ECF 146, at 33:10-34:7, 123:10-13, Testimony of Alan Bernon.

[419] ECF 146, at 130:4-12, Testimony of Alan Bernon.

2012 or thereafter, to direct Garelick Farms, Inc. to assign its Option to Purchase to any of the other subsidiaries Suiza purchased from Alan and Peter Bernon.[420]

Turning to the course-of-performance evidence, the Court relies on the previously recounted evidence that no member or affiliate of BLT questioned the validity of the Option to Purchase from 1997 until 2020. To the contrary, Robert Berkelhammer, Alan Bernon, and Paul Bernon behaved during those years as though the Option to Purchase was valid. The successors-in-interest to Garelick Farms, Inc., as well as the members and trustee of BLT, demonstrated a shared understanding that the anti-assignment provision did not foreclose the exercise of the Option to Purchase in 2012 or 2017 by Garelick Farms, LLC, which was, at the time, owned by Dean Foods Company.

Noteworthy, too, is the evidence that the Suiza GTL, LLC merger happened in December 1998, only a year and a half after the July 1997 signing of the Option to Purchase. As a member of Suiza's Board of Directors, Alan Bernon voted to approve the merger, and he then became President of Suiza GTL, LLC. Having known that Suiza Foods Corporation sought to consolidate the dairy industry, Alan Bernon could have foreseen that Garelick Farms, Inc. might be merged

---

[420] BLT argues that language referencing "future affiliates" is necessary to support Dairy Farmers' interpretation of the anti-assignment provision because the Stock Purchase Agreement was imminent, the parties were sophisticated, and similar language is used in other contracts. *See, e.g.*, *Associated Chiropractic Serv., Inc. v. Travelers Ins. Co.*, 1998 Mass. App. Div. 167, 1998 WL 544315, at *1 (Mass. Dist. Ct. Aug. 21, 1998). In BLT's view, the parties would have referenced "future affiliates" in the anti-assignment provision if they wanted to permit assignment to those entities. BLT has failed to identify any extrinsic evidence from the negotiations to support this view. And Dairy Farmers' argument is more convincing. The parties executing the Option to Purchase were aware that Garelick Farms, Inc. would sell its stock to Suiza Foods Corporation within 24 hours. They knew that Suiza Foods Corporation was a holding company whose business strategy was to acquire neighboring businesses. Therefore, they knew that they were selling control over their business to a holding company that would regularly acquire new businesses and, perhaps, merge those businesses with Garelick Farms, Inc. That context does not support the inference that the parties would have thought the inclusion of "future affiliates" language was necessary.

with other entities as part of that regional consolidation, even while the dairies would maintain their operational structures. And while voting to approve the Suiza GTL, LLC merger and then continuing to manage the Garelick milk processing plant as Suiza GTL, LLC's President, Alan Bernon never suggested that the anti-assignment provision had blocked the transfer of the Option to Purchase to his new LLC. Nor did he question the validity of the Option to Purchase when he voted, as a member of the board of directors, to approve the 2001 merger between Suiza Foods Corporation and Dean Foods Company, at which time Suiza GTL, LLC was renamed Dean Northeast, LLC, and then eventually Garelick Farms, LLC.

Weighing the extrinsic evidence, the Court concludes that the contracting parties intended a "related entity or affiliate of Garelick" to include those entities operating the milk processing business on the Franklin Premises. Because Suiza GTL, LLC was the entity that ran the milk processing facility after it absorbed Garelick Farms, Inc. in the merger, it was a "related entity or affiliate" of Garelick. To the extent the merger effectuated an assignment, the transfer of the Option to Purchase to Suiza GTL, LLC did not violate the anti-assignment provision.

### 4. The Option to Purchase Remained Valid Through Subsequent Corporate Reorganizations.

BLT next contends that, even if the Option to Purchase validly passed to Suiza GTL, LLC, it did not survive the subsequent corporate reorganizations.

Conceptually, the corporate reorganizations following the Suiza GTL, LLC merger fall into two buckets: (1) the transfers of ownership interests in connection with the formation of Suiza Fluid Dairy Group, L.P., another joint venture between Suiza and Dairy Farmers, as well as the transactions related to Suiza's 2001 merger with Dean Foods Company; and (2) Suiza GTL, LLC's name changes after the Dean Foods merger. With respect to the first bucket of transactions, the evidence demonstrates that various ownership interests transferred, but that Suiza GTL, LLC

87

survived those transfers as a distinct entity.[421] No evidence was introduced that Suiza GTL, LLC's contractual rights—including the Option to Purchase—were assigned in connection with these ownership transfers.[422] BLT's argument that these transactions violated the anti-assignment provision therefore falls short, because it has not shown that any assignment of the Option to Purchase took place in connection with those transactions. Instead, Suiza GTL, LLC continued to hold the Option to Purchase throughout the corporate reorganizations between 1998 and 2001.

The second bucket of transactions—the corporate name changes—occurred after Suiza Foods Corporation merged with Dean Foods Company. Specifically, on December 21, 2001, Suiza GTL, LLC changed its name to Dean Northeast, LLC,[423] and then on April 27, 2006, Dean Northeast, LLC, changed its name to Garelick Farms, LLC.[424] Throughout these name changes, Alan Bernon remained President of each LLC and oversaw the operations of the milk processing plant on the Franklin Premises. There is no evidence that any assignment was made in connection with these name changes, and, therefore, no basis to conclude that the anti-assignment provision of the Option to Purchase was implicated. But even if it was, because Suiza GTL, LLC, Dean Northeast, LLC, and Garelick Farms, LLC all ran the milk processing plant on the Franklin Premises, each was a "related entity or affiliate" of Garelick Farms, Inc. The Option to Purchase

---

[421] BLT also argues that Suiza Fluid Dairy Group, L.P. "absorbed" Suiza GTL, LLC, presumably because the latter was a subsidiary of the former. This argument is contradicted by the facts, which show that Suiza GTL, LLC continued to have a distinct existence before, during, and after the Suiza Fluid Dairy Group, L.P. joint venture.

[422] The only non-ownership assignment BLT identifies is the assignment of "certain assets" and "liabilities" from Suiza Foods Corporation to Suiza Fluid Dairy Group, L.P. as part of the Suiza Fluid Dairy Group transaction. *See* Exhibit 36, Original Suiza Fluid Dairy Group, L.P. Agreement, § 2.5(d). There is no evidence that the Option to Purchase was one of the "assets" or "liabilities" contemplated in the agreement, and BLT fails to develop any meaningful argument as to why this Court should infer that an assignment of the Option occurred.

[423] Exhibit 47, Suiza GTL, LLC Certificate of Amendment of Certificate of Formation.

[424] Exhibit 62, Certificate of Amendment to Certificate of Formation of Dean Northeast, LLC.

thus stayed with the entity operating the processing plant, which, from April 2006 until the 2020

bankruptcy proceedings, was Garelick Farms, LLC.[425]

> D. Dairy Farmers Acquired a Valid Option to Purchase Through the Dean Foods Bankruptcy.

This state of affairs was largely unchanged when Dean Foods declared bankruptcy in

November 2019. Garelick Farms, LLC remained a subsidiary of Dean Foods. Although Alan

Bernon was no longer leading Garelick Farms, LLC, and was instead working for Dairy Farmers,

Garelick Farms, LLC continued to hold the Option to Purchase and pay rent in accordance with

the Lease. The question, then, is whether Dairy Farmers acquired a valid and enforceable Option

to Purchase through the bankruptcy proceedings.

The Bankruptcy Court and Dean Foods accepted Dairy Farmers' bid to acquire Garelick

Farms, LLC, as well as other Dean Foods assets, on April 5, 2020, and the transaction closed on

---

[425] BLT separately argues that the 1998 Suiza GTL, LLC merger and the subsequent corporate reorganizations violated Section 9.04 of the Stock Purchase Agreement because the Option to Purchase was "assigned" in these transactions to a non-wholly owned subsidiary of Suiza without the "other party['s]" written consent. Section 9.04 of the Stock Purchase Agreement reads: "[N]either this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any party *hereto* without the prior written consent of the *other party*, nor is this Agreement intended to confer upon *any other person except the parties hereto any rights or remedies hereunder*, except that the Buyer may assign any or all of its rights, but not its obligations, hereunder to one or more wholly owned subsidiaries." Exhibit 15, at 60-61 (emphases added). Under the plain text of the provision, BLT is not a party to the Stock Purchase Agreement, which names Suiza Foods Corporation as the buyer, and the 21 fluids and plastics companies, as well as the parties named on Exhibit A to the Stock Purchase Agreement, as the sellers. *See id.* at 1, 60-61. As a non-party, BLT cannot assert contractual rights under the Stock Purchase Agreement unless it is a third-party beneficiary, *see Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.*, 455 Mass. 458, 464 (2009), or a similar doctrine applies, *cf. Machado v. System4 LLC*, 471 Mass. 204, 209-10 (2015) (discussing similar theories in the context of arbitration agreements). BLT does not argue that it is a third-party beneficiary, nor does it articulate any valid theory on which it could assert a right under the Stock Purchase Agreement. It cannot, accordingly, assert rights under Section 9.04 of that agreement.

89

May 1, 2020.[426] On May 4, 2020, the next business day, BLT filed formal objections to the transfer

of the Lease and Option to Purchase held by Garelick Farms, LLC to Dairy Farmers.[427] With

respect to the Option to Purchase, BLT argued, among other things, that the Option to Purchase

was not an "executory contract" that could be assumed or assigned under 11 U.S.C. § 365.[428] Dairy

Farmers responded by arguing that the Option to Purchase and Lease are an integrated document

or, in the alternative, that the Option to Purchase is an executory contract.[429]

On January 15, 2021, the Bankruptcy Court resolved the dispute between BLT and Dairy

Farmers. It determined that the Option to Purchase was assignable under 11 U.S.C. § 365  because

it was integrated into the Lease, or, alternatively, because the Option was itself an executory

contract.[430] Its Order determined, in relevant part, that "[a]ll objections to the entry of this Order,

including the Limited Objections and the BLT Response, are overruled for the reasons set forth on

---

[426] ECF 144, at 55:10-56:14, Testimony of Gregory Wickham; Exhibit 126, Order (a) Authorizing Sale of Certain of Debtors' Assets to Dairy Farmers of America, Inc. Free and Clear of All Claims, Liens, Interests, and Encumbrances, (b) Authorizing the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement and Related Documents, and (c) Granting Related Relief (Apr. 5, 2020); Exhibit 127, Asset Purchase Agreement Dated as of April 6, 2020 by and among Dean Foods Company, each of the Subsidiaries of Dean Foods Company Listed on the Signature Pages Hereto, and Dairy Farmers of America, Inc.

[427] *See* Exhibit 129, Limited Objection and Reservation of Rights to Cure Notice and Assumption Notice; Exhibit 130, Limited Objection and Reservation of Rights to Assumption Notice (Doc. 1771).

[428] *See* Exhibit 130, Limited Objection and Reservation of Rights to Assumption Notice (Doc. 1771), at 3-4; Exhibit 139, Bernon Land Trust, LLC's Response to Reply of Dairy Farmers of America, Inc. (Dkt. 3325), at 11-13.

[429] *See* Exhibit 138, Reply of Dairy Farmers of America, Inc. to (a) Limited Objection and Reservation of Rights to Cure Notice and Assumption Notice, (b) Limited Objection and Reservation of Rights to Assumption Notice (Doc. 1771), and (c) Limited Objection and Reservation of Rights of Bernon Land Trust, LLC to the Final Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases for Dairy Farmers of America, Inc. (#3286), at 6-9.

[430] *See* Exhibit 11, Transcript of Bankruptcy Court Objection Hearing, at 33-34.

the record at the Objection Hearing."[431] It ordered that the Lease and Option to Purchase "are hereby assumed in their entirety by the Debtors and assigned to [Dairy Farmers], effective as of January 11, 2021."[432] But it explained that, "[n]otwithstanding entry of this Order, all rights of [Dairy Farmers] and BLT under the Lease and Option, including with respect to the enforceability or validity thereof under *non-bankruptcy law*, are preserved, as announced by the Court at the Objection Hearing."[433] At the Objection Hearing, the Bankruptcy Judge had explained that the Option to Purchase "comes with all the hair and the warts that exist as of today. . . . I can't make it any better or worse than it exists . . . other than to the extent that it's [an] executory [contract]. . . . [BLT] get[s] to argue that what I authorized, what the debtor sold, was air."[434]

Thus, as framed in the Bankruptcy Court's Order, there were two questions before the Court: (1) whether, as a matter of federal bankruptcy law, the Option to Purchase was assignable to Dairy Farmers under 11 U.S.C. § 365, and (2) whether, as a matter of "non-bankruptcy law," the Option to Purchase held by Garelick Farms, LLC at the time of the proceeding was valid and enforceable.[435] The Bankruptcy Court resolved the first question in favor of Dairy Farmers, holding that the Option to Purchase was assigned under 11 U.S.C. § 365 to Dairy Farmers. The Bankruptcy Court did not resolve the second question, allowing the parties to argue in a future proceeding that, as a matter of state law, the Option to Purchase held by Garelick Farms, LLC was invalid at the time it was acquired.

---

[431] Exhibit 12, Bankruptcy Court Order, at 4.

[432] Exhibit 12, Bankruptcy Court Order, at 4.

[433] Exhibit 12, Bankruptcy Court Order, at 4 (emphasis added).

[434] Exhibit 11, Transcript of Bankruptcy Court Objection Hearing, at 34, 36 (emphasis added).

[435] Exhibit 12, Bankruptcy Court Order, at 4.

The preclusive effect of the Bankruptcy Court's Order is an issue of federal law, determined by the Restatement (Second) of Judgments. *See In re Kane*, 254 F.3d 325, 328 (1st Cir. 2001). Under the Restatement, "an issue 'actually litigated and determined by a valid and final judgment,' if 'essential' to the judgment, binds the same parties in any subsequent action, 'whether on the same or a different claim.'" *Id.* (quoting Restatement (Second) of Judgments § 27 (1982)). BLT advances no argument that the first question addressed by the Bankruptcy Court—concerning the assignability of the Option to Purchase under 11 U.S.C. § 365—lacks preclusive effect. And the standard is clearly met here: BLT and Dairy Farmers litigated the question of the assignability of the Option to Purchase under 11 U.S.C. § 365; that question was resolved in a final judgment in favor of Dairy Farmers on January 15, 2021; and that question was essential to the Bankruptcy Court's Order.[436] That Order now binds this Court. *See In re Kane*, 254 F.3d at 328.

The second question—whether the Option to Purchase was valid and enforceable under state law as of the date of the Bankruptcy Court's Order—is the question litigated in this case. And for the reasons described, the Court has determined that the Option to Purchase held by Garelick Farms, LLC, as a subsidiary of Dean Foods, was valid and enforceable as of the time of the bankruptcy proceedings. It was conveyed from Garelick Farms, Inc. to Suiza GTL, LLC through the merger, and then survived the subsequent corporate reorganizations and name changes to remain with Garelick Farms, LLC. The question is not, as BLT would have it, whether Dairy Farmers is a related entity or affiliate of Garelick Farms, Inc. today. Dairy Farmers acquired what Garelick Farms, LLC had at the time of the bankruptcy proceeding. Because the Option to Purchase held by Garelick Farms, LLC was valid and enforceable, and Dairy Farmers was assigned

---

[436] Exhibit 12, Bankruptcy Court Order, at 4.

that Option to Purchase under 11 U.S.C. § 365, the Court concludes that the Option to Purchase acquired by Dairy Farmers through the Dean Foods Bankruptcy is valid and enforceable.

  E. <u>BLT Did Not Terminate the Option to Purchase by Invoking Section 17.</u>

  BLT contends that, even if Dairy Farmers did acquire a valid Option to Purchase through the bankruptcy proceeding, BLT exercised its right under Section 17 to terminate the Option in its September 1, 2021 letter, sent one week after Dairy Farmers gave notice of its intent to exercise the Option.

  Titled "Default by Garelick," Section 17 provides: "In the event Garelick fails to purchase the Premises (other than because of a permitted termination or as a result of a default by the Trust), then the Trust, as the Trust's sole and exclusive remedy, shall have the right to terminate this Option to Purchase by giving written notice thereof to Garelick, whereupon neither party hereto shall have any further rights or obligations hereunder except as expressly provided otherwise in this Option to Purchase."[437] BLT reads this provision as giving it the right to terminate the Option to Purchase if, in 2012, Garelick Farms, Inc. or its successor-in-interest failed to exercise the Option. In BLT's view, it may terminate the Option to Purchase "at any time after Garelick's first failure to exercise it." ECF 150, ¶ 253. Pointing out that the provision's title references "[d]efault," Dairy Farmers responds that Section 17 allows BLT to terminate the Option to Purchase only if Garelick or its successor gives notice of its intent to exercise the option and then fails to pay—put otherwise, if it defaults.

  Dairy Farmers' construction of Section 17 best aligns with the text and structure of the Option to Purchase and the extrinsic evidence of the parties' intent. In Massachusetts, a "contract is to be construed to give reasonable effect to each of its provisions." *J.A. Sullivan Corp. v.*

---

[437] Exhibit 4, Option to Purchase, § 17.

*Commonwealth*, 397 Mass. 789, 795 (1986), *overruled on other grounds by G4S Tech. LLC v. Mass. Tech. Park Corp.*, 479 Mass. 721 (2018). Section 17 is entitled "Default by Garelick."[438] A default is "[t]he omission or failure to perform a legal or contractual duty; esp., the failure to pay a debt when due." DEFAULT, Black's Law Dictionary (12th ed. 2024). The section then specifies that in the event Garelick fails to purchase the Franklin Premises, "the Trust's sole and exclusive *remedy*" is to terminate the Option to Purchase.[439] Section 16, titled "Default by the Trust," likewise gives Garelick remedies "with respect to the Trust's default"—namely, terminating the Option, enforcing specific performance, or suing for damages.[440] Read in harmony, these sections prescribe the remedies available to the parties in the case of a default. In contrast, BLT's construction of Section 17—under which BLT could terminate the Option to Purchase at any time, and for any reason, after the first time to exercise in 2012 passed—would effectively give Garelick or its successor one real opportunity to exercise the Option, in 2012. But that would be inconsistent with Section 3, which explicitly contemplates valid exercises of the Option after the initial fifteen-year lease period: "The Option is exercisable by written notice . . . given to the Trust at least 6 months and no more than 12 months prior to the expiration of the Lease, as extended pursuant to the Lease Extension *or as thereafter extended in accordance with the Lease*."[441]

To the extent Section 17 is ambiguous, the extrinsic evidence before the Court cuts against BLT's interpretation. As discussed, Berkelhammer and members and associates of BLT considered the Option to Purchase valid after 2012. Before 2021, no member of BLT considered invoking Section 17 in the way BLT suggests. Indeed, Alan Bernon inquired in 2011 "if they miss

---

[438] Exhibit 4, Option to Purchase, § 17.

[439] Exhibit 4, Option to Purchase, § 17 (emphasis added).

[440] Exhibit 4, Option to Purchase, § 16.

[441] Exhibit 4, Option to Purchase, § 3 (emphasis added).

the date, exactly how long does the lease renew and when do they have the opportunity to give notice again?"[442] If BLT's construction of Section 17 were correct, BLT could have terminated the Option to Purchase any time after 2012. Instead, the same parties who negotiated the Option to Purchase—Berkelhammer and Alan Bernon—attempted to renegotiate the Option to Purchase in 2014 rather than simply terminating it. That BLT's interpretation of Section 17 did not occur to anyone associated with BLT until *after* it became clear that Dairy Farmers would exercise the Option is evidence that it is not an accurate reflection of the contracting parties' intent. The Court thus concludes that because Dairy Farmers was not in default in September 2021, Section 17 did not give BLT the power to terminate the Option to Purchase at that time, and its attempted termination has no legal effect.

BLT does not dispute that, if the Option to Purchase was valid, enforceable, and not otherwise terminated under Section 17, it breached the Option by failing to convey the Franklin Premises to Dairy Farmers at the March 15, 2022 closing. Dairy Farmers was ready, willing, and able to perform at the closing by making payment to BLT in the amount of ten times the fixed annual rent in effect at the time of the Option's exercise. *See Pierce v. Clark*, 66 Mass. App. Ct. 912, 913 (2006) ("[A] buyer must manifest that he is ready, able, and willing to perform by setting a time and place for passing papers or making some other concrete offer of performance." (brackets in original) (quotation marks omitted)). Nor does BLT dispute that Dairy Farmers suffered harm as a result of that breach. Dairy Farmers has therefore met its burden to show that BLT breached the Option to Purchase.

---

[442] Exhibit 72, February 2011 Emails between Alan and Paul Bernon, at 2.

## II.     <u>Equitable Relief for the Breach of the Option to Purchase.</u>

Dairy Farmers requests that the Court order specific performance as the remedy for BLT's breach of the Option to Purchase. BLT asserts two defenses to Dairy Farmers' request for specific performance. First, BLT contends that the Option should be declared void under Massachusetts law as an unreasonable restraint on alienation. Second, BLT contends that the Court should exercise its discretion to deny specific performance in light of various equitable considerations. The Court is not persuaded by either defense and concludes instead that specific performance of the Option to Purchase is warranted. The Court will not, however, award Dairy Farmers a restitutionary credit for the rent paid to BLT since March 1, 2022, because Dairy Farmers' request for that additional form of equitable relief was untimely.

### A.     <u>The Option to Purchase Is Not an Unreasonable Restraint Against Alienation.</u>

An option to purchase land "'imposes an immediate restraint upon alienation of the owner' of the property, for the period during which the option may be exercised." *Certified Corp. v. GTE Prods. Corp.*, 392 Mass. 821, 824-25 (1984) (quoting *Eastman Marble Co. v. Vermont Marble Co.*, 236 Mass. 138, 153 (1920)). Massachusetts law regards as null and void any restraint on alienation that is unreasonable. *See Franklin v. Spadafora*, 388 Mass. 764, 766-67 (1983). To determine whether a restraint is reasonable, courts look to the factors described in the Restatement of Property (First) § 406 (1944). *Franklin*, 388 Mass. at 766-67. A restraint is likely to be reasonable if:

> 1. the one imposing the restraint has some interest in land which he is seeking to protect by the enforcement of the restraint; 2. the restraint is limited in duration; 3. the enforcement of the restraint accomplishes a worthwhile purpose; 4. the type of conveyances prohibited are ones not likely to be employed to any substantial degree by the one restrained; [and] 5. the number of persons to whom alienation is prohibited is small.

*Id.* at 766 (quoting Restatement of Property (First) § 406 cmt. i). In contrast, a restraint is likely to be unreasonable if:

> 1. the restraint is capricious; 2. the restraint is imposed for spite or malice; 3. the one imposing the restraint has no interest in land that is benefited by the enforcement of the restraint; 4. the restraint is unlimited in duration; [and] 5. the number of persons to whom alienation is prohibited is large.

*Id.* at 766 n.6 (quoting Restatement of Property (First) § 406 cmt. i). "None of these factors is determinative, nor is the list exhaustive." *Id.* at 766.

The Court applies the factors in turn. First, Dairy Farmers has an interest in the land. Dairy Farmers is the tenant, operates a business on the Franklin Premises, owns the equipment in the processing plant, and has made over $12 million in capital investments since buying the plant. Massachusetts courts have found interests in the land in far more tenuous cases. *See, e.g.*, *Luo v. City of Boston*, 96 Mass. App. Ct. 1102, 2019 WL 4309063, at *2 (Sep. 12, 2019) (Rule 1:28 decision) (defendant had interest in the property "both as the original grantor of the property and as the benefited party"); *Gottlieb v. Girl Scouts of E. Massachusetts, Inc.*, No. 16-misc-000072-RBF, 2016 WL 3523859, at *7 (Mass. Land Ct. June 23, 2016) (plaintiff had interest as third-party beneficiary of the agreement at issue); *Venuto v. DiClemente*, No. 9904974F, 2001 WL 1174143, at *4 (Mass. Super. Ct. July 31, 2001) (enforcer of covenant not to sell building had interest given that he resided in an adjoining building). BLT nevertheless argues that Dairy Farmers "paid no consideration at all for the Option and did not even assign it any value in its bankruptcy bid." ECF 150, ¶ 240. BLT cites no case law for the proposition that a party must pay consideration for a purchase option in order to have an interest in the land. Nor does the Court agree with BLT's premise. There is no question, for example, that Ronnie Bernon Gallina has an interest in the Franklin Premises despite paying no consideration for her ownership interests in BLT. In any

event, Dairy Farmers *did* pay for the Option to Purchase because it bought Garelick Farms, LLC's assets out of bankruptcy.

Second, the restraint imposed by the Option to Purchase is limited in duration, even though it could conceivably last until 2087. Massachusetts courts have found that any durational limit, even for a life of a person, favors a finding of reasonableness. *See, e.g.*, *Venuto*, 2001 WL 1174143, at *4. Further, some Massachusetts courts have looked to the amount of time that has actually passed, rather than the amount of time that could pass if the holder failed to exercise the option. *See Tucker v. Adams*, No. 22-misc-000185-JSDR, 2023 WL 4862629, at *10 (Mass. Land Ct. July 31, 2023) (finding, under the circumstances, that waiting nearly four years to insist on a right of first refusal was too long, but that one or two years would likely not have been). Under this approach, 25 years passed between the 1997 grant of the Option to Purchase and its 2022 exercise. But because 15 of those years were the result of an agreement that guaranteed BLT rent, the Option to Purchase was invoked ten years after it first could have been. Under the circumstances, the Court finds that this factor marginally favors Dairy Farmers.

Third, the Option to Purchase serves a worthwhile purpose: allowing the business of running the milk processing plant to be united with the land, thus creating an incentive for greater investment in the business. BLT disagrees, arguing that the purpose of the Option to Purchase was "satisfied by a prior tenant . . . when the second Lease extension expired." ECF 150, ¶ 240. But this response improperly constrains the purpose of the Option to its Lease extension. While one aim of the Option to Purchase was to ensure a 15-year income stream to Elinor, another important aim—as described by Alan Bernon and Gregg Engles at trial—was to provide a mechanism to eventually reunify the land and the milk processing business. Particularly in view of the range of

beneficial purposes recognized across Massachusetts case law,[443] the goal of fostering investment in the business through unification of the land and business supports the Option's reasonableness.

The parties agree that the fourth factor is inapplicable. Dairy Farmers does not dispute that the fifth factor, which concerns the number of persons to whom alienation is prohibited, favors BLT. The Option to Purchase limits BLT's ability to sell or otherwise transfer the Franklin Premises to any entity other than Garelick Farms, Inc. or a successor-in-interest or related entity or affiliate. This factor thus cuts against a finding of reasonableness. *See Tucker*, 2023 WL 4862629, at *9 (fact that "class of people to whom alienation is prohibited is large" cuts against reasonableness determination); *cf. Franklin*, 388 Mass. at 770 (fact that condominium bylaw amendment allowed alienation of property to all persons except small group supported reasonableness).

The parties also agree that whether the purchase price is "fixed" bears on whether the restraint is reasonable. *See Bortolotti v. Hayden*, 449 Mass. 193, 204-05 (2007); Restatement (Third) of Property (Servitudes) § 3.4, cmt. e (2000). They disagree, however, on whether the Option to Purchase sets a "fixed" purchase price. Dairy Farmers contends that because the purchase price increases every five years according to a formula set by the Lease, it is not "fixed." BLT contends that the fixed nature of the formula, which results in a purchase price below fair market value, renders the purchase price "fixed." Dairy Farmers has the better view of

---

[443] *See, e.g.*, *Franklin*, 388 Mass. at 769 (promoting owner occupancy in a condo complex is a worthwhile purpose); *Tucker*, 2023 WL 4862629, at *9 (avoiding litigation is a worthwhile purpose); *Luo*, 2019 WL 4309063, at *2 ("open spaces" for residents are a worthwhile purpose); *Gottlieb*, 2016 WL 3523859, at *7 ("build[ing] girls of courage, confidence, and character" is a worthwhile purpose); *but see Bonilla v. Najera*, 102 Mass. App. Ct. 435, 438-39 (2023) (no worthwhile purpose where party could identify none other than enforcing the agreement); *Brighton Park Assocs., LLC v. City of Boston*, No. 352084-LJL, 2008 WL 383442, at *2-*3 (Mass. Land Ct. Feb. 14, 2008) (where "the City has failed to articulate any public purpose at stake with the future use of locus," no worthwhile purpose is served by the option).

Massachusetts law: a definite purchase price is "fixed," whereas a price that increases over time in accordance with a formula, even if it does not keep up with inflation, is not "fixed." *See Tucker*, 2023 WL 4862629, at *1, *9 (set purchase price is fixed); *Brighton Park*, 2008 WL 383442, at *1-*2 (same).

While the weight of the "reasonableness" factors favors Dairy Farmers, the corresponding "unreasonableness" factors confirm that the restraint imposed by the Option to Purchase is reasonable. There is no evidence that the restraint is "capricious" or "imposed for spite or malice." *Franklin*, 388 Mass. at 766 n.6. As discussed, Dairy Farmers has an interest in the land, its enforcement of the restraint advances a worthwhile purpose, and the restraint is not of unlimited duration. *See id.* The only "unreasonableness" factor that favors BLT—that the Option to Purchase prohibits alienation to a large group—cannot overcome the weight of the other factors that favor Dairy Farmers. The Court accordingly concludes that the Option to Purchase is not an unreasonable restraint against alienation of the Franklin Premises.

B.    The Balance of Equities Favors Specific Performance.

BLT next asks the Court to exercise its equitable discretion to deny Dairy Farmers specific performance as a remedy for BLT's breach of contract. Massachusetts law holds that "'real property is unique and that money damages will often be inadequate to redress a deprivation of an interest in land.'" *McCarthy v. Tobin*, 429 Mass. 84, 89 (1999) (quoting *Greenfield Country Estates Tenants Ass'n, Inc. v. Deep*, 423 Mass. 81, 88 (1996)). The remedy of specific performance "therefore 'is usually granted with respect to contracts to convey land.'" *Pierce*, 66 Mass. App. Ct. at 914 (quoting *Raynor v. Russell*, 353 Mass. 366, 367 (1967)). The trial evidence demonstrated that, because of the degree of capital investment needed for milk processing plants and the difficulty of transferring the equipment in such plants to a different location, businesses that own

100

milk processing plants usually own the land on which the plants sit. Accordingly, the Court concludes that damages would not be an adequate remedy for Dairy Farmers. *See* M.G.L. c. 214, § 1A; *Atlantech Inc. v. Am. Panel Corp.*, 540 F. Supp. 2d 274, 285 n.73 (D. Mass. 2008) ("[W]here damages are an inadequate remedy and the nature of the contract is such that specific enforcement of it will not involve too great practical difficulties, equity will grant a decree of specific performance.'" (quoting *Sanford v. Boston Edison Co.*, 316 Mass. 631, 634 (1944))).

Nevertheless, the Court has authority to limit or deny specific performance when that remedy would impose an undue hardship or would otherwise be grossly unfair. *See, e.g.*, *Curley v. Mobil Oil Corp.*, 860 F.2d 1129, 1134-35 (1st Cir. 1988); *Peters v. Wallach*, 366 Mass. 622, 628 (1975). BLT principally contends that specific performance is unfair because the purchase price for the Franklin Premises under the Option to Purchase, about $9.6 million, is 20% of the fair market value of the land today which, viewed most favorably to BLT, is $48.7 million. But under Massachusetts law, "[s]pecific performance [may] not be refused merely because the [purchase] price is inadequate or excessive." *Peters*, 366 Mass. at 628. Unless the owner of land bears some responsibility for the increase in value of the land, an increase in value after the contract—assuming the deal was fair—is not a reason to deny specific performance. *See Normandin v. Eastland Partners, Inc.*, 68 Mass. App. Ct. 377, 391-92 (2007) (where the property value increase was not due to owner's efforts, no reason to deny specific performance); *Costello v. Pet Inc.*, 17 Mass. App. Ct. 382, 387-88 (1984) (same). BLT has pointed to no evidence that it—as opposed to the businesses—has made improvements to or contributed to the increase in value of the Franklin Premises since the land was separated from the processing plant and other facilities. Nor has BLT pointed to any case in which the increase in the value of land was grounds to deny specific performance of an otherwise valid option to purchase. While there is no question

that Dairy Farmers is getting a bargain, a purchase price of 20% of the total value of the property does not, without more, impose an undue hardship on BLT. *See Quinn v. Mar-Lees Seafood, LLC*, 69 Mass. App. Ct. 688, 705-06 (2007) (overturning refusal to order specific performance where there was no evidence of fraud or mistake, but trial court thought it was an unfair deal); *cf. Brighton Park*, 2008 WL 383442, at *1-*3 (unreasonable restraint on alienation where option was fixed at $6,500, just over 1% of the property's $495,000 market value).[444]

BLT next suggests that specific performance is unfair because Dairy Farmers did not allocate money toward acquiring the Option to Purchase in formulating its bid on Dean Foods assets in the Bankruptcy Court. This argument fails for multiple reasons. First, the trial testimony revealed that Dairy Farmers did not know about the Option to Purchase at the time of the bid. Dairy Farmers was unaware of the Option to Purchase because Alan Bernon—a member of BLT and an executive at Dairy Farmers, with fiduciary duties to the company—failed to disclose that information. Second, insofar as BLT objects to Dairy Farmers' failure to allocate value to the land, Gregory Wickham explained that Dairy Farmers did not allocate value to *any* land that was rented, rather than owned, by a company it wished to bid on. BLT points out that, after Dairy Farmers' bid and discovery of the Option to Purchase, Dairy Farmers considered, but ultimately rejected, selling off certain portions of the Franklin Premises. But BLT has done the same thing: in 2010,

---

[444] Furthermore, an exercise of an option to purchase will usually occur when the purchase price is less than fair market value. Unlike a right of first refusal, which must be exercised or lost, a purchase option is an option. It is likely to be exercised—especially by a business—only when it is financially prudent to do so. Thus, an obvious factor in deciding to exercise a purchase option is whether doing so would allow the buyer to acquire land at below market prices. Alan Bernon acknowledged as much in an email around the time Garelick Farms, LLC could have first exercised the Option to Purchase in 2012, writing: "They may not want to spend 8 million in this market without the ability to turn around and sell some of the un[n]eeded land right away to recoup part of their investment." Exhibit 72, at 1.

2014, and 2020, its members and trustee or manager sought to regain and then sell off portions of the Franklin Premises. The equities do not, accordingly, favor BLT on this argument.

BLT protests that specific performance is unfair because "BLT's primary beneficiary, Elinor[,] . . . was not paid *any* money by Suiza in connection with Suiza's acquisition of Garelick in 1997." ECF 150, ¶ 246 (emphasis in original). The reason Elinor was not paid any money in connection with that transaction, aside from the 15 years of guaranteed rental income, has nothing to do with Dairy Farmers or Suiza. The reason is that she had previously sold her stock in Garelick Farms, Inc. to her sons. If Alan and Peter Bernon—sophisticated businessmen who were the owners of Garelick Farms, Inc. in 1997—thought their mother should have received more compensation for the Suiza transaction, they could have arranged for some of their $300 million to go to her. There is no evidence that they did so. In contrast, the Stock Purchase Agreement did state that their sister, Ronnie Bernon Gallina, was to receive $900,000 in connection with the sale of Garelick Farms, Inc. to Suiza, although, as Ronnie testified, she was never in fact paid.

Finally, BLT contends that denying specific performance would not prejudice Dairy Farmers because it can continue to lease the plant at below-market rates. This reality does not justify denying specific performance. Dairy Farmers is indeed getting a good deal, and one it was not aware of when it bid on Garelick Farms, LLC in bankruptcy. But it is a deal that Dairy Farmers paid for, and one that BLT agreed to when it knowingly signed an Option to Purchase with a corporation—Garelick Farms, Inc.—that was to be sold the following day to a company whose business strategy consisted of mergers and acquisitions in the dairy industry. Dairy Farmers now runs the milk processing plant on the Franklin Premises, invests in the plant's operations, and employs local workers. In light of all of the circumstances, the Court will award specific performance of the Option to Purchase to Dairy Farmers.

C.    Dairy Farmers Is Not Entitled to Restitution for Rent Paid Since March 2022.

In its Revised Proposed Findings of Fact and Conclusions of Law, Dairy Farmers additionally requests that, in calculating the purchase price for the Franklin Premises, the Court credit it all the rent it has paid to BLT since BLT breached the Option to Purchase for failing to appear at the closing in March 2022. ECF 148, ¶ 204. That amount is now approximately $3 million. *See id.*

The Court declines to award Dairy Farmers this additional form of equitable relief. *See Nissan Autos. of Marlborough, Inc. v. Glick*, 62 Mass. App. Ct. 302, 311 (2004) (describing the "equitable nature" of the remedy sought by Dairy Farmers). Dairy Farmers did not seek restitution or a credit against the purchase price in its amended complaint; that pleading sought only specific performance as the remedy for the breach of the Option to Purchase. *See* ECF 9, ¶ 47 & p. 11-12 (Prayer for Relief). Nor did Dairy Farmers raise its request for a restitutionary credit in briefing the parties' cross-motions for summary judgment, or in the Proposed Findings of Fact and Conclusions of Law it submitted to the Court before trial. *See* ECF 125-1, ¶¶ 144, 160 (requesting specific performance for breach of the Option to Purchase and damages, "in the form of the difference between the amount that the Trust has required [Dairy Farmers] to pay in rent since March 2022, and the correct amount of rent pursuant to the Lease," for breach of the Lease). The first time Dairy Farmers sought a credit against the purchase price came in passing at the tail end of closing arguments, *see* ECF 142, at 104:22-105:5 (asking the Court to "order specific performance" and give Dairy Farmers "restitutionary credit for the rent paid from the time of breach, which is March of '22 through the closing"), and then again in one paragraph in Dairy Farmers' post-trial Revised Proposed Findings of Fact and Conclusions of Law, *see* ECF 148, ¶ 204. Although Dairy Farmers' request is not unreasonable under Massachusetts law, *see Nissan*

*Autos. of Marlborough*, 62 Mass. App. Ct. at 311, its untimeliness deprived BLT of a meaningful opportunity to respond to this demand for additional equitable relief. In the exercise of its equitable discretion, the Court accordingly declines to credit against Dairy Farmers' purchase price the entirety of the rent payments made to BLT since March 2022. *See Texaco P.R., Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 874 (1st Cir. 1995) ("[R]estitution is a remedy *ex gratia* that a court will withhold when the justice of the case does not call for it." (quotation mark omitted)).

## III.     The Lease Claims.

Dairy Farmers' second breach-of-contract claim contends that BLT breached the Lease when, in June 2020, it insisted for the first time on a new method for calculating rent, starting in 2022. BLT seeks declaratory judgment that its new method of calculating rent is correct. Since March 2022, Dairy Farmers has paid rent according to BLT's method of calculation under protest.

Section 3.02 of the Lease, which governs rent, reads: "The fixed annual rental for each five (5) year option period shall be equal to the lesser of (a) one hundred fifteen percent (115%) of the fixed annual rental payable during the preceding five (5) year period, multiplied by the change in the Cost of Living, measured by the Consumer Price Index."[445] The Court determined on summary judgment, and the parties agree, that this provision is ambiguous. Dairy Farmers contends that under the provision, the new rent for a five-year Lease term is calculated by multiplying the rent during the prior five-year term by the lesser of 115% *or* the CPI. BLT argues that the rent should be calculated for each new five-year term by multiplying the prior term's rent by 115% *and* the CPI increase. To assess the parties' intent behind the ambiguous language, the Court again looks first to extrinsic evidence concerning the parties' negotiations, and then to extrinsic evidence concerning the course of performance under the Lease. *See Mercury Sys.*, 820 F.3d at 52.

---

[445] Exhibit 2, Indenture of Lease, § 3.02.

Neither party has introduced meaningful evidence of BLT's or Garelick Farms, Inc.'s intent during the 1986 negotiations over the Lease. Referencing Alan Bernon and Ronnie Bernon Gallina's pretrial declarations, BLT contends that the original "intent of the Lease was to provide as much rent as possible to Elinor." ECF 150, ¶ 258. In her pretrial declaration, Ronnie Bernon Gallina averred, "my brothers and I intended for the rent to be calculated such that it incorporated adjustments for inflation over time and kept up with the fair market rental value of comparable properties."[446] Similarly, in his pretrial declaration, Alan Bernon averred that he and his brothers "wanted Elinor to receive the maximum amount of rent possible and would not have agreed to be a party to a Lease that calculated the rent as less than market value."[447] These pretrial statements were, however, inconsistent with Ronnie and Alan's trial testimony. Ronnie testified that (1) she had no role in the negotiation or formation of the Lease; (2) she was not consulted as the Lease was being drafted; (3) she never met or spoke to Ralph Semonoff, Elinor's attorney, who drafted the Lease; and (4) she first read the Lease in 2020.[448] Her lack of involvement in the negotiations over the Lease renders her pretrial claims regarding her intent in developing the Lease wholly incredible. Similarly, Alan testified that he and his brothers "didn't have any input in [the] lease."[449] He also testified that the Lease sought to give Elinor an income stream to compensate for her selling her Garelick Farms, Inc. stock at a preferred rate to her sons, but he did not say that the intent was to give Elinor the *greatest possible* income stream.[450] In light of Alan Bernon and

---

[446] Exhibit 179, Declaration of Ronnie Bernon Gallina, ¶ 18.

[447] Exhibit 178, Declaration of Alan Bernon, ¶ 11.

[448] ECF 146, at 184:14-185:5, 199:15-201:20, Testimony of Ronnie Bernon Gallina; *see* ECF 146, at 15:1-16, 95:18-20, Testimony of Alan Bernon.

[449] ECF 146, at 95:18-20, Testimony of Alan Bernon. Peter Bernon, who signed the Lease on behalf of Garelick Farms, Inc. did not submit an affidavit or testify at trial.

[450] ECF 146, at 15:1-16, Testimony of Alan Bernon.

Ronnie Bernon Gallina's trial testimony, the Court does not credit their pretrial claims that the negotiating parties wished to give *as much rent as possible* to Elinor. At most, the evidence shows that the negotiating parties wished to give Elinor *an* income stream through the Lease.[451] There is no contemporaneous evidence about *how* the negotiating parties intended rent to be calculated under Section 3.02 of the Lease.

In contrast, Dairy Farmers introduced ample, and unrebutted, evidence about the course of performance under the Lease. The evidence showed that every rent calculation agreed to by the parties from 1992 to 2020 aligned with Dairy Farmers' interpretation of Section 3.02 of the Lease. And until the bankruptcy proceedings, everyone who discussed how to calculate rent agreed with Dairy Farmers' interpretation. Robert Berkelhammer emailed Alan Bernon in 2006 about "what we believe is the intent" of Section 3.02—"namely the rent will increase by the lesser of the CPI increase or 115%."[452] Five years later, in 2011, Paul Bernon similarly emailed Alan Bernon, explaining that "[t]he Lease has extensions through 2087, with the rent going up by the lesser of: 115% every five years or CPI."[453] There is no evidence supporting BLT's position—that rent is calculated by multiplying the prior term's rent by 115% *and* CPI—over the 28 years of the parties' performance from 1992 to 2020. Further, Drew Kaplan's admissions that his "fresh set of eyes" led to a "different interpretation" of Section 3.02 in 2020,[454] and that he did not discuss "prior

---

[451] No witness testified that the rent was intended to reflect market rates. Nor did any witness testify that Elinor was not adequately supported under the old rental calculation.

[452] Exhibit 204, December 12, 2006 Email from Berkelhammer to Alan Bernon (emphasis added).

[453] Exhibit 72, February 2011 Emails between Alan and Paul Bernon, at 1.

[454] ECF 144, at 253:20-23, 254:5-12, Testimony of Drew Kaplan.

interpretations" with members of BLT,[455] suggests that BLT's new interpretation is not reflective of the original intent of the parties.[456]

The weight of the extrinsic evidence favors Dairy Farmers' interpretation of Section 3.02. Where the parties each offer reasonable interpretations of ambiguous contractual language, but where there is strong extrinsic evidence in favor of Dairy Farmers' interpretation and virtually no evidence in favor of BLT's interpretation, this Court concludes that Dairy Farmers' interpretation more accurately reflects the intent of the drafting parties. *See New York Cent. R. Co. v. Stoneman*, 233 Mass. 258, 262-63 (1919) (explaining, under similar circumstances, that course of performance evidence is "of great importance" in determining an ambiguous provision's meaning). BLT has, accordingly, breached the Lease by insisting, since March 2022, on receiving rent from Dairy Farmers measured by multiplying the prior term's rent by 115% *and* CPI.

Acquiescing in BLT's method, Dairy Farmers has been paying under protest a fixed annual rent of $1,289,339.54, with fixed monthly installments of $107,444.96, each month since March 2022. Under its correct method, Dairy Farmers should have paid an annual rent of $1,105,286.71, with monthly installments of $92,107.23. Having overpaid BLT by $15.337.73 every month since March 1, 2022, Dairy Farmers is entitled to 35 months of damages, or $536,820.55. In addition, under Massachusetts law, prejudgment interest is mandated "[i]n all actions based on contractual obligations" at a rate of "twelve percent per annum from the date of the breach or demand" to the entry of judgment when, as here, the contract does not specify a different interest rate. M.G.L.

---

[455] ECF 144, at 255:2-7, Testimony of Drew Kaplan.

[456] BLT argues that the course of conduct between it and *Dairy Farmers* supports its interpretation, because it has put forward its new interpretation as long as Dairy Farmers has been its tenant. BLT cites no case law for the proposition that the course of performance evidence is inapplicable to successors-in-interest. Such a rule would improperly allow a party to rewrite ambiguous language in contracts to its advantage, and against the intent of the original parties, whenever a contractual interest was transferred.

c. 231, § 6C; *see Fratus v. Republic Western Ins. Co.*, 147 F.3d 25, 30 (1st Cir. 1998) ("In diversity cases, state law must be applied in determining whether and how much pre-judgment interest should be awarded."). Dairy Farmers is, accordingly, entitled to $187,607.75 in pre-judgment interest, calculated from March 1, 2022 to the date of entry of judgment.

## CONCLUSIONS AND ORDERS

For the foregoing reasons, Bernon Land Trust, LLC is liable to Dairy Farmers of America, Inc. for breach of the Option to Purchase contract, dated July 30, 1997. Dairy Farmers is entitled to specific performance of the Option to Purchase. Bernon Land Trust is ORDERED, no later than February 27, 2025, to sell and convey the Franklin Premises, as defined in Exhibit A to the Option to Purchase, to Dairy Farmers, in exchange for a purchase price of $9,611,188.80, which is ten times the annual rent in effect when Dairy Farmers sent its Notice of Exercise of Option.

Further, Bernon Land Trust is liable to Dairy Farmers for breach of the Indenture of Lease, dated December 30, 1986. Dairy Farmers is hereby awarded damages from Bernon Land Trust in the amount of $536,820.55. In accordance with M.G.L. c. 231, § 6C, Dairy Farmers is further awarded $187,607.75 in pre-judgment interest on those damages.

In accordance with Section 15 of the Option to Purchase, Dairy Farmers, as the prevailing party, is hereby awarded reasonable costs and attorney's fees. Pursuant to Federal Rule of Civil Procedure 54(d), Dairy Farmers shall file an application for such costs and fees within 45 days of this Order. BLT shall have 30 days to respond to any such application.

SO ORDERED.

/s/ Julia E. Kobick_____
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

Dated: January 28, 2025